UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                          CRIMINAL NO. 3:17-cr-00140-DPJ-FKB-2

HEATHER ELIZABETH WRIGHT-BEARD



TRIAL TRANSCRIPT
VOLUME 1



BEFORE THE HONORABLE DANIEL P. JORDAN III
CHIEF UNITED STATES DISTRICT JUDGE
AND A JURY
JUNE 13, 2018
JACKSON, MISSISSIPPI



APPEARANCES:

FOR THE GOVERNMENT:   MS. KEESHA D. MIDDLETON
                      MS. JENNIFER CASE

FOR THE DEFENDANT:    MR. ROBERT THOMAS RICH



REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____

501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

# TABLE OF CONTENTS

OPENING STATEMENTS:

Opening Statement by Ms. Case .........................5

Opening Statement by Mr. Rich .........................7

    Exhibit G-1 for ID ..............................10

    Exhibit G-2 for ID ..............................10

DALE STALLINGS                                        11

    Direct Examination By Ms. Middleton ...............11

    Exhibit G-16(a) ..................................16

    Exhibit G-18(a) and G-18(b) .....................19

    Exhibit G-3 through G-15 ........................22

    Exhibit G-19 ....................................28

    Exhibit G-27(a) through G-27(b) .................30

    Exhibit G-28(a) through G-28(c) .................30

    Exhibit G-29(a) through G-29(r) .................30

    Exhibit G-30(a) through G-30(b) .................31

    Exhibit G-31(a) through G-31(b) .................31

    Exhibit G-32(a) through G-32(c) .................31

    Exhibit G-33(a) through G-33(j) .................31

    Exhibit G-34(a) through G-34(j) .................31

    Exhibit G-35(a) through G-35(d) .................31

    Exhibit G-36(a) .................................31

    Exhibit G-37(a) through G-37(g) .................31

    Exhibit G-38(a) through G-38(j) .................31

Exhibit G-39(a) through G-39(c)  .................31

Exhibit G-20  ....................................37

Cross-Examination By Mr. Rich  .....................39

Redirect Examination By Ms. Middleton  .............46

DEVIN RICE                                          48

Direct Examination By Ms. Case  ....................48

Cross-Examination By Mr. Rich  .....................61

Redirect Examination By Ms. Case  ..................66

1    (Voir Dire, Jury Selection, and Preliminary Instructions

2    Not Transcribed)

3    (Jury In)

4    THE COURT:  So the trial will now begin.  First the

5    government will make an opening statement which is simply an

6    outline to help you understand the evidence as it comes in.

7    Next the defendants' attorney may, but is not required to, make

8    an opening statement.  Open statements are neither evidence nor

9    arguments.

10    The government will then present its witnesses, and

11    counsel for the defendant may cross-examine them.  Following

12    the government's case, the defendant may, if she wishes,

13    present witnesses whom the government may cross-examine.  After

14    all the evidence is in, I will instruct you on the law, and the

15    attorneys will present their closing arguments to summarize and

16    interpret the evidence for you.  After that, you will retire to

17    deliberate on your verdict.

18    All right.  Ms. Middleton, how much time do you

19    need -- or Ms. Case?

20    MS. CASE:  Not more than ten minutes, Your Honor.

21    THE COURT:  Would you like a warning?

22    MS. CASE:  Not necessary.  Thank you.

23    THE COURT:  All right.  Thank you.

24    MS. CASE:  May it please the court.

25    THE COURT:  Yes, ma'am.

OPENING STATEMENT FOR THE GOVERNMENT

MS. CASE:  Ladies and gentlemen, a few years ago the defendant, Heather Wright-Beard, met the man who would become her husband, David Beard.  Even before they married, Mr. and Ms. Beard began their live at one.  They lived together near Vicksburg, Mississippi, while they renovated a modest home in west Jackson.

In March 2016 they moved into that home.  A few months later, Mr. Beard pled guilty and admitted his role in a home invasion.  He was out of prison while he waited to be sentenced.  Mr. Beard expected he would be in prison for some time so he and the defendant, his fiance, made plans to take care of Ms. Beard while Mr. Beard was in prison.

One way that Mr. Beard sought to help his wife was by marrying her.  Yes, he married her for love.  But one motivation for the timing of the Beard's marriage was that Mr. Beard would soon be in prison.  By not delaying their marriage ceremony, Mr. Beard ensured that his wife would have access to his accounts and assets and that she could visit him in prison.

Mr. Beard helped his wife financially in other ways as well.  He moved items out of the building that he owned so that his wife could rent it and have a source of income.  He even sold his personal property to raise money for her.

Mr. Beard also did several things to give his wife

security during the time that she would have to live alone in west Jackson without him.  He bought her a dog for protection.  He installed security cameras in their home, and he bought his wife a gun.

That gun is one of two guns that brings us here today.  You see, neither Mr. Beard for Ms. Beard could legally have a gun.  They are both convicted felons.  One consequence of their felony convictions is they cannot possess a gun.  Ms. Beard cannot own a gun.  She cannot use a gun.  She cannot have easy access to a gun.  And your task is to determine whether the defendant possessed a gun.

The parties agree there were two guns in the home.  The parties also agree that the defendant is a convicted felon.  The only dispute is whether Ms. Beard possessed a gun around December 2, 2016.  She did.

The court will tell you what it means to possess a gun.  Possession does not require ownership.  It simply requires that a person have control over a gun or that she be able to exert control over it.  More than one person can possess the same gun, and consider the meaning of possession as you hear testimony from the witnesses in this trial.

The government anticipates that you will hear testimony about two guns.  First, you will hear that around the time of their marriage in September of 2016, the defendant and her husband went to purchase a small revolver.  They bought the

gun for the defendant's protection.  The defendant held the

gun, confirmed that she liked it, and maintained control over

it.  She often kept the gun by her bed, and she kept ammunition

for that gun in her closet.

You will also hear that the defendant knew that a

rifle was in her home.  The rifle was in an unlocked gun safe

in an unlocked closet in the middle of the home.  The rifle sat

alongside the defendant's pellet gun.  The ammunition in the

defendant's closet also fit the rifle.

The defendant knew that these guns were in her home.

She had easy access to both of them.  We have the burden of

proving to you beyond a reasonable doubt that the defendant

knowingly possessed at least one of these two guns.  We embrace

our burden and our opportunity to present this case to you.

And at the end of this trial, Ms. Middleton and I will

ask you to return the verdict that the facts and the law

demand, to find the defendant, Heather Wright-Beard, guilty.

Thank you.

THE COURT:  All right.  Thank you.  Mr. Rich, do you

wish to make an opening statement?

MR. RICH:  I do, Your Honor.

OPENING STATEMENT FOR THE DEFENDANT

MR. RICH:  Ms. Case is correct.  The only issue in

this case is knowing possession.  Both sides stipulate that

Ms. Beard is a convicted felon.  She has been convicted of a

felony.  Both sides agree that there were two guns found in the home.  But what we disagree about is knowing possession, knowing possession.

I believe the evidence will show that when law enforcement came into the home a year and a half ago, December 2, 2016, that the Winchester rifle that you heard mention of was concealed in a gun cabinet.  I believe that you'll also hear testimony that a Taurus pistol was found, was concealed in a bag behind the mirror.

I believe you'll hear testimony that no one from law enforcement saw Mr. Beard possess a gun.  The only testimony that I believe you'll hear is from her husband, who has pled guilty in this case, that Ms. Beard ever possessed either gun. I believe that's the only testimony that you will ever hear of that.

So at the end of the day, that and a lot more evidence that you're going to hear, I believe when you have the decision of knowing possession, we're going to ask you to find the defendant not guilty on this charge.

THE COURT:  All right.  Thank you.  Does either party wish to invoke the rule?

MS. MIDDLETON:  Yes, Your Honor.  The government would like to invoke.

THE COURT:  All right.  I don't know any of the witnesses.  So if there's -- I'll ask the parties to monitor

1    that.  Are there any in the courtroom?  There's no one in the

2    courtroom for the government.

3              MR. RICH:  Not for the defense, Your Honor.

4              THE COURT:  All right.  Thank you.  The government

5    call its first witness.

6              MS. MIDDLETON:  Your Honor, if I may, before I call my

7    first witness, the government and the defense have a couple of

8    stipulations that we would like to read into the record.

9              THE COURT:  Okay.  Give me one second.

10     (Short Pause)

11             THE COURT:  All right.  Ladies and gentlemen, as you

12   just heard, the parties have entered into an agreement or

13   stipulation as to certain facts.  That means that both sides

14   agree as to what those facts are.  You may treat those facts as

15   having been proven in this case.

16             All right.  Ms. Middleton.

17             MS. MIDDLETON:  Your Honor, the first stipulation is

18   as follows:

19             The government and the defendant stipulate and agree

20   that the Taurus brand model 94 Ultra-Lite 9 bearing serial

21   number RG69194, .22 caliber revolver found at the residence of

22   the defendant, Heather Elizabeth Wright-Beard, on December 2,

23   2016, is a firearm and was manufactured in Brazil.  Prior to

24   December 2nd of 2016, the firearm traveled in and affected

25   interstate and foreign commerce.

1        The government and the defendant stipulate and agree

2 that the Winchester brand model 67A .22 caliber rifle bearing

3 no serial number found at the residence of the defendant,

4 Heather Elizabeth Wright-Beard, on December 2, 2016, is a

5 firearm and was manufactured in Connecticut prior to

6 December 2, 2016.  The firearm traveled in and affected

7 interstate commerce.

8        This stipulation has been signed by the government,

9 Keesha Middleton, and for the defendant, Tom Rich.  It is

10 denoted by Government's Exhibit G-2.

11        We have a second stipulation.

12        THE COURT:  Okay.

13        MS. MIDDLETON:  The government and the defendant

14 stipulate and agree that the defendant, Heather Elizabeth

15 Wright-Beard, is a convicted felon.  Heather Elizabeth

16 Wright-Beard had previously been convicted of a crime

17 punishable by imprisonment for a term in excess of one year,

18 that is, a felony, at the time of the crime alleged in the

19 indictment.

20        It has been signed by the government and by the

21 defendant and is denoted by Government's Exhibit G-1.

22        THE COURT:  Okay.  I'll, I guess, mark those for

23 identification purposes as G-1 and G-2.  If you can approach.

24     (Exhibit G-1 for ID marked)

25     (Exhibit G-2 for ID marked)

1          THE COURT:  Yes.

2          MS. MIDDLETON:  Your Honor, the government calls

3   Special Agent Dale Stallings.

4      (Witness Sworn)

5          MS. MIDDLETON:  May I proceed?

6          THE COURT:  Yes.

7                         DALE STALLINGS,

8     having first been duly sworn, testified as follows:

9                       DIRECT EXAMINATION

10  BY MS. MIDDLETON:

11  Q   Good afternoon.

12  A   Good afternoon.

13  Q   Would you please state and spell your name for the record.

14  A   Dale Stallings D-A-L-E S-T-A-L-L-I-N-G-S.

15  Q   Mr. Stallings, where are you employed?

16  A   I work for the Bureau of Alcohol, Tobacco, Firearms, and

17  Explosives.

18  Q   Is that commonly known as ATF?

19  A   It is.

20  Q   What's your position with ATF?

21  A   I'm a special agent.

22  Q   How long have you worked as a special agent with ATF?

23  A   For approximately ten and a half years.

24  Q   Agent Stallings, were you working as a special agent on

25  December 2 of 2016?

A    I was.

Q    And did you participate in the execution of an arrest

warrant and search warrant on that particular date?

A    I did.

Q    Do you recall the location?

A    Yes.  It was at 4645 Van Winkle Park Drive in Jackson,

Mississippi.

        THE COURT:  Let me -- can everybody on the jury hear

him okay?

BY MS. MIDDLETON:

Q    I believe the last question was at what location, and you

said 4645 Van Winkle Park Drive?

A    That's correct.

Q    Is that location within the Southern District of

Mississippi?

A    It is.

Q    Agent, I want to turn your attention to the execution of

the arrest warrant at 4645.  What was your role?

A    My role during the execution of the warrant was to provide

perimeter security around the building.

Q    For those of us who are not law enforcement and not

familiar with perimeter security, what does that entail?

A    Generally you have a couple of agents or officers who take

a position on the corners of the buildings to where they have a

view of any exterior windows or doors in order to provide

1   safety in case anything should happen from those locations.

2   Q   Okay.  While serving as perimeter, who executed the arrest

3   warrant?

4   A   It was the United States Marshal's task force.

5   Q   Do you know who they were arresting?

6   A   They had a warrant for David Beard.

7   Q   At the time that arrest warrant was executed, do you know

8   how many people were in the residence at that time?

9   A   There were two occupants in the residence.

10   Q   Who were they?

11   A   It was David Beard and Heather Wright-Beard.

12   Q   Do you see Heather Wright-Beard in the courtroom today?

13   A   I do.

14   Q   Please point her out and identify what she's wearing.

15   A   She's sitting at the defense table wearing a black jacket

16   and a white blouse.

17        MS. MIDDLETON:  Let the record reflect that the

18   witness has identified the defendant, Heather Elizabeth

19   Wright-Beard.

20        THE COURT:  It will.

21   BY MS. MIDDLETON:

22   Q   When the marshals executed the arrest warrant, what, if

23   anything, was found?

24   A   During the execution of the arrest warrant, the marshals

25   observed a shotgun shell in plain view.

1   Q   When you say "in plain view," do you know where exactly it

2   was?

3   A   It was in a closet sitting on top of a gun safe.

4   Q   What's significant about the finding of a shotgun shell?

5   A   Prior to the execution of the warrant, the marshals task

6   force had information that David Beard was a convicted felon.

7   Q   What does that mean in relation to the shotgun shell?

8   A   That means he's prohibited from possessing any firearms or

9   ammunition.

10   Q   After the finding of the shotgun shell, what happened?

11   A   After the shotgun shell was discovered, ATF sought a search

12   warrant.

13   Q   Did they get a search warrant?

14   A   They did.

15   Q   Once a search warrant was received or once ATF got the

16   search warrant, does ATF do anything in particular before

17   actually going in and physically searching the residence?

18   A   We will document the scene.  We will do a -- we'll take

19   photographs of the exterior of the building, do a video

20   walk-through prior to the search to show the condition of the

21   residence, and we will do a rough sketch of the floor plan of

22   the residence.

23   Q   Let's talk a little bit about the video.  Did you say why

24   you video the residence?

25   A   Yes, just to show the condition of the residence prior to

1    the search.

2    Q    Who took that video?

3    A    I did.

4    Q    Did you download that video on any type of media?

5    A    I downloaded it to a DVD.

6         MS. MIDDLETON:  May I approach the witness?

7         THE COURT:  Yes.

8    BY MS. MIDDLETON:

9    Q    I'm handing you what's previously been marked as

10   Government's Exhibit G-16(a).  Do you recognize it?

11   A    I do.

12   Q    What is it?

13   A    It's a DVD containing the recording of the pre-search

14   walk-through.

15   Q    You have reviewed it before?

16   A    I have.

17   Q    How do you know?

18   A    I initialed it after reviewing it.

19   Q    Is this copy -- a true and correct copy of the video that

20   you took of 4645 Van Winkle Park Drive on February 2, 2016.

21   A    It is.

22        MS. MIDDLETON:  At this time, we would like to offer

23   into evidence Government's Exhibit G-16(a).

24        THE COURT:  Any objection?

25        MR. RICH:  No objection.

1          THE COURT:  G-16(a) is admitted.

2      (Exhibit G-16(a) marked)

3          MS. MIDDLETON:  May I retrieve the recording and

4  publish to the jury?

5          THE COURT:  Yes.

6  BY MS. MIDDLETON:

7  Q   While that's playing, can you please tell us what we're

8  seeing?

9      (Clip Played)

10  A   That's the front of the residence, the front door.

11  Q   Okay.  What's this one?

12  A   As you walk in, that's a kitchen area.

13  Q   There's a room to the left here?

14  A   Yes, living room area.

15  Q   Okay.  Now -- and the living area is right adjacent to the

16  kitchen.  What's this room you're walking into now?

17  A   Well, the one showing right now is a closet next to the

18  living room area.

19  Q   Okay.

20  A   To the left of that door is the entrance into the bedroom.

21  Q   This bedroom?

22  A   Yes.

23  Q   How many bedrooms are in the house?

24  A   There's one.

25  Q   And this is the condition the residence was in when you got

1 there, before the warrant was executed.  Correct?

2 A    Prior to the search warrant being executed.

3 Q    What's this area?

4 A    A small hallway.  There's a closet that is showing right

5 now.

6 Q    What's significant about this closet in particular?

7 A    That's the closet where the gun safe was located where the

8 shotgun shell was observed.

9 Q    What about this area?

10 A    That's a room.  It had a washer and dryer and I believe it

11 had a freezer in it as well.

12 Q    The video is kind of dark.  Were the lights off in some

13 areas?

14 A    Some of the lights were off.  That's a bathroom area.

15 Q    The size of the house, would you say large, small, or how

16 would you describe it?

17 A    The front of the residence I would describe it as being

18 small.  In the back there was a large garage which is what's

19 being shown on the video right now.

20 Q    This is the garage?

21 A    Yes.

22 Q    And that door that was showing there, is that the only way

23 to get into the garage or did you enter from the house?  Was it

24 two ways to get into the garage?

25 A    There's the interior door coming from the house, which is

1  the one I walked through in the video to reach this section,

2  and then there was the -- a garage door -- I don't believe we

3  ever opened that door or not.

4  Q   So pretty much of the rooms in the house, you have a living

5  room, bathroom, kitchen, bedroom, garage, gun closet.  There

6  weren't like two bathrooms, two bedrooms.  It was a pretty

7  small space.

8  A   That's correct.

9  Q   Other than the video, you also mentioned that a sketch or

10  drawing of the residence was done.

11  A   Yes.

12  Q   Did you prepare it?

13  A   I did not.

14  Q   Do you know who prepared it?

15  A   It was ATF Special Agent Edwin Reliford.

16  Q   Did you review it for its accuracy?

17  A   I did.

18      MS. MIDDLETON:  May I approach the witness?

19      THE COURT:  Yes.

20  BY MS. MIDDLETON:

21  Q   I hand you what's been previously marked as Government's

22  Exhibit G-18(a) and G-18(b).  Do you recognize it?

23  A   I do.

24  Q   What is it?

25  A   It's the sketch of the floor plan of the residence as well

1 as the second page is a legend where we designated each room

2 with a number.

3 Q   And do these exhibits fairly and accurately reflect the

4 layout of 4645 Van Winkle Park Drive as it existed on

5 December 7, 2016.

6 A   It does.

7        MS. MIDDLETON:  At this time, we would like to offer

8 G-18(a) and G-18(b) into evidence.

9        THE COURT:  Any objection?

10        MR. RICH:  No objection.

11        THE COURT:  G-18(a) and(b) are both admitted.

12    (Exhibit G-18(a) and G-18(b) marked)

13        MS. MIDDLETON:  May I publish to the jury?

14        THE COURT:  You may.

15 BY MS. MIDDLETON:

16 Q   Okay.  Agent Stallings, is this the sketch that you were

17 talking about in regards to the residence?

18 A   It is.

19 Q   And if you would, utilizing the screen, I want you to just

20 make a mark, whether it be an X, denoting and explaining each

21 one of the rooms that are shown on this drawing.

22 A   Right here is the kitchen area.

23 Q   Uh-huh.

24 A   This is the living room.  This is the --

25 Q   The master bedroom?

1  A    Yes.  The master bedroom.  It has the number 1 written in

2  it right next to the bed.

3  Q    And how many closets are in the residence?

4  A    There's a closet in the living room, and there's a closet

5  in the hallway.

6  Q    Let me help you here.  This -- is this the area in which --

7  the first closet you're talking about with the gun safe?

8  A    Yes, it is.

9  Q    Okay.  And there's a closet here?

10 A    Correct.

11 Q    And that's a closet in the living room?

12 A    It is.

13 Q    Okay.  And this is the only bedroom in the house.  Correct?

14 A    That's correct.

15 Q    Okay.  Let's talk -- go back to the execution of the search

16 warrant.  Once the video was taken, once you took the video,

17 what other role did you undertake?

18 A    My role after taking the video was to photograph any items

19 that were found that may have any evidentiary value.

20 Q    Did you participate in the search or just photograph?

21 A    No, I was photographing -- I was more or less floating from

22 room to room.  Whenever someone would find something, they

23 would request me to come photograph it.

24 Q    That was the procedure that they would let you know when

25 something was found and you would photograph?

1  A   That's correct.

2  Q   What, if anything, was found on that day at 4645?

3  A   There were firearms, ammunition, and drug paraphernalia

4  found.

5      MS. MIDDLETON:  Your Honor, may I ask the witness to

6  step down and examine Government's Exhibit G-3 through 15?

7      THE COURT:  Yes.

8  BY MS. MIDDLETON:

9  Q   Agent, I want to you examine all of these items and let me

10 know when you're done.

11 A   (Witness Examines Items)  I'm finished.

12 Q   Do you recognize those items?

13 A   I do.

14 Q   What are they?

15 A   That is all the evidence that was taken from the residence

16 during the search warrant.

17 Q   You took these items into evidence?

18 A   That's correct.

19 Q   And some of the items have seals on them in particular.

20 Were these items sealed when they were taken into evidence?

21 A   Once we retrieved the item from the residence and took them

22 back to our office, they were then packaged and sealed.

23 Q   Have they been open at any point in time prior to trial?

24 A   Yes, they have.

25 Q   When?

1   A   I wasn't present when it occurred, but I was informed that

2   some of the items were opened in order for them to be examined

3   by the defense.

4   Q   Other than review of the items by defense counsel, have

5   there been any other changes?

6   A   The only other knowledge I have is that one of the firearms

7   was test fired.

8   Q   Other than what you just stated, are these items in the

9   same or substantially the same condition as they were when they

10  were taken from 4645 Van Winkle Park Drive?

11  A   They are.

12          MS. MIDDLETON:  Your Honor, at this time we would like

13  to offer G-3 through 15 into evidence.

14          THE COURT:  Any objection?

15          MR. RICH:  No objection.

16          THE COURT:  All right.

17    (Exhibit G-3 through G-15 marked)

18          MS. MIDDLETON:  Your Honor, at this time I would ask

19  if Agent Stallings can open some of the items and publish to

20  the jury.

21          THE COURT:  You may.  Somebody has walked in.  I want

22  to just make sure it was not a witness in back to the left

23  here.

24          MR. RICH:  No.

25          MS. MIDDLETON:  No.

BY MS. MIDDLETON:

Q   All right.  Let's talk about first G-3.  Agent, what is G-3?

A   G-3 is a Winchester model 67A .22 caliber rifle.

Q   And where was this rifle found?

A   This rifle was found in the gun safe in the closet in the hallway.

Q   And in particular, the gun safe that was found in -- do you know whether or not that gun safe was open?

A   It was.

Q   Was this rifle test fired?

A   It was.

Q   Why?

A   We had received a statement from David Beard that he believed that it wasn't a functioning firearm and that he referred to it as a training rifle.

Q   Were you present for the test firing of this rifle?

A   I was.

Q   Did it function as a firearm?

A   It did.

Q   Let's take a look at G-4.  Agent Stallings, what is G-4?

A   G-4 is a Taurus model 94 Ultra-Lite 9, .22 caliber revolver.

Q   Do you know where there particular revolver was found?

A   Yes, it was found in the bedroom.

1    Q    Do you know who found it?

2    A    It was found by MBN Agent Devin Rice.

3    Q    Do you know what type of bullets this particular revolver

4    holds?

5    A    .22 caliber bullets.

6    Q    Do you know -- Agent, are you aware or do you know if any

7    .22 caliber bullets were found at 4645 Van Winkle Park Drive?

8    A    Yes, there were.

9    Q    Where?

10   A    There were -- it was .22 caliber ammunition.  There was one

11   found in the living room area.  There was a box containing

12   .22 caliber ammunition in the closet of the bedroom.

13   Q    And do you see that particular box anywhere in this

14   evidence here?

15   A    I do.  And make a correction.  I referred to it as a closet

16   in the bedroom.  It's a closet in the living room.

17   Q    Thank you.  Which exhibit has the .22 caliber bullets?

18   A    It's Government's Exhibit 5.

19   Q    Could you, please -- and inside of G-5, does it contain

20   currently right now .22 caliber bullets?

21   A    It does.

22   Q    Do you know how many of those bullets are in that box?

23   A    314.

24   Q    Let's discuss generally G-6 through G-15, beginning with

25   G-6.

A    G-6 is one round of .22 caliber ammunition.

Q    And, Agent, is that .22 caliber ammunition the same as the ammunition that's in G-5?

A    It is.

Q    Where was this found?

A    This was found in room number 2, which I believe is the living room area.

Q    Let's take a look at G-7.  What's contained in G-7?

A    G-7 is a camouflage box, and this box contains several magazines for different firearms.

Q    And where was this found?

A    This was found in the same closet that contained the gun safe.

Q    The same closet in which the Winchester rifle was found in?

A    That's correct.

Q    Right off the kitchen?

A    Yes.

Q    G-8.  What's contained in G-8?

A    G-8 contains 24 rounds of multi-caliber assorted ammunition.

Q    And there's several different caliber ammunition that's included in G-9?

A    Yes.  It was recovered from the same camouflage box.

Q    So the ammunition found in G-8 was inside the camouflage box that was in the gun safe?

1  A   That's correct.

2  Q   G-9:  What is G-9?

3  A   G-9 is one round of .22 caliber ammunition which was found

4  in room number 3, which is the bedroom.

5  Q   Okay.  Do you know on which side of the room it was found?

6  A   If you're standing at the foot of the bed in the bedroom

7  facing the bed, it would be on the left-hand side.

8  Q   Thank you.  Let's take a look at G-10.  What is G-10?

9  A   G-10 is six rounds of a sorted multi-caliber ammunition.

10 Q   Where was it found?

11 A   It was found in room number 5.

12 Q   Which is?

13 A   Which I believe refers to the closet -- the closet in the

14 hallway where the gun safe was located.

15 Q   G-11?

16 A   G-11 is a bag that contains 30 rounds of assorted

17 multi-caliber ammunition which was found in room 8, which is

18 the large garage at the back of the residence.

19 Q   G-12?

20 A   G-12 is 79 rounds of assorted multi-caliber ammunition

21 which was found in room 8.  That's the garage at the back of

22 the residence.

23 Q   Will you open it.

24 A   (Witness Complied with Request.)

25 Q   Now let's take a look at G- -- G-13.

1   A   G-13 is a black bag that contains 52 rounds of assorted

2   ammunition, and this item was found in room 8, the garage.

3   Q   Let's take a look at G-14 and G-15.

4   A   G-14 is an ammunition can which contains 483 rounds of

5   assorted multi-caliber ammunition.

6   Q   Finally let's take a look at G-15.  You're going to have to

7   pick that one up.

8   A   G-15 is a black plastic toolbox that contains 687 rounds of

9   multi-caliber ammunition.

10   Q   Where was that found?

11   A   This was found in room 8 the garage.

12   Q   In total, approximately how much ammunition was found at

13   the residence?

14   A   Approximately 1700 rounds.

15   Q   And this evidence was found where?  Just -- was it just

16   contained to one particular room or --

17   A   No, it was found throughout the residence.

18   Q   Of the evidence that was collected, was there any type of

19   list or anything to keep track of the evidence?

20   A   Yes.  We kept a property log.  As we found items, we would

21   document what was found.

22   Q   Okay.

23          MS. MIDDLETON:  May I approach?

24          THE COURT:  Yes.

25   BY MS. MIDDLETON:

1    Q   I hand you what has previously been marked as G-19.  Do you

2    recognize it?

3    A   I do.

4    Q   And what is it?

5    A   This is the property inventory list that was maintained

6    during the search.

7    Q   Did you prepare it?

8    A   I did not.

9    Q   Have you -- who prepared it?

10   A   This list I believe was prepared by Special Agent Edwin

11   Reliford.

12   Q   You have reviewed it for its accuracy?

13   A   I have.

14   Q   And is G-19 a true and accurate copy of the property

15   inventory list which reflects the evidence that was seized at

16   4645 Van Winkle Park Drive?

17   A   It is.

18           MS. MIDDLETON:  At this time, we would like to offer

19   Government's Exhibit G-19, which is two pages, into evidence.

20           THE COURT:  Any objection?

21           MR. RICH:  No objection.

22           THE COURT:  All right.  G-19 is admitted.

23      (Exhibit G-19 marked)

24           MS. MIDDLETON:  May I publish?

25           THE COURT:  Yes.

BY MS. MIDDLETON:

Q    This is page 1 of G-19.  What's the date on this document?

A    The date is December 2, 2016.

Q    Is that the same day on which the search warrant was executed?

A    It is.

Q    Does this document, including the page that's showing on the screen and including page 2, list everything that you seized from 4645?

A    It does.

Q    Now, you mentioned earlier that you were the photographer at the residence.

A    That's correct.

        MS. MIDDLETON:  May I approach?

        THE COURT:  Yes.

BY MS. MIDDLETON:

Q    Agent I've just handed you G-27(a) through G-27(b), G-28(a) through 28(c), G-29(a) through 29(r), G-30(a) and 30(b), G-31(a) and G-31(b), G-32(a) through G-32(c), G-33(a) through G-33(j), G-34(a) through G-34(j), G-35(a) through G-35(d), G-36(a), G-37(a) through G-37(g), G-38(a) through G-38(j) and finally G-39(a) through G-39(c).

    Please take a look at all those photos and let me know when you're done examining them.

A    (Witness Complied with Request)  I'm finished reviewing

1  them.

2  Q    Do you recognize those photos?

3  A    I do.

4  Q    What are they photos of?

5  A    These are photographs from when we executed the search

6  warrant.  They are photographs of the residents that were

7  present as well as items that were seized, and it's also

8  photographs of all the evidence collectively photographed.

9  Q    Do these photographs fairly and accurately depict the

10  residents that were present at the scene as well as the scene

11  and the evidence collected at 4645 Van Winkle Park Drive?

12  A    It does.

13         MS. MIDDLETON:  Your Honor, at this time we offer

14  Government's Exhibit G-27(a) through G-27(b), G-28(a) through

15  G-28(c), G-29(a) through G-29(r), G-30(a) through G-30(b),

16  G-31(a) through G-30(b) (sic), G-32(a) through G-32(c), G-33(a)

17  through G-33(j), G-34(a) through G-34(j), G-35(a) through

18  G-35(d), G-36(a), G-37(a) through G-37(g), G-38(a) through

19  G-38(j), and G-39(a) through G-39(c) into evidence.

20         THE COURT:  Any objection?

21         MR. RICH:  No objection.

22         THE COURT:  All right.  Those exhibits are admitted

23  into evidence.

24     (Exhibit G-27(a) through G-27(b) marked)

25     (Exhibit G-28(a) through G-28(c) marked)

1    (Exhibit G-29(a) through G-29(r) marked)

2    (Exhibit G-30(a) through G-30(b) marked)

3    (Exhibit G-31(a) through G-31(b) marked)

4    (Exhibit G-32(a) through G-32(c) marked)

5    (Exhibit G-33(a) through G-33(j) marked)

6    (Exhibit G-34(a) through G-34(j) marked)

7    (Exhibit G-35(a) through G-35(d) marked)

8    (Exhibit G-36(a) marked)

9    (Exhibit G-37(a) through G-37(g) marked)

10   (Exhibit G-38(a) through G-38(j) marked)

11   (Exhibit G-39(a) through G-39(c) marked)

12        MS. MIDDLETON:  Your Honor, may we publish?

13        THE COURT:  You may.

14   BY MS. MIDDLETON:

15   Q   I want to turn your attention to G-30(a).  What is this a

16   photo of?

17   A   That's a photograph of a piece of furniture --

18   Q   Uh-huh.

19   A   -- in the living room area, and there is a -- one round of

20   ammunition on top of the furniture.

21   Q   Would you please indicate utilizing your screen where the

22   ammunition is located?

23   A   (Witness complied with request).

24   Q   And you said that is a round of what, .22?

25   A   Yes.

1    Q    What is G-30(b)?

2    A    That's a close-up photo of the same round of ammunition.

3    Q    Okay.  Let me turn your attention to G-32(a).  What are we

4    seeing in this photo?

5    A    That is the closet in the living room area.

6    Q    Do you know what items of -- who those clothes are

7    attributable to?

8    A    The closet contained clothing for women as well as shoes.

9    Q    What are we seeing in 32(b)?

10   A    On the middle shelf is the black box containing the .22

11   caliber ammunition.

12   Q    Is this an interior shot of the same closet in G-31 -- that

13   was G-32(a), the previous photo?

14   A    It is.

15   Q    And these are the shoes that you're referring to?

16   A    That's correct.

17   Q    Okay.  And that photograph, the black box, is that the same

18   black box that's G-5?

19   A    It is.

20   Q    With the .22 rounds of ammunition?

21   A    Yes.

22   Q    What are we seeing in G-32(c)?

23   A    That's a photograph of the contents of the box.  That's .22

24   caliber ammunition and a couple of writing pens.

25   Q    Let's take a look at G-34.  What are we seeing in that

1   photograph of G-34(a)?

2   A   This is a photograph that was taken in the bedroom to

3   the -- if you're standing at the foot of the bed facing the bed

4   to the left against the wall, against the wall here is a

5   mirror, and down on the floor here is a black bag where the .22

6   caliber revolver was located.

7   Q   And is that the same .22 caliber revolver that is G-4?

8   A   Yes.

9   Q   Is this a photo of G-4?

10   A   It is.

11   Q   That's another shot of G-4?

12   A   It is.

13   Q   What are we seeing in G-34(e)?

14   A   This is a photograph on top of the bed of a cell phone.

15   Q   Where was this cell phone?

16   A   Cell phone was on the left side of the bed close to where

17   the black bag containing the revolver was found.

18   Q   On the floor, on the shelf, or where was it?

19   A   On the floor.

20   Q   When looking at G-29(c), we just discussed the cell phone.

21   Where in this photo is the cell phone?

22   A   It is on the floor right here.

23   Q   And earlier you mentioned a mirror.

24   A   Yes.

25   Q   Where is it in this photo?

1   A   The mirror is leaned against the wall right here.

2   Q   Okay.  So the area that we're looking at on the left of the

3   screen, is this -- does this photo represent a close-up shot of

4   that area in that corner?

5   A   Yes, it does.

6   Q   More particularly, this photo -- you indicated that a black

7   bag was found over in that corner.

8   A   That's correct.

9   Q   There are also some -- appears to be medicine bottles on

10  the floor there.

11  A   Correct.

12  Q   What is G-34(i)?

13  A   It's close-up of medication bottles that were on the floor

14  next to the mirror.

15  Q   What are we seeing here in G-34(a)?

16  A   That's a close-up of a few of the medicine bottles.

17  Q   What's the name on the medicine bottles?

18  A   Heather Wright.

19  Q   These are the same medicine bottles that were found on the

20  floor immediately near the black bag?

21  A   That's correct.

22  Q   What are we seeing in G-37(a)?

23  A   That's a photograph of the interior of the gun safe, and

24  that is the Winchester rifle.

25  Q   That's in the brown?

1   A   Yes.

2   Q   Thank you.  What were these two other items that are in

3   there?

4   A   Those were air rifles.

5   Q   And is it illegal to possess an air rifle?

6   A   No, it's not.  They are not considered firearms.

7   Q   What are we seeing in G-37(c)?

8   A   That's a photograph of the interior of the camouflage box

9   with the magazines.

10  Q   The same camouflage box that's on the table with the

11  magazines in it?

12  A   That's correct.

13  Q   That another photo of the camera box?

14  A   It is.

15  Q   What is this a photo of?

16  A   That's a photograph of the top of the gun safe.  There are

17  some shotgun shells on top of it.

18  Q   It's the same gun safe in which the Winchester was found

19  and the magazines.

20  A   That's correct.

21  Q   That's right off the kitchen.

22  A   Yes.

23  Q   Out of all of those photos that you took and that were

24  collected, did you keep -- or how did you keep track of all of

25  these photos?

A    We used a photo log.  Anytime we took a photo, we would

write it down on the log.

Q    Did you prepare it?

A    I prepared part of it.

Q    What part did you not prepare?

A    The third and fourth page I didn't prepare and I believe

the first three lines of the first page.

Q    You have reviewed it to make sure that these photographs --

that everything that's logged on this log is accurate?

A    I have.

MS. MIDDLETON:  May I approach?

THE COURT:  Yes.

BY MS. MIDDLETON:

Q    I hand you what's been marked as G-20.  Do you recognize

it?

A    I do.

Q    What is it?

A    It's the photo log.

Q    And is this a true and correct copy of the photo log that

was utilized to document the photos taken of the evidence and

the scene 4645 Van Winkle Park Drive?

A    It is.

MS. MIDDLETON:  At this time, we would like to offer

into evidence Government's Exhibit G-20, which is four pages.

THE COURT:  Any objection?

1       MR. RICH:  No objection.

2       THE COURT:  G-20 is admitted.

3    (Exhibit G-20 marked)

4       MS. MIDDLETON:  May I publish to the jury?

5       THE COURT:  Yes.

6  BY MS. MIDDLETON:

7  Q    Agent, I turn your attention to page 1 of the photo log.

8  In particular, I want to turn your attention to number 19.

9  What does number 19 -- photo number 19 reference?

10 A    It references a photograph of the cell phone that was

11 discovered next to the bed.

12 Q    It's an LG cell phone?

13 A    Yes.

14 Q    What are those numbers?  I assume those are numbers.

15 A    Yes.  That is the pin code to unlock the phone.

16 Q    How did you get the pin code -- how was the pin code --

17 A    The pin code was provided by Heather Beard.

18 Q    And that's the same phone that was in the photograph that

19 you circled on the floor on G-29(m)?

20 A    Yes.

21 Q    According to this photo log, where was the Taurus revolver,

22 the G-4 -- Exhibit G-4 found?

23 A    Room number 3, which was the bedroom.

24 Q    When you say "in the bedroom," you're referring to the same

25 photo that you discussed that you circled by the black

1    nightstand?

2    A    Yes.  The photograph with the black bag and the mirror.

3    Q    Of the rooms in the house, where were firearms and

4    ammunition found in all -- when you're talking about the rooms

5    in the house?

6    A    The firearms -- one was found in the bedroom.  That would

7    be the Taurus revolver.  The Winchester rifle was found in the

8    gun safe in the closet off the hallway.  There was ammunition

9    found in the living room, the bedroom, the closet and the --

10   where the gun safe was as well as the garage out the back of

11   the house.

12   Q    So in total in the eight rooms in the house, we're talking

13   about ammunition was in the living room, the bedroom, the

14   garage, the gun closet, which is right off the kitchen, and a

15   closed in the living room.

16   A    Yes.

17   Q    Other than the photographer, did you undertake any other

18   role in this investigation?

19   A    Once the evidence was brought back to our office to be

20   properly packaged and labeled, one of my other duties is as the

21   evidence vault custodian.  Once the evidence was prepared for

22   the vault, I checked it into the vault.

23   Q    You checked everything in once it was --

24   A    Yes.

25           MS. MIDDLETON:  Court's indulgence.

1    (Short Pause)

2         MS. MIDDLETON:  Your Honor, as I understand it, when I

3    was admitting photographs, one of the exhibits I misspoke and

4    said G-30 twice, and it should be we were also admitting

5    G-31(a) and(b).

6         THE COURT:  All right.  So noted.  Thank you.

7         MS. MIDDLETON:  I tender the witness.

8         THE COURT:  All right.  Cross.

9                        CROSS-EXAMINATION

10   BY MR. RICH:

11   Q   Agent Stallings, you mentioned earlier that you were

12   present when the arrest warrant was executed for Mr. Beard.

13   A   I was.

14   Q   What was the purpose for that arrest warrant?

15   A   To my knowledge, I knew that the U.S. Marshal task force

16   had an active arrest warrant for David Beard, and they

17   requested that we be there in support.

18   Q   When you were present at the home that day, did you ever

19   see Ms. Beard possess either the Winchester rifle or the Taurus

20   revolver?

21   A   No.

22   Q   I want to ask you some questions about this evidence, this

23   physical evidence up here.  You talked about this rifle.  You

24   said that you were present when it was test fired.  Can you

25   tell me how was it fired?  How was it successfully fired?

1   A   It was test fired in our office. This was after the search

2   warrant had concluded. I don't remember the exact date. I

3   believe it's noted on the evidence tag. But the way we'll test

4   fire any firearm is we'll take a round of ammunition that fits

5   the firearm. We'll remove the bullet from it and remove powder

6   from it where all we are left with is a casing and a primer.

7      That casing and primer is then inserted into the firearm.

8   We have a barrel that we use that we stick -- it's a large

9   barrel that we stick the barrel of the firearm into just in

10   case for safety reasons anything should come out of the

11   firearm. Pulled the trigger. The hammer struck the primer,

12   and it set the primer off.

13   Q   But you test fired this firearm specifically because you

14   had information that it would not fire.

15   A   That's correct.

16   Q   And it did fire?

17   A   It did fire.

18   Q   As to the revolver, you mentioned and we saw in a

19   photograph that it was found in a black bag.

20   A   That's correct.

21   Q   Now, you've mentioned a lot of things about evidence that

22   you're the custodian for the vault.

23   A   Yes.

24   Q   That were you tasked with filming the scene that day?

25   A   Yes.

1  Q   You were tasked with documenting all this evidence?

2  A   I didn't keep the property log.  I just -- a partially kept

3  the photo log, but my main task was to photograph.

4  Q   I saw a photo in there of someone wearing gloves while

5  holding the revolver.  Were those your hands?

6  A   No, it was not.

7  Q   But it's important to keep proper documentation and

8  preservation of physical evidence in a case?

9  A   Correct.

10 Q   Where is the black bag?

11 A   We do not have the black bag.

12 Q   I see a Crown Royal bag here where evidence was found,

13 marked as G-11, with assorted ammunition.  I see a black camera

14 bag, a green metal box and medical chest and another box --

15 excuse me, two other boxes up here that hold ammunition.  Is

16 that correct?

17 A   That's correct.

18 Q   And you were able to keep the containers that held that

19 evidence.  Is that correct?

20 A   That's correct.

21 Q   Is Ms. Beard charged with possessing any of this

22 ammunition?

23 A   To my knowledge, she's just charged with possession of the

24 firearms.

25 Q   And so the container that held one of these pieces of

1    evidence at issue, this Taurus pistol, you don't have that bag?

2    A    We generally don't keep containers that firearms are kept

3    in.  The purpose for keeping the containers that the ammunition

4    was in is because we were dealing with the large amount of

5    ammunition and the vast majority of it is loose.  And so these

6    containers provided a means for us to package it and keep it

7    together.

8    Q    Let me ask you this about the picture with the rubber

9    gloves.  I'm showing you what's been marked as G-34(b), a

10   photograph of this Taurus revolver with someone holding it

11   wearing rubber gloves.  Would you agree that one purpose of

12   wearing rubber gloves while coming into contact with a firearm

13   is to preserve any markings that may be on it?

14   A    It is.

15   Q    Any fingerprints that may be on it?

16   A    Yes.

17   Q    So this Taurus pistol was found in a black bag.

18   A    Correct.

19   Q    And any container that that pistol could be in could have

20   affected potential markings on it.

21   A    I'm not a forensic scientist.  I imagine they could be

22   rubbed off.

23   Q    You found a number of magazines during the search.

24   A    Yes.

25   Q    What is a magazine?

1  A   Magazine –– it holds ammunition for the firearm.

2  Q   I'm holding what's been marked as G-7, a box of magazines.

3  And I count eight magazines in this box.  Can you confirm that

4  for me?

5  A   There's eight magazines.

6  Q   Were any guns that matched those magazines found in the

7  house?

8  A   No, they weren't.

9  Q   Agent Stallings, I want to show you what's been marked as

10  G-32(a).  It's a photo of the closet that you identified as

11  containing women's clothing.  Is this the photo that you

12  identified it as?

13  A   It is.

14  Q   I'm also going to show you what's been marked as G-32(b),

15  the interior of the closet.  When this photograph was taken,

16  clothes were removed prior to taking that photograph.  Is that

17  correct?

18  A   I don't recall if any had been removed.  I didn't remove

19  any clothing, but another agent may have.

20  Q   I'm going to show you again photograph G-32(a).  Do you see

21  clothing on the right side of that closet on the upper half of

22  the closet?

23  A   I do.

24  Q   Do you see clothing on the left half of the closet on the

25  upper half of the closet?

1  A    There appears to be clothing on the left-hand side.

2  Q    In G-32(b), do you see clothing on the left side of the

3  closet?

4  A    I do.

5  Q    And there's no clothing on the right side of the closet?

6  A    No.

7          THE COURT:  Mr. Rich, we've been going about an hour

8  and a half.  If you're close, then we'll finish it.  If not,

9  would this be an appropriate time for a break?

10         MR. RICH:  I'm close, Your Honor.  I'm close.  I only

11  foresee a few more minutes.

12  BY MR. RICH:

13  Q    Agent Stallings, I'm showing you what's been marked as

14  G-34(a), the picture of the location of the black bag.  Is that

15  correct?

16  A    That's correct.

17  Q    Looks like the mirror has been broken in this picture.  Was

18  the mirror broken at any point in time?

19  A    Yes.  During the search -- I wasn't present when it

20  happened, but the mirror was broken.

21  Q    But prior to the black bag being located, I'm showing you

22  G-29(m), the photograph of the bedroom with the mirror intact.

23  Is that how the bedroom looked prior to the bag being found?

24  A    That's not a photograph that I took, but it does appear to

25  be the condition of the room prior.

Q   And the black bag was concealed behind the mirror?

A   Yes.

Q   There's a lot of ammunition on this table, Agent Stallings. You found .22 ammunition.  Is that correct?

A   Yes, .22 caliber ammunition was recovered.

Q   You found 12 gauge shotgun ammunition.

A   That's correct.

Q   Twenty gauge shotgun ammunition.

A   I believe.  I'd have to look at the particular calibers to confirm.

Q   You found 223 ammunition, for a 223 rifle.

A   Again I'd have to take a look.

Q   I'm handing you a box.  It's marked 9 millimeter.  Do you agree that's 9 millimeter ammunition?

A   Yes, it's 9 millimeter ammunition.

Q   I'm handing you a box that's been marked as 243 ammunition. Do you agree that that's 243 ammunition?

A   It is.

Q   I'm handing you a box that's been marked as 270 ammunition. Do you agree that that's 270 ammunition?

A   It is.

Q   And you mentioned earlier that you found 12 gauge shotgun ammunition and .22 gauge shotgun ammunition.

A   Correct.

Q   And large amounts.

1    A    Yes.

2    Q    But you did not find guns that matched any of that

3    ammunition?

4    A    We did not.

5    Q    So in this case, the presence of ammunition alone is not

6    proof of the presence of a gun, a particular gun, caliber gun?

7    A    It is not.

8              MR. RICH:  No further questions, Your Honor.

9              THE COURT:  All right.  Thank you.  Redirect?

10                    REDIRECT EXAMINATION

11   BY MS. MIDDLETON:

12   Q    Agent Stallings, you were asked a question about during the

13   search warrant whether or not you saw the defendant, Heather

14   Beard, possess a firearm or possess any type of weapon.  When a

15   search warrant is executed, are any occupants of that residence

16   allowed to have any type of item that may pose a threat,

17   specifically a firearm?

18   A    No, they are not.

19   Q    You were also asked a question regarding the containers

20   that are here today, the containers that are holding lose

21   ammunition.  The black bag, do you -- does ATF consider that

22   evidence?

23   A    We don't consider the bag itself as evidence.  The

24   ammunition within the bag is the evidence.

25   Q    Now, if there was a holster, would you have taken a

1  holster?

2  A   We typically don't.

3  Q   Defense counsel also asked you a question about specific

4  calibers of ammunition.  What caliber of ammunition is in that

5  black box?

6  A   In the black box, it contained .22 caliber ammunition.

7  Q   In this box, .22 caliber?

8  A   Yes.

9  Q   And that same .22 caliber ammunition fits this weapon?

10  A   It does.

11  Q   And it was found where?  Where was the ammunition found?

12  A   The ammunition was found in that box within the closet in

13  the living room area.

14  Q   I want to turn your attention to your post -- your prevideo

15  that you took before the execution of the search warrant.  You

16  were asked some questions about clothing in the closet.  I want

17  you to take a look at this video and tell me what you see in

18  the center of that screen.  Here.

19  A   The black box.

20  Q   The clothing is there.

21  A   Yes.

22  Q   But the black box is also there.

23  A   Yes.

24        MS. MIDDLETON:  No further questions.

25        THE COURT:  All right.  Thank you.  Can this witness

1  be finally excused?

2          MS. MIDDLETON:  Yes, Your Honor.

3          THE COURT:  All right.  Thank you.  Ladies and

4  gentlemen, we'll go ahead and take our afternoon break.  It is

5  3:40.  Let me ask you to come back at 3:55 and we will be in

6  recess until then.  Court's in recess.

7      (Jury Out)

8      (Recess)

9      (Jury In)

10          THE COURT:  All right.  Whose next?

11          MS. CASE:  Your Honor, the government calls Devin

12  Rice.

13      (Witness Sworn)

14                          DEVIN RICE,

15    having first been duly sworn, testified as follows:

16                      DIRECT EXAMINATION

17  BY MS. CASE:

18  Q    Agent Rice, will you please introduce yourself and spell

19  your name.

20  A    Devin Rice D-E-V-I-N R-I-C-E.

21  Q    What is your occupation?

22  A    I'm an agent with the Mississippi Bureau of Narcotics.

23  Q    How long have you been a law enforcement officer?

24  A    Approximately seven years.

25  Q    On December 2nd, 2016, were you present for the execution

1   of an arrest warrant at 4645 Van Winkle Park Drive in Jackson,

2   Mississippi?

3   A   Yes.

4   Q   Is there a home at that address?

5   A   Yes.

6   Q   What types of buildings were in the area around that

7   property?

8   A   It was like a special shop building set up.

9   Q   Who was to be arrested that morning?

10  A   David Beard, I believe.

11  Q   And what was your role during the arrest?

12  A   I was assisting initially as a perimeter while contact was

13  attempted to be made with Mr. Beard.  Mr. Beard came to the

14  door.  I was still on the perimeter, and I was informed that

15  they were -- I guess ATF and the marshals were going to wait

16  and apply for an additional search warrant for the residence at

17  which time I still stayed outside until we were advised that

18  the search warrant was signed.

19  Q   Did you participate in the search of the home at 4645 Van

20  Winkle Park Drive?

21  A   Yes.

22  Q   And what was your role during that search?

23  A   My main role was searching what would be labeled as the

24  master bedroom.

25  Q   And what types of items were you looking for?

1  A   I believe weapons, firearms, and possibly drugs as well

2  since we were there -- myself and other agents were there with

3  the Bureau of Narcotics.

4  Q   Did you walk through the entire home?

5  A   I don't know that I went in every single room.  But after

6  doing searching in the master bedroom, I made my way through

7  the house at different times looking.

8       MS. CASE:  Your Honor, I would ask that I be able to

9  publish what has been admitted as Government's 28(b) and(c).

10      THE COURT:  You may.

11  BY MS. CASE:

12  Q   Agent Rice, I'm showing what is G-28(b) and(c).  What is

13  shown here?

14  A   It appears to be the front of the dwelling of the Beard's.

15  Q   How about Government's Exhibit 28(c)?

16  A   The door that the agent is standing by with the yellow

17  cutout is the front door, and the window I believe was an old

18  door but was closed in, sealed off.

19  Q   At the front of the home?

20  A   Yes.

21  Q   Is this the home where the arrest and the search took

22  place?

23  A   It is.

24  Q   I'm going to show you what has been admitted as

25  Government's Exhibit 18(a) and ask if you recognize that.

1  A    It appears to be the sketch of the approximate layout of

2  the building.

3  Q    Is that a fair representation of the floor plan of the home

4  that was searched that day?

5  A    To the best of my knowledge that I can recall.

6  Q    Let me show you Government's Exhibit 29(1).  What do you

7  see here?

8  A    What appears to be the, I guess you could say, master

9  bedroom.

10  Q    Is that the room that you searched that day?

11  A    Yes.

12  Q    How about this view what is represented in Government's

13  Exhibit 29(m)?

14  A    Again that's the master bedroom, and the angle of the

15  photograph is looking back towards what would be behind that

16  wall would be the outside of the front of the building.  The

17  bed there in the center and behind the photographer would have

18  been a dresser or chest of drawers.

19  Q    Are the photographs, the two photographs you saw of the

20  bedroom, Government's 28(1) and(m), fair representations of the

21  bedroom at 4645 Van Winkle Park Drive?

22  A    To the best of my knowledge.

23  Q    At the time of your search?

24  A    Correct.

25  Q    How many bedrooms were in that home?

1    A    I believe all in all it was just that one bedroom.

2    Q    Can you tell the jury where in this room you searched?

3    A    Primarily I was on the -- if you're looking at the photo,

4    the left side of the photograph where you can see a mirror, a

5    large mirror propped up against the wall as well as where some

6    equipment is plugged in and what appears to be some type of

7    nightstand in the corner as well.

8    Q    Do you recall were there men or women's items on that

9    particular side of the bed?

10   A    I believe it was mostly women.

11   Q    I'm going to show you Government's Exhibit 34(g).  Can you

12   tell the jury what is shown in this photo?

13   A    A fan, lotion looks like.

14   Q    Let me back up.  Can you help orient the jury where is this

15   photo?  Where in the house?

16   A    This is the -- what I call the nightstand that was in the

17   same far corner of the bedroom on that side.

18   Q    When you say "that side," would you say that's the left or

19   the right side, if you're looking at the head of the bed

20   standing at the foot of the bed?

21   A    At the angle photograph, it would be the far left corner.

22   Q    Left corner.  Can you touch that screen in front of you and

23   circle where that nightstand is?

24   A    (Witness complied with request).

25   Q    And what of significance did you find during your search of

1    that portion of the bedroom?

2    A    Behind the mirror or -- which is here, stands all the way

3    to the floor.  Want me to just mark it?

4    Q    Can you show that again?

5    A    The mirror is here propped up against the wall.

6    Q    So you've circled on Government's 29(m) the left portion of

7    the photograph.

8    A    Yes.

9    Q    Okay.  So tell us what you found of significance in that

10   area.

11   A    In the photo, you can see that the mirror -- the base of

12   the mirror on the floor is not flush with the wall.  It's not

13   up next to it.  And I recall from the top here pulling that

14   area back.  And at the bottom in that void by the floor, I

15   recovered a black bag or case small, and inside of that case I

16   recovered a silver with black handle revolver.

17   Q    And you said you found a black bag.  How big was that bag?

18   A    Like a large digital camera size.

19   Q    How much larger than the revolver would it have been?

20   A    Not very much.

21   Q    And what else was behind the mirror?

22   A    There was other junk really.  I believe there was a

23   zip-lock bag of some sort, and it had pill bottles labeled in

24   them as well.  I believe they were labeled Ms. Beard's name on

25   them.

1   Q   What did you do after you found the revolver?

2   A   I notified the ATF agent that I had recovered a revolver at

3   which time an ATF agent came into the room, photographed the

4   pistol -- the revolver and I assume took more photographs at

5   the location where I recovered it.

6   Q   Did you do anything to the revolver before ATF agent

7   arrived?

8   A   I took it out of the case, opened the action to render it

9   safe, and I do believe there was not any ammunition in the

10   revolver at the time.

11   Q   You said that you called the ATF agents.  Do you remember

12   which agent you called?

13   A   I do not.

14   Q   Did you find anything else of significance during your

15   search?

16   A   No.

17   Q   I'm going to show you one more time if we -- if you can

18   circle for us the area of the room that relates to the gun that

19   you found.

20   A   In this void behind the mirror that's on the left side of

21   the bedroom.

22   Q   And if we progress through these photographs from 29(m),

23   Government's 29(m) to Government's 34(g), that takes us from

24   the entry to the bedroom to where in the bedroom?

25   A   All the way in that far left corner by the black

1    nightstand.

2    Q    And what is shown at the bottom of that nightstand near the

3    bottom of that nightstand?

4    A    Bottles, a case of pill bottles here.

5    Q    Is that the bag of bottles that you were discussing?

6    A    Yes, appeared to be.

7    Q    Let me show you -- while we're on this photograph, is there

8    anything of relevance on the nightstand itself that you see in

9    this photograph?

10   A    There's I think some kind of makeup or marker bag.

11   Q    I've circled the front right corner of that nightstand.  Do

12   you know what's inside that circle?

13   A    It appears to be a bullet of some sort.

14   Q    Do you know who recovered that bullet?

15   A    I do not.

16   Q    I'm going to show you Government's Exhibit 34(a).  What is

17   shown here?

18   A    It appears to the black case.  There's a glare on the

19   picture, but it appears to the black case behind the mirror

20   that was broken.

21   Q    Can you help -- help orient the jury by showing where the

22   mirror is that you're discussing?

23   A    The broken edge is here.  It continues about -- right there

24   is the floor.

25   Q    So if one was standing and looking at themselves in the

1  mirror, that would be the right side of the mirror?

2  A   Yes.

3  Q   And how did that mirror break?  Do you know?

4  A   At some point moving the mirror -- I believe after I found

5  the revolver and the revolver was placed for photographic

6  depiction, I believe the mirror on that right side was broken.

7  Q   Can you -- to help us make sure we're oriented to where we

8  are in the bedroom, can you highlight for the jury where the

9  nightstand is, the black nightstand is in Government's 34(a)?

10 A   (Witness Complied with Request.)

11 Q   And in that mirror we see a person or multiple people.  Can

12 you describe what's shown in terms of that body?

13 A   I'm assuming the right side of the photo, which you see

14 blue jeans here, is going to be an agent.  And then this mirror

15 reflection of two feet possibly of the same agent or another

16 agent taking the picture.

17 Q   So on the left side of the screen is a reflection in the

18 mirror?

19 A   Yes.

20 Q   If you would, show the jury where the gun was found.

21 A   Inside of this what looks like in the picture the black

22 case.

23 Q   Was this photograph taken before or after you found that

24 gun?

25 A   After.

1    Q    Is it fair to say this is a recreation?

2    A    It is.

3    Q    And how did the agents who were taking this photograph know

4    how to recreate this scene?

5    A    When I located the revolver in the black case and called an

6    ATF agent in the room, I advised the agent where I had found

7    and showed -- leaned the mirror back and showed him that it was

8    on the -- in that void area at the base of the mirror by the

9    floor.

10   Q    What is under the black bag that you circled on this

11   screen?

12   A    I guess you're referring to the pill bottles in the case?

13   Q    I'm going to show you Government's Exhibit 34(b).  Can you

14   tell the jury what is shown?

15   A    That appears to be the revolver that I recovered.

16   Q    This is the revolver that was in the black bag?

17   A    Yes.

18   Q    Do you know what caliber this is?

19   A    The barrel is stamped .22 long rifle.

20   Q    What's shown in Government's 34(c)?

21   A    The other side of the revolver.

22   Q    Do you know who manufacturers this revolver?

23   A    Taurus.

24   Q    Is that the handgun that you found -- is that a photograph

25   of the handgun that you found in the black bag?

1    A    Yes.

2         MS. CASE:  Your Honor, may I retrieve an exhibit from

3    the table?

4         THE COURT:  You may.

5    BY MS. CASE:

6    Q    I'm going to hand you what's been admitted as Government's

7    Exhibit 4.  Do you recognize that?

8    A    Yes.  It's the revolver that's photographed.

9    Q    And the revolver you found in the black bag?

10   A    Yes.

11        MS. CASE:  May I retrieve that, Your Honor?

12        THE COURT:  Yes.

13   BY MS. CASE:

14   Q    We saw in the photograph some pill bottles that you

15   referenced.  Government's 34(i) depicts what?

16   A    It appears to be the same bag that had the pill bottles in

17   them where the revolver was recovered.

18   Q    And how about Government's 34(j)?

19   A    I believe those are the same three pill bottles as in the

20   previous photo that you can make out the name Heather Wright on

21   them.

22        MS. CASE:  Your Honor, may I approach the witness?

23        THE COURT:  Yes.

24   BY MS. CASE:

25   Q    Agent Rice, I've handed you what's been admitted as

1   Government's Exhibit 27(b).  Do you recognize that?

2   A   Yes, ma'am.

3   Q   What is that?

4   A   Ms. Beard.

5   Q   Do you know what -- if that's a fair representation of

6   Heather Beard at the time of the search on December 2, 2016?

7   A   Yes, that's how I recall her.

8           MS. CASE:  May I retrieve the exhibit?

9           THE COURT:  Yes.

10          MS. CASE:  May I publish to the jury?

11          THE COURT:  I think it's in evidence.

12          MS. CASE:  It is.

13  BY MS. CASE:

14  Q   I'm showing Government's Exhibit 27(b), and that is as you

15  remember Ms. Beard on the day of the search?

16  A   Yes, ma'am.

17  Q   Do you see Ms. Beard in the courtroom today?

18  A   I do.

19  Q   Can you identify her for the jury?

20  A   Blonde female at the defense table, black blouse -- white

21  blouse, back jacket.

22          MS. CASE:  Your Honor, can the record reflect he has

23  identified the defendant?

24          THE COURT:  So reflect.

25  BY MS. CASE:

1  Q   Was Ms. Beard present when law enforcement was searching

2  her home on December 2, 2016?

3  A   Yes.

4  Q   Was she aware that a revolver was found behind the mirror

5  in the bedroom?

6  A   Yes.

7  Q   What, if anything, did Ms. Beard say after you found the

8  revolver?

9  A   After I completed my search of the bedroom, I believe

10  Ms. Beard was in the -- not dining room but living room foyer

11  area, which is just adjacent to the bedroom before you go into

12  the front door and kitchen area.  Multiple agents were there

13  with her in that room.  As I was in and out of different areas

14  of the house, and I remember -- recall at one time someone

15  posed a question to Ms. Beard, *Where did you get the gun?*  And

16  I recall to some effect Ms. Beard saying, *I got the gun from*

17  *him* or *He gave me the gun for a birthday present*.

18  Q   For a birthday present?

19  A   Correct.

20  Q   Do you remember anything else related to the revolver that

21  Ms. Beard said that day?

22  A   I don't.

23        MS. CASE:  Court's indulgence, Your Honor.

24     (Short Pause)

25        MS. CASE:  Government tenders witness.

1    THE COURT:  All right.

2                    CROSS-EXAMINATION

3  BY MR. RICH:

4  Q    Agent Rice, you mentioned earlier that you were present

5  when David Beard was arrested.

6  A    Yes.

7  Q    Ms. Beard was not arrested that day?

8  A    That I don't know.

9  Q    You did not arrest her that day?

10  A    No, I did not.

11  Q    You did not see her arrested that day?

12  A    I know she was detained.  But when I was finished at the

13  scene, I don't recall if she was arrested and taken to another

14  location or not.

15  Q    She was initially cuffed.

16  A    I believe so.

17  Q    And then she was unhandcuffed.

18  A    I don't believe that I saw her unhandcuffed at any time.

19  Q    Okay.  Who directed you to search the bedroom?

20  A    I don't remember anyone specific.

21  Q    You said you searched the left side of the bedroom looking

22  at the photograph.

23  A    Correct.  The photograph in your hand.

24  Q    Showing you what's been marked as G-29(l), the photograph

25  of the bedroom, you said you searched the left side of the

1    bedroom looking at that photograph.

2    A    Correct.  And the angle of that photograph is more angled

3    towards the right side.

4    Q    Okay.  I'm going to show you what's been marked as G-29(m),

5    a more straight-on photograph.  Is this the same bedroom?

6    A    Yes.

7    Q    Okay.  You mentioned someone searched the right side of the

8    bedroom.

9    A    Best I recall there was at least three or four officers in

10   that room at some point.

11   Q    You said that this mirror on the left side that I've marked

12   on the left side of the bedroom, that's the mirror that you

13   pulled away?

14   A    Correct.

15   Q    And directly behind it is -- or close behind it is the

16   nightstand?

17   A    Correct, past it.

18   Q    I'm showing you what's been marked as G-34(g), which is a

19   picture of that nightstand.

20   A    Yes.

21   Q    I've highlighted for you something on the corner of this

22   nightstand.  You identified that earlier as a .22 caliber

23   bullet.

24   A    That's what it looks like to me, yes.

25   Q    This is directly next to the mirror or very close proximity

1  to the mirror you've stated.

2  A   Yes.

3  Q   And you found the gun behind the mirror but not this bullet

4  next to it, you mentioned.

5  A   I don't recall that bullet being there on the corner of the

6  table at the time that I searched.

7  Q   Okay.  I wanted to ask you about -- again about this

8  photograph straight on from the bedroom.  You said that about

9  the bullet not being there.  Agent Rice, you see something --

10 you see something blue to the right of that mirror?  Do you see

11 where I'm pointing?

12 A   Under the --

13 Q   The charger cords.

14 A   Yes.

15 Q   It appears -- would you agree it appears to be a blue

16 bucket, some blue container?

17 A   Yes.

18 Q   And that appears to be between the mirror and that

19 nightstand?

20 A   Yes.

21 Q   I'm again showing you what's been marked as G-34(g).  This

22 is a photograph with pill bottles -- what's been identified as

23 pill bottles in the bottom of the photograph.  Is that correct?

24 A   Correct.

25 Q   Okay.  And you said earlier that this photograph is a

1  recreation?

2  A   To the best of my knowledge.

3  Q   Okay.  And you said earlier that you don't recall that

4  bullet that's in this photograph also being on the bedside

5  table when you searched behind the mirror.

6  A   Not in that exact location.

7  Q   So before this picture was taken, you testified that things

8  were put back to recreate the scene.

9  A   I testified that the revolver that I recovered in the black

10  case was put back.  I don't know about any other evidence that

11  was recovered because I didn't find that bullet or I don't know

12  who found that bullet.

13  Q   Okay.  And I think I may have shown you the wrong

14  photograph, Agent Rice.  I apologize.  I believe you were

15  testifying to this about 34(a) earlier, the black bag next to

16  those pill bottles.  Is there a blue container in this

17  photograph between the mirror and the nightstand?

18  A   Doesn't appear to be.

19  Q   Does there appear to be something blue inside the

20  nightstand?

21  A   Where you pointed, yes.

22  Q   I'm going to show you a photograph that you said was taken

23  prior to searching.  Does it appear to be anything blue from

24  the nightstand in this picture?

25  A   No.  But I do not know that this picture was taken prior to

1    the search.  I don't know who took pictures.

2    Q    But you'd agree in one picture there's something blue from

3    the nightstand and now there's not something blue in the

4    nightstand.

5    A    It appears.

6    Q    Agent Rice, do you know of any other photographs that were

7    recreated?

8    A    No, because I don't recover -- I don't recall recovering

9    any other evidence of value.

10   Q    You mentioned earlier that you overheard Ms. Beard say

11   something or respond to a question about the gun being a gift,

12   a birthday gift.  Is that correct?

13   A    That's correct.

14   Q    Do you remember her exact quote?

15   A    I do not.

16   Q    Did you make a report in this case?

17   A    I did not.

18   Q    Did you take a written statement from her?

19   A    I did not.

20   Q    Did you take a recorded statement from her?

21   A    Did not.

22   Q    Can you recall the exact wording of the question posed to

23   her?

24   A    To the best of my knowledge from what I recall was, *Where*

25   *did you get the gun?*

1    Q    Do you know when Ms. Beard's birthday is?

2    A    I do not.

3    Q    Did she say when she gained knowledge of the gun?

4    A    How do you mean?

5    Q    Did she say -- did she say, *I received it after my*

6    *birthday?*  Did she say -- I'll ask you that.

7    A    I don't know at what time, all I know is best I recall she

8    made mention it was a birthday present.

9    Q    So you don't know if she received it that day or six months

10   prior?

11   A    I don't know which day she received it.

12             MR. RICH:  I tender the witness.

13             THE COURT:  All right.  Redirect?

14                      REDIRECT EXAMINATION

15   BY MS. CASE:

16   Q    Agent Rice, would it have been possible to photograph the

17   location of the revolver before you found it?

18   A    I'm sorry?

19   Q    Would it have been possible to photograph the location of

20   the revolver before you found it?

21   A    In the condition I found it, no, I was not be able.

22   Q    Why not?

23   A    It was concealed inside the black case behind the mirror.

24   Q    Behind a mirror.  Is -- are the photograph that we saw of

25   the black bag's location accurate recreations of where you

1  found the black bag?

2  A   Yes.  Other then the mirror being broken and part of it

3  missing.

4  Q   So the mirror would have been intact when you found the

5  black bag?

6  A   Yes.  As it was in one of the other photographs, I believe.

7  Q   The location of the black bag in the bedroom is

8  geographically accurate?

9  A   To the best of my knowledge.

10  Q   Government's 34(a) shows the black bag?

11  A   Yes.

12  Q   And you would have the knowledge because you found the

13  revolver.  Correct?

14  A   That's correct.

15  Q   Who told the photographing agents how to place the black

16  bag?

17  A   I would have because I was the one that found it.

18  Q   When agents execute a search warrant, do they move items

19  about a room?

20  A   Yes.

21  Q   If photographs are taken during a search, is it likely that

22  an item will be shuffled -- an item's position will change in

23  various photographs because a search is ongoing?

24  A   Yes.

25  Q   I'd like to show you Government's Exhibit 28(l), and I'll

1  direct you to the foot of the bed if you can tell us what

2  object is shown at the foot of the bed, what large piece of

3  furniture.

4  A   Under that red like cover or blanket I guess like a trunk

5  or a chest, wooden trunk or chest.

6  Q   If I show you -- let me back up.  What types of items are

7  on top of that trunk?

8  A   Looks like a black ashtray, something clear with a leopard

9  print, makeup bag or some kind of bag.

10  Q   Now, I will show you Government's Exhibit 34(a).  What

11  piece of furniture is shown in the center of that photograph?

12  A   I believe that's the same trunk that was under the red

13  sheet.

14  Q   Where's the red sheet?  Can you tell in the photograph?

15  A   Appears to be in the bottom right where the time stamp is.

16  Q   Where's the leopard print bag that you were referring to?

17  A   Directly above that between something white and the red

18  sheet.

19  Q   What's on top of that trunk now?

20  A   Appears to be laptop or laptop computers.

21  Q   Is it fair to say that objects have been moved during the

22  course of the search?

23  A   Between these photos, yes.

24  Q   Mr. Rich asked, but the statement that you overheard

25  Ms. Beard make after the revolver was found, you say you don't

1  remember the particulars of the phrase that she used?

2  A   Correct.

3  Q   But you do remember what, about what she said?

4  A   The fact that she said along the lines that she got the

5  revolver for a birthday present, either referring to David

6  Beard, I would assume.  And I thought it was odd that I

7  recalled she saying that because Mr. Beard being a convicted

8  felon would be gifting Ms. Beard a revolver, who is under my

9  impression was also a convicted felon.

10          MS. CASE:  No further questions, Your Honor.

11          THE COURT:  All right.  Thank you.  You can step down.

12  Ms. Case, do you have a short witness?

13          MS. CASE:  I do not, Your Honor.

14          THE COURT:  You said you do not?

15          MS. CASE:  I do not.

16          THE COURT:  Well, why don't y'all come up for a minute

17  and let's coordinate.

18      (At the Bench:)

19          MS. MIDDLETON:  We expect our next witness to be

20  fairly lengthy.

21          MS. CASE:  Maybe like an hour and a half.

22          THE COURT:  How are we in terms of progress today?

23          MR. RICH:  I think we can finish tomorrow.

24          MS. MIDDLETON:  Yeah.

25          THE COURT:  You do?

1        MS. MIDDLETON:  Depending on you.

2        MR. RICH:  If it's dependent on me, I think we can

3   finish tomorrow.

4        THE COURT:  I'll let the jury go, and I'll tell them

5   there's a chance they may stay a little later tomorrow, phrase

6   it out that way.

7      (Bench Conference Concluded)

8        THE COURT:  Okay.  The next witness I understand is

9   going to be fairly lengthy.  It doesn't make any sense to put

10  somebody on the stand at 4:35 and stop them 25 minutes later

11  and break it up like that.  I believe we're making appropriate

12  progress in this case.  I'm going to let you go for the night.

13  It's hard to predict sometimes how long things will take.

14  There's -- in criminal trials, both parties have a right to

15  have the trial -- put on the case they need to put on.  I'm not

16  going to rush it.  It could finish tomorrow or it could spill

17  over into Friday morning.  So I would ask you to, I guess, be

18  prepared in the event that you get the case tomorrow, say,

19  around tomorrow afternoon sometime, make arrangements in case

20  we need to stay a little bit past 5 or as long as it takes, if

21  you're in the deliberation process, if that makes sense.  It's

22  hard to predict.  It will either be tomorrow afternoon or

23  probably first thing Friday, one of the two.

24        All right.  Now, I need to remind you of the

25  instructions I've given you before that don't -- this is where

1  it gets important because you're going to go home and whoever,

2  your spouse or your roommate or whatever, is going to say, *Hey,*

3  *what's going on?  What kind of case is it*?  And all that.  You

4  just have to tell them, *I can't tell you*.

5       The reason for all of these, you know, you may say

6  something pretty innocent and your roommate says*, Oh, I heard*

7  *about that*, and blurt something.  Or you may go do some

8  research and find something that may be -- believe it or not,

9  not everything on the Internet is true.  It may not be

10  accurate, but because you found it outside the courtroom, the

11  attorneys would be deprived of an opportunity to explain to you

12  why what you found was wrong.  So the case has been decided on

13  what happens here.  So it's now really important.

14       No research, no communication about the case.  I want

15  to again remind you you have to keep an open mind until you

16  hear all the evidence and until you've heard the instructions

17  on the law.  Sometimes I'm in trial and we get like a five-day

18  trial and the jury's checked out after day four.  They think

19  they know what's going on.  And on day 5, some witness says

20  something and all of the sudden I see all those jurors grabbing

21  their notepads and start scribbling and they start panicking

22  because they realize they haven't really been paying attention

23  like they should have.

24       You never know what's going to happen in a trial.

25  You've got to keep an open mind until we get to the very end.

1    Again if it happens to be anything in the media, which I don't

2    expect, I'll need for you to let me know tomorrow morning.

3           With that, I'll ask you to put the notepads in the

4    jury room and we will see you -- we'll start at 9:00 sharp

5    tomorrow morning.  Thank you.

6      (Jury Out)

7           MS. CASE:  Your Honor, we have no further need for

8    agent Devin Rice, and he can be released, if that's acceptable.

9           THE COURT:  Is he subject to recall?

10           MR. RICH:  No, Your Honor.

11           THE COURT:  All right.  He may be released.  All

12    right.  Anything else we need to put on the record before we

13    adjourn for the night?

14           MS. MIDDLETON:  Nothing for the government.

15           MR. RICH:  Nor the defense.

16           THE COURT:  Okay.  Ms. Beard, I'm going to advise you

17    one more time you've got to be here on time.  If I say 2:00, I

18    don't mean 2:05.  Everybody else was here ready to go.  I would

19    get here early tomorrow, if I was you.  All right.  Anything

20    else?  No?  All right.  We're adjourned.  Thank you.

21      (Recess)

22

23

24

25

CERTIFICATE OF REPORTER

I, CHERIE GALLASPY BOND, Official Court Reporter, United States District Court, Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the proceedings had in the aforenamed case at the time and place indicated, which proceedings were recorded by me to the best of my skill and ability.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.


This the 16th day of June, 2018.



s/ *Cherie G. Bond*
Cherie G. Bond
Court Reporter