UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                     CRIMINAL NO. 3:17-cr-00140-DPJ-FKB-2

HEATHER ELIZABETH WRIGHT-BEARD



TRIAL TRANSCRIPT
VOLUME 2




BEFORE THE HONORABLE DANIEL P. JORDAN III
CHIEF UNITED STATES DISTRICT JUDGE
AND A JURY
JUNE 14, 2018
JACKSON, MISSISSIPPI



APPEARANCES:

FOR THE GOVERNMENT:  MS. KEESHA D. MIDDLETON
                     MS. JENNIFER CASE

FOR THE DEFENDANT:   MR. ROBERT THOMAS RICH



REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____

501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

1                        TABLE OF CONTENTS

2

3    DAVID BEARD                                              81

4        Direct Examination By Ms. Case  .....................81

5          Exhibit G-21(a)  ................................133

6          Exhibit 21(b)  .................................134

7        Cross-Examination By Mr. Rich  ....................138

8        Examination By Ms. Case (outside jury presence)  ...159

9          Exhibit D-17(a) through 17(d)  .................160

10         Exhibit G-22(c) for ID  ........................161

11       Redirect Examination By Ms. Case  .................162

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.  Let me -- we have more than

2    one snag this morning so we'll work through this.  The first

3    snag is that our alternate -- one of our alternate jurors was

4    parking his car over at the Westin and somebody hit his car so

5    he's not here.  He's -- last word I got is that he's dealing

6    with all that and will be here as soon as he can.  He's not

7    here.

8          The other issue is that the defendant is not here.

9    And, Mr. Rich, I know -- she called in -- just for the record,

10   she called into the office, spoke to my law clerk, said that

11   she had an altercation with her boyfriend last night or

12   something.  Anyway, I think you've now spoken with her.

13         MR. RICH:  Yes, Your Honor.  I spoke with her in your

14   law clerk's office.  She said she was calling from somewhere

15   called Old Town Road Specialties.  She said that her phone was

16   smashed during that altercation with her boyfriend and she was

17   left without a vehicle.

18         I tried to call her this morning prior to court

19   around -- I can tell you the exact time, Your Honor.  I called

20   her at 7:56 this morning, and I also called her at 7:37 this

21   morning, and both calls went directly to voicemail.  I can't

22   confirm if that's because the phone was turned off or if it

23   verifies her story or not.

24         She said that someone was there -- someone by the name

25   of Chico who could give her a ride.  I don't know his complete

1  name.  She said she could be here in 15 to 30 minutes when she

2  gets dressed.  I told her to please come on.

3        She did say that she had some broken toes which caused

4  her to be in severe pain.  I said if she could get through it

5  and could sit at counsel table with me without receiving any

6  medical attention for those toes, please come on, and she said

7  she could.

8        THE COURT:  All right.  Do you have any idea

9  whether -- whether the jury could tell that she's been in an

10 altercation?

11       MR. RICH:  Without seeing her, I don't know.

12       THE COURT:  She didn't say anything getting --

13       MR. RICH:  She didn't say about any bruising, any

14 scratches.  I don't know.

15       THE COURT:  Okay.  Well, we'll just have to cross that

16 bridge, you know, when she does get here.  Shone told me there

17 were a couple of other issues that y'all want to take up, and

18 we'll go ahead and do that now.  Ms. Middleton -- Ms. Case?

19       MS. CASE:  Your Honor, the government anticipates the

20 next witness being David Beard, and his -- he has pled guilty

21 and is detained in this case.  His counsel is Ms. Jessica

22 Borne, and Ms. Borne has asked if the court would like to

23 advise Mr. Beard of any of his Fifth Amendment rights, and she

24 has also asked that during Mr. Beard's testimony that she be

25 allowed to sit within a reasonable distance so that she can

1    communicate with him if needed.

2              THE COURT:  What's your position?

3              MS. CASE:  We are amenable to both of those requests.

4              THE COURT:  Okay.  When you -- you're not talking

5    about having her sit over here by the witness stand, are you?

6              MS. CASE:  We are, Your Honor.

7              THE COURT:  I've never had that request, and I've

8    never seen that done.  Why would she have to be sitting there

9    basically holding his hand?

10             MS. CASE:  I have just seen that previously, Your

11   Honor, where the witness' counsel can be available in a body

12   language sort of way of, *Let me stop and talk to you* or

13   something like that.

14             THE COURT:  Mr. Rich, do you have a position on this?

15             MR. RICH:  I don't have any objection.

16             THE COURT:  All right.  Where exactly -- I have been a

17   little apprehensive about Mr. Beard and Ms. Beard from a

18   security standpoint already, and we have three of our marshals

19   here.  I was -- in fact, I was going to instruct Singleton -- I

20   was going to instruct you to tell the boyfriend that he was not

21   going to be in the courtroom.  I was getting some bad vibes

22   about him yesterday.  So where exactly would she sit?  Because

23   I think I'm going to have the marshal sitting if not right

24   where you are, maybe a little to the left.

25             MS. CASE:  Anywhere that the marshals feel is safe,

1   even between the two counsel tables sort of in line with where

2   we are she would have fairly clear view of her client there.

3          THE COURT:  Okay.  I think that's better.  You just

4   may pull up a chair right between the tables, and I'm okay with

5   that.  The parties don't have any objection to it, I take it.

6          All right.  We'll -- and I think that she's going to

7   have to be here before I -- before we bring him in before I

8   give him his Fifth Amendment instruction.  Were there any other

9   issues that we need to take up?

10          MS. CASE:  None that come to mind, Your Honor.

11          MR. RICH:  Not from the defense, Your Honor.

12          THE COURT:  All right.  Well, we'll take a recess and

13   I have sent word back to the jury that we're short an

14   alternates right now because of the car wreck, and I said

15   there's some other things that we're dealing with.  I didn't

16   tell them what it was.  Just be thinking about it, I suppose,

17   if the defendant gets here before the alternate I feel like we

18   could get by with one alternate if that person is going to be

19   gone for most of the morning.

20          And I don't know that that's the case, but I can't

21   imagine losing two more jurors in the span of what we think

22   will be one day.  So I would think about dropping that

23   alternate and moving forward assuming that she gets here and he

24   does not.

25          All right.  If there's nothing else, we'll be in

1    recess until she shows up.  Just let me know.

2        (Recess)

3        THE COURT:  All right.  Obviously we're not starting

4    on time.  I'm not going to waste any time right now dealing

5    with that.  I am going to deal with it, but not right now.  The

6    jury's been sitting back there for over 30 minutes waiting.

7    Let's take care of Mr. Beard's instructions and then we'll get

8    it moving.  Are we ready to bring them in?

9        MS. MIDDLETON:  Yes, Your Honor.

10       THE COURT:  Okay.

11   (Witness Enters Courtroom)

12       THE COURT:  All right.  Mr. Beard, good morning.

13       MR. BEARD:  Good morning.

14       THE COURT:  Mr. Beard, at this point I need to give

15   you some standard instructions, standard warnings having to do

16   with your Fifth Amendment right to the remain silent.  Sir, you

17   understand that if you want to testify you can, but that if you

18   do not wish to testify you don't have to.  Do you understand

19   that?

20       MR. BEARD:  Yes, sir.

21       THE COURT:  Okay.  Do you also understand that whether

22   or not you testify is a decision that you and you alone must

23   make?  I assume you spoke with your attorney, Ms. Borne, who's

24   here in the courtroom.  But at the end of the day, you're the

25   one who has to decide whether you want to go forward.  Do you

1  understand that?

2         MR. BEARD:  Yes, sir.

3         THE COURT:  Do you understand that?

4         MR. BEARD:  Yes, sir.

5         THE COURT:  Okay.  Do you understand that once you

6  respond to a question that you would then have to give

7  responses to relevant followup questions?  Do you understand

8  that?

9         MR. BEARD:  Yes, Your Honor.

10         THE COURT:  Okay.  All right.  Counsel, is there

11  anything else you want me to cover here?

12         MS. CASE:  Nothing further, Your Honor.

13         THE COURT:  Okay.  Are we ready to bring the jury in?

14         MS. CASE:  We are, Your Honor.

15         THE COURT:  Okay.

16      (Jury In)

17         THE COURT:  Good morning.  I'm sorry for these delays.

18  You know, real trials, it's not like watching TV where

19  everything happens in 30 minutes.  Life gets in the way

20  sometimes, and I understand one of you had a problem with your

21  car.  I'm not sure who that was, but I'm sorry about that.

22         We are ready to proceed.  I do need to ask you whether

23  any of you have anything you need to report to me about the

24  instructions I gave you at the end of the day.  No?  All right.

25  Government call its next witness.

1          MS. CASE:  Government calls David Beard.

2          THE COURT:  All right.

3      (Witness Sworn)

4          THE COURT:  You may proceed.

5                          DAVID BEARD,

6      having first been duly sworn, testified as follows:

7                      DIRECT EXAMINATION

8  BY MS. CASE:

9  Q   Mr. Beard, will you please introduce yourself and spell

10 your name.

11 A   I'm David Calvin Beard D-A-V-I-D C-A-L-V-I-N B-E-A-R-D.

12 Q   Are you known as any other name or nickname?

13 A   I'm known as Cornbread.

14 Q   Do you know the defendant, Heather Beard?

15 A   Yes, I do.  She's my wife.

16 Q   Do you see her in the courtroom today?

17 A   I do.  She's sitting in the black shirt.

18          MS. CASE:  Your Honor, can the record reflect that

19 Mr. Beard has identified the defendant?

20          THE COURT:  It is will so reflect.

21 BY MS. CASE:

22 Q   Mr. Beard, were you arrested on your home on December 2,

23 2016?

24 A   Yes, ma'am.

25 Q   Where is that home?

1    A    4645 Van Winkle Park Drive Jackson, Mississippi.

2    Q    Do you own other property in that area?

3    A    I own the one next to it, which is 4645 -- 4745.  I haven't

4    been there in two years.

5    Q    Can you describe the area around your home and that other

6    property?

7    A    It's an industrial park with a dead-end drive and big

8    commercial buildings.

9    Q    I'm going to show you -- I'm showing you what's marked

10   Government's Exhibit 28(b).  What is shown in this photograph?

11   A    That is the front of my building.  My Yukon and Heather's

12   Firebird.

13   Q    And when you say your building, is that your home?

14   A    That's our home.  In the front of it we have an apartment

15   we built.

16   Q    And the other property that you own in the area, where is

17   that?  Is that shown?

18   A    It's to the left.  If you look it's the building to the

19   left, and we used to own the one to the right too.

20   Q    Okay.  What is shown in Government's Exhibit 28(c)?

21   A    That's the front door to our house, to our building.

22   Q    Roughly how many square feet was your house at 4645 Van

23   Winkle Park Drive?

24   A    The living area is about 1,000 square foot, 900 to a

25   thousand.  The shop area is about another 3,000.

1    Q   How many bedrooms did your home have?

2    A   Just one.

3    Q   I'm going to show you Government's Exhibit 18(a) and ask if

4    you recognize this.

5    A   That is a floor plan of our living area.

6    Q   Is that generally accurate floor plan of that house?

7    A   Yes, ma'am.  It's pretty accurate.

8    Q   And if you could, use this as a guide and you can touch the

9    monitor in front of you and just point out each room in the

10   residential part of that house.

11   A   This is the front door.  That's the front door right here.

12   Q   One moment.  Let me fix this.  Try that again.

13   A   Right there's the front door.  This is our kitchen area.

14   This goes to the living room.  Then here's our bedroom right

15   here, and then in the back I have a closet here.  There's a

16   sink and there's a pantry area, washer/dryer.  These are our

17   tub and our shower and our toilet.

18   Q   Okay.  Who was present at your house at the time that you

19   were arrested on December 2, 2016?

20   A   Heather and I.

21   Q   Were you at your house when law enforcement officers

22   searched your home on that day?

23   A   No, I was not.

24   Q   Even so, are you familiar with the evidence that the

25   officers and the agents took from your house that day?

1   A   Yes, I am.

2   Q   What types of items were taken out of your house by law

3   enforcement officers?

4   A   Two guns, ammunition, and electronics.

5   Q   Any drug paraphernalia?

6   A   And drug paraphernalia.

7   Q   I'm going to show you a series of photographs that have

8   been admitted of the interior of your home and ask that as I

9   show them that you tell the jury what's shown on the screen.

10  And we're going to start with Government's 29(a).

11  A   That is me standing there in custody in my front kitchen

12  area right there by the front door.

13  Q   When was this photograph taken?

14  A   The morning of December 2nd.  That is our dining area right

15  in our kitchen.  When you step from the front door, it's right

16  to the right.

17  Q   How about -- that was 29(b).  How about 29(c)?

18  A   That would be the hallway that goes back to the shop and to

19  my closet, and then there's another doorway that leads into the

20  living room.

21  Q   The doorway on the left most side of the photo leads into

22  where?

23  A   The living room.

24  Q   And the doors through the center of the --

25  A   That leads to the garage area, pantry area and to my

1    closet.  He's facing my closet.

2    Q    29(d) is -- what is that?

3    A    That's that hallway that he was just standing in.  To the

4    left of the trash can is a closet, to the right is a sink, and

5    then through that other doorway to the left is our pantry and

6    also a door that goes out into the garage area.

7    Q    So in this photograph, the photographer moved forward

8    several feet?

9    A    Yes, ma'am.

10   Q    And how did the photographer change his position for 29(e)?

11   A    He's kind of off to the right.  The doorway to the left is

12   into the living room.

13   Q    That's the left most side of the photo?

14   A    Yes, ma'am.  The doorway to the right you could see my

15   closet right there.

16   Q    In the center of the photograph.  I'm going to show you

17   29(f) and ask what's here.

18   A    That's the interior of my closet.

19   Q    I'm going to draw a circle around the object in the center

20   of this photograph and ask you what that is.

21   A    That is a gun safe.

22   Q    When did you get that gun safe?

23   A    I got it back in the earlier part of the summer.

24   Q    Of 20- --

25   A    '16.

```
1    Q    And what's in 29(g)?

2    A    That's the interior of the closet.

3    Q    That's similar to the prior photograph?

4    A    Yes, ma'am.

5    Q    And how about what's shown in 29(h)?

6    A    That's the sink that's right across from the closet in that

7    little hallway.

8    Q    And what's in 29(i)?

9    A    That is a view of our living room from the kitchen.  That's

10   a little pass-through window, and you can see the wall and

11   stuff in other living room.

12   Q    Okay.  And I'm going to skip to 29(k) and ask you what's in

13   that photograph?

14   A    That is our living room picture of the -- that would be the

15   front wall outside the shop were the door -- the window, and

16   that's our living room right there.

17   Q    Okay.  And what's in 29(j)?

18   A    That's a picture standing in our living room.  Looking

19   straightforward is our bedroom and to the right is Heather's

20   closet.

21   Q    So can you mark on the screen for the jury and show the

22   entrance to the bedroom.

23   A    Yes.  That's our bedroom.

24   Q    And is that headboard in the back, is that the bed?

25   A    That is the bed frame we had just purchased.  We had not
```

1   put it up yet.  Our mattresses were on the floor.

2   Q   Can you show in this photograph where a dog crate is?

3   A   Where what is?

4   Q   Dog crate.

5   A   It's right here, right there.

6   Q   Would you show the jury -- you mentioned a closet, where

7   that is?

8   A   It's right behind -- it's right there.

9   Q   So that's the dark spot on the right side of the

10  photograph?

11  A   Yes, ma'am.

12  Q   And what's shown in 32(a)?

13  A   That is Heather's closet.

14  Q   Is that what you just showed on the right side of the

15  photograph?

16  A   Yes, ma'am.  That's it.

17  Q   Now, what do we see in 29(l)?

18  A   That's our bedroom, our bed that would be the left wall

19  once you come through the doorway.

20  Q   And how about 29(m)?

21  A   That's a straight view of our bed standing at the foot of

22  the bed.

23  Q   Is the photographer standing near the doorway to the

24  bedroom?

25  A   He's inside the doorway about at the foot -- there's a

1    Cedar chest right there at the foot of the bed, and he's

2    standing kind of in front of it.

3    Q    What's shown in 29(n)?

4    A    The photographer turned around.  That would be the back

5    wall in our bedroom.

6    Q    And 29(o)?

7    A    That is our pantry.  A freezer to the left and washer and

8    dryer in the very back.  My closet where I hung my clothes and

9    stuff are right there to the your right, and my clothes are in

10   crates on the floor there.

11   Q    Can you circle your clothing that you're discussing?

12   A    Yes.

13   Q    And how about the crates that you mentioned?

14   A    Right there.

15   Q    What's in 29(p)?

16   A    It's just supplies.  We had been remodeling.  Heather had

17   been doing a bunch of painting.  It's tape and such that she

18   had that we both had used.

19   Q    What about 29(q)?

20   A    That is a bathtub that we had installed.

21   Q    And finally 29(r)?

22   A    That's our shower to the left, and to the right's a doorway

23   that goes to our toilet.

24   Q    Who lived in this home with you?

25   A    Just Heather and I.

```
1    Q    Anyone else?

2    A    No.

3    Q    When did Ms. Beard move into the house?

4    A    In March with me.

5    Q    March of what year?

6    A    2016.

7    Q    Who else had a key to the house?

8    A    Nobody.  We had went on a little vacation, and we had some

9    friends living next door.  We let them have a key to it for a

10   few days, but that was it.

11   Q    Did any people such as those stay temporarily at your

12   house?

13   A    Another friend stayed one or two nights helping me with

14   some pluming, putting a new sink, but that was it.

15   Q    When was the last time you remember a guest staying at your

16   house?

17   A    End of June, August.

18   Q    And that's 2016?

19   A    Yes.

20   Q    And when people stayed at your house, where did they sleep?

21   A    On the couch.

22   Q    Let me ask you about your relationship with Ms. Beard.

23   When did you and Heather Beard meet?

24   A    We met -- we met at the end of December of 2015.

25   Q    In 2015?
```

1   A   Yes, ma'am.

2   Q   And what was her name at that time?

3   A   Heather Elizabeth Wright.

4   Q   And tell the jury about your relationship with Ms. Beard

5   before you married her.

6   A   We actually started dating in January, and it was -- kind

7   of moved quick.  We had moved in with her family -- her cousin

8   in Flowers, Mississippi.  We lived there for a while and then

9   we split up.  And a friend of mine has a house in Vicksburg.  I

10  was staying there.  She moved in with me, and we decided to

11  remodel the apartment in one of my buildings because I actually

12  lived in other one.  We remodeled and started.  We had a friend

13  of ours doing it.  We were paying him.  And we moved in March,

14  and we continued -- she did a lot of the work.

15  Q   And when you say you remodeled the apartment, you mean

16  4645 Van Winkle Park Drive?

17  A   Yes, ma'am.

18  Q   The one that we just saw photographs of?

19  A   Yes, ma'am.  The ones you were showing the pictures.

20  Q   When did you and Ms. Beard marry?

21  A   We married I believe it was September.

22  Q   Of 2016?

23  A   2016, the beginning of September.

24  Q   Did you marry Ms. Beard because you love her?

25  A   Yes, I did.

1    Q    Besides love, is there another reason that you married her

2    when you married her?

3    A    There it was for a reason, yes.  We knew at the time

4    because before I met Heather, I had caught a state case.  And I

5    knew I was going to plea bargain it.  I was going to go to the

6    state facility.  So we knew we could not visit because her

7    history and my history we couldn't visit each other without

8    being married so that was one of the reasons.  Plus I wanted to

9    take care of her, let her live in my house and stuff while I

10   was gone because I thought I would be coming home in October.

11   Q    Did you have illegal drugs and drug paraphernalia in your

12   house --

13   A    Yes, I did.  I did.

14   Q    -- at 4645 Van Winkle Park Drive?

15   A    Yes, I did.

16   Q    Did you actually use meth at that time?

17   A    Yes.

18   Q    Methamphetamine?

19   A    Yes.

20   Q    Did you have ammunition in your house at 4645 Van Winkle

21   Park Drive?

22   A    Yes.

23   Q    Did you have guns in your house at that address?

24   A    Yes.

25   Q    What guns were in your house on December 2, 2016?

1    A    In the gun cabinet there was a .22 rifle, Winchester rifle.

2    And in the bedroom there was a .22 pistol, a Taurus .22 pistol.

3    Q    So those two guns use the same ammunition?

4    A    Ma'am?

5    Q    So are you saying those two guns use the same ammunition?

6    A    Yes, ma'am, they do.

7    Q    How did you come to possess the rifle?

8    A    I had bought a vehicle from a friend, and in the -- it was

9    a Jeep.  There was no top.  It was all covered in leather -- I

10   mean leaves.  And when I was cleaning it out, I found the

11   rifle.  It was all rusted up and everything.  I even called the

12   guy and asked him did he want it back.  He said he didn't know

13   it was in there.  We just kind of just threw it in the shop.

14   He kind of moved around.  And when we were packing my closet

15   up, either Heather or I put it in the closet.

16         MS. CASE:  Your Honor, may I approach and retrieve

17   Government's Exhibit 3?

18         THE COURT:  Yes.

19   BY MS. CASE:

20   Q    Mr. Beard, I'm holding Government's Exhibit 3.  Do you

21   recognize this?

22   A    Yes, that's the .22 rifle.

23   Q    Is this the one you were talking about?

24   A    Yes, ma'am, that is it.

25   Q    I have placed on the screen a photograph, Government's

1  Exhibit 37(a).  Do you recognize that?

2  A   Yes.  That's the interior of my gun cabinet.

3  Q   What's shown inside the gun cabinet?

4  A   To the left is that .22 Winchester.  Beside it is Heather

5  and I's -- the pellet rifles are called Gamo pellet rifles.

6  They are for plinking, and there's some arrows that go to my

7  bows.

8  Q   How did you say the rifle got placed in that gun safe?

9  A   Like I said, it was in the shed.  When we were packing this

10 closet up, either Heather or I, one of us put it in there.  I

11 don't know exactly which one put it in there.

12 Q   Who -- did both of you know that the gun was in the house?

13 A   Absolutely.

14 Q   Who had a key to that gun safe?

15 A   It wouldn't lock.  There's no lock.  When I got it from my

16 buddy, he didn't have the key, and I took the top lock out to

17 get the key.  It had never been fixed.  It didn't --

18 Q   Okay.  How about the closet that the gun safe was in?  Who

19 had the key to that?

20 A   We both did.  For a while, it didn't even have a lock on

21 it.

22 Q   So before the rifle was put here, where was it in your

23 house?

24 A   In the garage area.  We had the garage area that I did work

25 out of.

1    Q    Was there a case that it was in?

2    A    No.  It was laying on back of a four-wheeler -- of the

3    four-wheeler, or was laying on the rack, just laying around up

4    in a corner, stuck in a corner.  It looks a lot better now than

5    it did when I had it.  You can see in the pictures it was all

6    rusted and everything.

7    Q    Now, you mentioned some other items in this gun safe.  I'm

8    going to circle two black guns that are in the -- near the

9    center of that photograph.  What are those?

10   A    Those are Gamo whispers, air rifles, single shot pellet air

11   rifles.

12   Q    Whose rifles are those?

13   A    The left one is Heather's, and the right one is mine.

14   Q    How do you know whose is whose?

15   A    The yellow dot on the bottom.  You can tell by the scope.

16   I put a better scope on mine.

17   Q    Why did you have those two guns?

18   A    We shoot at different targets.  We used to live in Flowers

19   in the woods, and at the lake house we'd shoot turtles in the

20   lake.  We did plinking, shoot at metal targets or paper

21   targets.

22   Q    I'm going to show you Government's 29(g) again, and I'm

23   going to circle some objects in the center of that photograph

24   and ask you what those are.

25   A    The paper targets laying across the top right there with

1    circles on them, and then right below it is a plinking target.

2    That's in the box.  You shoot it.  It makes a plinking noise,

3    and it flips over and resets.

4    Q    You're talking about small little BB type --

5    A    Uh-huh.

6    Q    -- objects?

7    A    Little pellets, like air rifle pellets you give your kids.

8    Q    And who all shot the two air guns that we saw in the

9    previous photograph?

10   A    We both shot each of ours.  Heather shot hers, and I shot

11   mine.

12   Q    I'm going to leave 29(g) on the screen for a minute and

13   circle the gun safe that we saw earlier and ask you where the

14   lock is on that gun safe.

15   A    Right there in the center of that you can see the lock is

16   missing.  There's a hole where the lock used to go.

17   Q    So the cabinet cannot be locked?

18   A    No, it could not.  There's a lock assembly sitting in my

19   bedroom.

20   Q    I'm going to show you some more photographs of -- that are

21   related in the closet where these items are, and I'd ask you to

22   tell the jury what you see on 37(b).

23   A    That is a shelf inside my closet and a little metal box

24   that's got clips for pistols in it.

25   Q    Let me show you 37(c) and ask what you that is.

 1   A   That's inside that box.  That's different clips for

 2   pistols.

 3   Q   Are those -- do those clips have ammunition in them?

 4   A   Some of them do.  I can see that the top one there has

 5   rounds in it.

 6   Q   Can you circle that for us?

 7   A   Yes.  (Witness Complied with Request).

 8   Q   How about 37(d)?  What's here?

 9   A   That is the top of my gun case, and that's four shotgun

10   shells sitting on top of it.

11   Q   There?

12   A   Yes, ma'am, and right there, yes, ma'am.

13   Q   What do we see in 37(e)?

14   A   It's some kind of container with a bullet in the bottom of

15   it.  I believe it was in my closet.  I'm not sure.

16   Q   How about 37(f)?

17   A   That I believe was on top of my gun cabinet.  There's a

18   bullet sitting there and the pellets for the air rifles and a

19   little flashlight.

20   Q   The pellets are in the tin can in the middle of the screen?

21   A   They are in the silver container.  That's the pellets.

22   There's one right there beside the bullet.  Right there on the

23   bottom left, that's one of the pellets that go in the pellet

24   gun.

25   Q   Were you allowed to possess the gun such as the .22 caliber

1   rifle that was in that gun safe?

2   A   No.  When I received the gun or got it out of the vehicle,

3   I was under the understanding it was a hunting safety course

4   rifle and did not fire.  I found out that the agents had fired

5   the gun.  It does fire.  I was not allowed to have it.

6   Q   Why were you not allowed to that have rifle?

7   A   Because I have a felony on my record.

8   Q   Did Heather Wright-Beard, your wife, also have a felony

9   conviction before December 2016?

10   A   Yes, she does.

11   Q   Did your status as convicted felons prevent either of you

12   from possessing the air guns that we talked about?

13   A   No, it does not.

14   Q   Why not?

15   A   Because anybody can buy them.  You go into Walmart,

16   children can buy them.

17   Q   And you said you were arrested at your house on December 2,

18   2016.  Right?

19   A   Yes, ma'am.

20   Q   What time of day were you arrested?

21   A   It was around 6, 6:30.  It was early in the morning.

22   Q   And why were you arrested?

23   A   Because I had a state charge that I was supposed to go to

24   my sentencing on October 31st, and I did not go.  And they

25   issued a warrant for my arrest for failure to appear, and the

1    U.S. marshals came and got me.

2    Q    Tell the -- what charge led to that?

3    A    Rankin County called it home invasion.  MDOC calls it

4    residential burglary.

5    Q    Tell the jury what you did that led up to that home

6    invasion charge.

7    A    Before I met Heather, I had another young lady living with

8    me.  She had ran off with my vehicle, my Yukon, some laptops

9    and jewelry and stuff like that, and disappeared with another

10   guy.  And I found out where she was a week later, and me and an

11   employee of mine went there to get my stuff back.  And my

12   employee ran inside the house and threatened somebody in the

13   house.  We left.  They called the police.  I got pulled over;

14   he did not.  I got pulled over, and I took the charge.

15   Q    You say your Yukon.  How did you get -- how did you come to

16   possess the Yukon?

17   A    My dad died in 2013; my mom unfortunately in '15.  I

18   inherited when she passed away.  The rings the girl had stolen

19   I inherited from my dad.

20   Q    I'm going to return your attention to Government's 28(b)

21   and ask you again what this is.

22   A    That's pictures in front of the building.  That's Heather's

23   Firebird I had bought her, and that's my Yukon to the right.

24   Q    The vehicle on the right of the photo is the Yukon?

25   A    Is the Yukon.

1    Q    When was that photograph taken?

2    A    I guess December 2nd, yes.

3    Q    You had that vehicle on December 2nd, 2016?

4    A    Yes, I did.  I think I still do.

5    Q    So you were able to keep the Yukon that was the subject of

6    your home invasion charge?

7    A    Right.  The gentleman that was driving it that night was

8    not pulled over, or I never mentioned him in the case or

9    nothing.

10    Q    So, nevertheless, did you plead guilty to the home invasion

11    charge?

12    A    Yes, I did.

13    Q    Were you sentenced for that crime?

14    A    I was sentenced to five years.

15    Q    Now, you said you were arrested on December 2, 2016,

16    because you did not appear for your sentencing hearing.

17    A    Right.  I was originally arrested October 10th of 2015, I

18    believe.

19    Q    Well, the arrest that brings us here today --

20    A    The arrest that brings us here today is December 2nd.

21    Q    And can you tell us the sequence of events that led up to

22    you not appearing at your sentencing hearing?

23    A    We were supposed to go to sentencing on October 1st.  We

24    had prepared everything, and then all of the sudden we got a

25    call from my lawyer.  He was going to put it off a week.  Then

1    we were supposed to go October 8th, and then we got a call

2    about three days before that, that the judge had something to

3    do for two weeks.  So we were going to do it like the 16th or

4    something of October, two weeks later that Monday -- it was

5    October 31st.

6         October 31st that morning, we had got up, and we had been

7    in a big fight about three or four days.  We busted the windows

8    out of our vehicles, front windshield, side windshield, stuff

9    like that.  And me and Heather got in an argument, and she said

10   she wasn't going to drive me to my sentencing or go with me to

11   my sentencing so I just didn't go.

12   Q   So you just didn't show up for your sentencing?

13   A   I did not show up for my sentencing.

14   Q   When did you plead guilty for that home invasion charge?

15   Do you remember?

16   A   I believe it was in July -- it was June or July of 2016.

17   Q   In the summer of 2016?

18   A   Yes, ma'am.

19   Q   And at the time you pled guilty or around that time, what

20   length of sentence did you expect to receive?

21   A   Five years.

22   Q   On the home invasion charge?

23   A   Home invasion charge yes, ma'am.

24   Q   How much of that sentence did you expect to serve in

25   prison?

1    A    About two and a half years.  I had to do 50 percent of it

2    in the state of Mississippi.

3    Q    And when was your original sentencing hearing set for the

4    home invasion charge?  What date?

5    A    It started -- it was supposed to have been October 1st.

6    Q    Okay.

7    A    Then it got moved to the 8th and then to the 31st.

8    Q    So first time was October 1st 2016?

9    A    When I was supposed to go, yes, ma'am.

10   Q    And in relation to that, when did you and Ms. Beard get

11   married?

12   A    Three weeks before that.

13   Q    Did Ms. Beard know that you were headed to prison before

14   the two of you decided to get married?

15   A    Yes, she did.

16   Q    And what arrangements did you make in anticipation of the

17   year or two that you expected to be in prison?

18   A    We had had some problems with the taxes on the building.

19   So we lost one of the buildings to taxes, and I sold a bunch of

20   my stuff so we could come up with the money.  And Heather had

21   talked to the tax people and got it as low as we could.  The

22   gentleman we were buying it from did not buy the taxes.  We got

23   the taxes paid off and we were selling things.  I had bought

24   her a dog for protection.  I had bought her the pistol for

25   protection.  We live in a bad neighborhood.

1    Q    And is one of the things that you did in anticipation of

2    going to prison to marry Ms. Beard?

3    A    Yes, it was part of it.

4    Q    Was there any -- why did you and Ms. Beard marry knowing

5    that were you going to prison?

6    A    Because I love my wife.  We were in love at the time.  And,

7    you know, I was hoping she could be able to visit me and, you

8    know, stand by me while I was in prison, you know, and take

9    care of me, help me out.

10   Q    Was there any financial benefit that occurred as a result

11   of that marriage?

12   A    For her, yes; not for me.

13   Q    What would it have been for Ms. Beard?

14   A    She was getting rent off of one of my buildings, and my

15   nephew at the time was paying me for buying my parents' house

16   from me, and he was paying me 500 a month, and I was giving her

17   300 and I was taking 200 of it so I would have canteen in

18   prison.  My nephew was mailing her 3 and me 2.

19   Q    And that was -- the spousal relationship provided that

20   benefit?

21   A    Yes.

22   Q    You said you were renting a property.  Can you explain

23   that?

24   A    Yes.  My original building -- the first one I bought that's

25   next door to the left, she was renting it to -- it was a guy

1   that worked at a shop right there on our street, him and his

2   girlfriend were living in that building because I had an

3   apartment built in it originally.  I've had that building since

4   '09.

5   Q   All right.  Did you have items in that building before you

6   rented it out?

7   A   We moved everything out so we could rent it out, yes,

8   ma'am.  We had -- I had my race car in there and some other

9   stuff.

10  Q   And where did that rent money -- who received that rent

11  money?

12  A   She did.

13  Q   And you mentioned some things you did for physical

14  security.  Did you install anything in the house for security?

15  A   Installed security cameras and a DVR.  Like I said, I

16  bought a pit bull, you know, and I bought her the pistol.

17  Q   So you mentioned that you bought a pistol.  Why did you buy

18  a gun?

19  A   Because on the back -- behind our building is a

20  neighborhood street, Dixie Avenue, in South Jackson.  That's a

21  rough neighborhood.  It has a lot of gang violence, gunfire and

22  stuff.  On the holidays, they don't shoot fireworks.  They

23  shoot guns.  So I mean, it's -- she needs it for protection.

24  We've had numerous people break in or people attempting to

25  break in breaking into vehicles there.  The shops all up and

1    down the street are always getting broke into.

2    Q    Who would have been living in the home with Ms. Beard after

3    you went to prison?

4    A    Was not supposed to be anybody.

5    Q    Did you buy the gun before or after you and Ms. Beard

6    married?

7    A    It was before.

8    Q    Do you know approximately when you bought the gun?

9    A    Yeah, it was June, July, in the summer.  We had been at a

10   soccer game that day in Madison or Ridgeland.

11   Q    Was it -- do you know in relation to your marriage how far

12   in advance of your marriage it would have been?

13   A    About a month and a half.

14   Q    Can you tell the jury how you bought the gun?

15   A    I had been putting feelers out for small caliber action.  I

16   wanted a little 25 automatic, and a friend of mine had called

17   me and told me he had that .22 pistol.  And we had met at Sonic

18   on Highway 51 in Ridgeland, and I purchased it right there in

19   the parking lot of the Sonic while we were eating.

20   Q    Who was with you when you bought the gun?

21   A    It was Heather and I and Heather's daughter, Hope.

22   Q    Who did you buy the gun from?

23   A    Guy's name is Ian.  I don't know his last name.  He lives

24   over in south Jackson.  He's somebody I had done business with

25   and met before and stuff.

1   Q   What type of gun did you say you asked for?

2   A   I was asking for a small caliber pistol, just something

3   small for her.

4   Q   And what did you actually buy?

5   A   I bought a 9 shot .22 Taurus Ultra-Lite.

6   Q   You said .22 Taurus?

7   A   Yes, ma'am, Taurus.22 Ultra-Lite, a nine shot.

8   Q   What does .22 refer to?

9   A   .22 caliber.

10  Q   How much did you pay for the gun?

11  A   I paid 160.

12  Q   When you bought this gun from Ian, who did Ian give the gun

13  to?

14  A   He walked up to the passenger side window.  We were talking

15  through the passenger window.  We were at Sonic.  He couldn't

16  come to my window because the ordering thing is right there.

17  And he -- Heather rolled down the window, and we was talking to

18  him and he passed it through the window to me.  Heather handed

19  it to me through the window.

20  Q   What, if anything, did Ms. Beard say when you all received

21  the gun?

22  A   I looked at it first, and then, you know, handed it back to

23  her.  And she looked at it, and I said, *Is this what you want?*

24  And she said, *Yeah.*  I handed her the money, and she handed it

25  to Ian.

1   Q   So you -- you said Ian got his money how?

2   A   I pulled it out of my pocket, counted it, Heather was right

3   there beside me in the front seat.  I handed it to her and she

4   handed it to Ian.

5   Q   Okay.  Why didn't you just go to a store that sells a gun

6   and buy this gun?

7   A   Why did I --

8   Q   Why did you not go to a store to buy this gun?

9   A   I was a felon.  I can't go buy a gun.

10  Q   Who had control of the gun after you bought it?

11  A   I gave it to her.  It was her gun.

12  Q   When you say "her" who is that?

13  A   Heather's.

14  Q   Where did Ms. Beard keep the revolver?

15  A   It varied between her purse and the nightstand.  She'd have

16  it somewhere in the bedroom over by her nightstand.

17  Q   Could you have used that gun if you wanted to?

18  A   I could have probably found it and used it, yes.

19  Q   Did you ever?

20  A   I did grab it one day.  We were in a bad argument, and I

21  grabbed it and put to it my head and was going to try and

22  commit suicide.  And me and her tussled over the gun, and I

23  took it and threw it.  A window in our bedroom is busted

24  because I threw it and busted that window.

25  Q   Did you ever see Ms. Beard with the revolver after she had

1    it at the Sonic?

2    A    Yes, numerous times.

3    Q    Tell us about what you remember.

4    A    One of them I was standing in my shop area.  She opens the

5    door, puts it in my face, pulled the trigger three times and

6    said -- started off walking and said, *It's just that easy*.  The

7    gun was empty.  She put it my face and pulled the trigger three

8    times.

9         Then on one night we seen somebody in the cameras at the

10   back of the building.  We figured it was the kid from the

11   building behind us -- the house behind us.  I went out through

12   the garage area going to holler and grab him.  All of the

13   sudden behind me I hear two gunshots.  I turn around at the

14   fence, and there's Heather hollering, *The next time I'm going*

15   *to shoot you in your ass*.  She discharged a gun in the air

16   twice.

17   Q    That time that the gun was -- that Ms. Beard discharged the

18   gun, was that before or after you married?

19   A    I believe it was -- I believe it was after we were married.

20   Q    Can't be sure?

21   A    I'm not exactly sure the date.

22   Q    And the time that she unloaded it and pulled the trigger in

23   your direction, was that before or after you married?

24   A    I believe that was after we married.

25   Q    What did you do after she pointed the revolver at you and

1   pulled the trigger?

2   A   I got the pistol, and a friend of mine had come by that day

3   or the next day, and I gave it to him to keep -- get it out of

4   the house.   I said, *Don't give it back to her until I go to*

5   *prison.*   But apparently he gave it back to her.   I later found

6   out that she was seeing my friend's twin brother.   They were

7   seeing each other before I went to prison.

8   Q   When you say you took the revolver and gave it to another

9   person to keep --

10  A   A gentleman named Todd Bates.

11  Q   What instruction did he have?

12  A   Do not give it back to her until after I go to prison.

13  Q   So you intended for her to have the gun again?

14  A   Yes.   It was bought for her for protection for while I was

15  in prison.

16  Q   After you handed the gun to your friend, when is the next

17  time you remember seeing it?

18  A   When y'all showed me pictures of it a few weeks ago.

19  Q   Y'all --

20  A   The prosecutor.

21  Q   The government?

22  A   The government.

23  Q   Did you know that the revolver was back in your house?

24  A   No, I did not.

25          MS. CASE:   Your Honor, may I approach and pick up

1   Exhibit 4?

2           THE COURT:  Yes.

3   BY MS. CASE:

4   Q   Mr. Beard, I'm showing you what's been admitted as

5   Government's Exhibit 4, and I'll ask if you can recognize that.

6   A   Yes, that's the Taurus .22 Heather liked that I bought,

7   that I purchased for Heather.

8   Q   This is the gun we've been talking about?

9   A   Yes, ma'am, that's it.

10  Q   This is the gun that you bought for Ms. Beard before you

11  went to jail?

12  A   Yes, ma'am, that is it.

13  Q   If we can, I'd like to go through some more photographs of

14  the home.  I'm going to start with Exhibits 31(a) and(b) and

15  ask you what is shown here on 31(a), specifically in this sort

16  of center of the table?

17  A   That is a laptop -- not a laptop.  A tablet that was

18  Heather and I's -- Heather and mine.

19  Q   If we look at --

20  A   That's our laptop -- I mean, our tablet.  It says

21  Heather -- David and Heather Beard.

22  Q   So that's Government's 31(b).  Is that a shared laptop?

23  A   Yes.

24  Q   Shared iPad, excuse me.  If we can look at Government's

25  Exhibit 30(a) and I ask you what is on this photograph?

1   A   As you enter our living room, that's a table that's right

2   against the wall.  That's right before the closet, Heather's

3   closet.

4   Q   What is shown on that table to the left of the stack of

5   DVDs?

6   A   That's a .22 bullet.

7   Q   Can you draw a circle around that for us.

8   A   (Witness complied with request.)

9   Q   And I'll show you -- I'll show you Government's 30(b) and

10  ask you what that is.

11  A   That is a .22 caliber bullet.

12  Q   Is that a close-up of the bullet we just saw?

13  A   Yes, ma'am.

14  Q   Does that bullet fit either of the two guns that was in

15  your house?

16  A   Fits both.

17  Q   And what's that bullet on that table in your living room on

18  the day you were arrested?

19  A   I'm not sure.  I don't know.  Apparently it was.  I

20  don't -- I don't remember it being there.

21  Q   I'm going to return your attention to Government's Exhibit

22  29(m).  Tell us again what room this is.

23  A   That is standing at the foot of our bed taking the picture.

24  That's our bedroom.

25  Q   You say "our."  Whose bedroom?

1    A    That's Heathers and mine.

2    Q    How many beds were in the house?

3    A    Just one.

4    Q    And if you're at the foot of the bed and looking at the

5    bed, which side of the bed did you sleep on?

6    A    I slept on the right.

7    Q    What side did your wife sleep on?

8    A    Ma'am?

9    Q    What side did your wife sleep on?

10   A    She slept on the left.

11   Q    Who was the primary user of the shelves on the right side

12   of the bed?

13   A    That is mine.

14   Q    I'm going to show you some photographs from that side of

15   the bedroom and ask if you can tell the jury what we see.  And

16   the first thing I'm going ask you to do is compare two

17   photographs.  The first is 33(a).  And if you would, start by

18   looking at the plastic shelves at the top.

19   A    Yes.

20   Q    I'm going to change the photograph to 33(b) --

21   A    Okay.

22   Q    -- and ask that you look at those shelves again.  So

23   comparing Government's 33(a) and(b), have items been moved

24   around?

25   A    Yes, they have.  To the left of the plastic case is some

1    scales.  They were down in the lower shelf.  On the second

2    shelf there's another set of scales with a baggie on it.  They

3    were in another place.  The plastic thing on the top, you can

4    tell the drawers were opened.  My cigarettes and stuff aren't

5    there on top but the scales are now.  It was cigarettes in the

6    other photo.

7    Q    Are the cigarettes still there?

8    A    Cigarettes are at the bottom now next to the last shelf by

9    the locks that went to the gun cabinet.

10   Q    Is it fair to say that the items on these shelves are in

11   the same general area in the bedroom that they would have been

12   when were you arrested?

13   A    Yes.  They were on my side.

14   Q    So I'm going to ask you about a couple of items in this

15   area.  What is shown on the top shelf on the left side?

16   A    That is a set of scales.

17   Q    This is the top left-hand corner?

18   A    Yes, ma'am.  That's them.

19   Q    What is shown -- I'm going to circle the middle of the next

20   shelf.  What is shown there?

21   A    There's another set of scales with a bag sitting on it, and

22   on the ashtray is a syringe with methamphetamine in it.

23   Q    What's the black bottle?

24   A    That's Bod body spray.

25   Q    Whose is that?

1    A    Me.   That's mine.

2    Q    Whose are the other objects we've circled so far?   Are the

3    other objects --

4    A    Mine also.

5    Q    -- yours also?

6    A    Mine, yes.

7    Q    How about the cigarettes on this shelf?

8    A    That's mine.   I smoke Marlboro Light in the soft pack.

9    Heather smokes a hard pack, the box.

10   Q    On the very top of this shelf there's a wallet.   Whose

11   wallet is that?

12   A    That's my wallet, and that's my money and pocket knives and

13   stuff in that top drawer.

14   Q    That's 33(c).   On 33(d), that's --

15   A    That's my identification card and my driver's license.

16   Q    From the wallet that --

17   A    From the wallet.

18   Q    It came out of the wallet?

19   A    Yes, they were in my wallet.

20   Q    33(d) is a close-up of some of what we've seen, and I'm

21   going to circle what's on the shelf between the Santa cup and

22   the Bod spray and ask you what that is.

23   A    That's a set of scales, plastic baggie and a syringe with

24   methamphetamine in it.

25   Q    You said those are yours.

1   A   They are mine.

2   Q   How about in 33(g)?  What do we see towards the right of

3   that photograph?

4   A   That's close-up of the scales, baggie and the syringe.

5   Q   What's on the scale?

6   A   A baggie with apparently some kind of white powder in it.

7   Methamphetamine probably.

8   Q   What's to the right of 33(h)?

9   A   Another set of scales, a remote, and some of my car keys.

10   Q   How about what's in 33(i)?

11   A   That's a pair of scales that were up on top of it.

12   Q   And 33(j), what are those plastic bags in the center used

13   for?

14   A   Empty -- they are empty methamphetamine bags from where I

15   had purchased methamphetamine.

16   Q   And what is in the corner of the bin above the Energizer

17   battery?

18   A   A .22 caliber bullet.

19   Q   Did I circle it?

20   A   Yes, ma'am, that's it.

21   Q   These items on the piece of furniture, those are your

22   items?

23   A   Yes, ma'am, they are.

24   Q   I'm going to continue with some photos around the bedroom

25   and ask you where we are in the bedroom in this photograph.

```
1    A    That is the cedar chest at the foot of our bed.

2    Q    What's in -- that was 35(a).  What's in 35(b)?

3    A    That appears to be Heather's driver's license and one of my

4    old phones.

5    Q    What about 35(c)?

6    A    That's Heather's driver's license.

7    Q    What's in 35(d)?

8    A    That is a pair of laptops I had bought us.  One was hers,

9    and one was mine.

10   Q    And what furniture is in the bedroom in the opposite side

11   of the bed?

12   A    That's a dresser in the back that we both use.  And then

13   there's like a clothes rack that we both use hanging -- our

14   clothes are hanging to the right.  All the bins on the floor

15   are Heather's stuff, and there's a dog kennel with our dog in

16   it.

17   Q    Can you show us the bins that you're talking about that

18   Ms. Beard used?

19   A    (Witness complied with request.)

20   Q    And the clothing rack that you all used?

21   A    (Witness complied with request.)

22   Q    Where generally on the dresser is Ms. Beard's --

23   Ms. Beard's effects?

24   A    All this is her stuff.

25   Q    So you've circled --
```

1  A   I circled her.

2  Q   -- things on the right side of the photograph?

3  A   Ma'am?

4  Q   You've circled things on the right side of the photograph?

5  A   Yes.  Things on the right side is hers.

6  Q   And is the right side on the left side of the photograph

7  where the door to the bedroom is?

8  A   To the right.  It's right here about where the bin is, the

9  bottom where the doorway's right there.  You come in and that

10  will all be to your right.

11  Q   Okay.  So that was Government's Exhibit 29(n).  You circled

12  a few things on Government's 29(n) for where you wife kept her

13  belongings.  Are there any other places that she kept her

14  clothes in the house?

15  A   Her closet and in our bedroom and that was about it.

16  Sometime it would be back in the laundry room.  After she'd

17  wash and dry them she may hang them up there.

18  Q   I'm going to show you Government's 18(a) again, the floor

19  plan.  I'm going to ask -- you said her closet.  If you could

20  explain where Ms. Beard's closet is.

21  A   It's right here outside of our bedroom.

22  Q   And the bins of clothing that you highlighted on 29(n),

23  where are those?

24  A   Those are right here on this side of the doorway.  We hang

25  clothes, and there's a bin right there inside that doorway, and

1  that's the dresser there beside it.

2  Q   And can you show us which side of the bed would have been

3  Ms. Beard's?

4  A   Where I sleep?

5  Q   Where your wife slept.

6  A   Right here.

7  Q   I'm going to show you Government's 32(a) and ask you what

8  is shown.

9  A   That's Heather's closet, the doorway to her closet.

10  Q   Whose items do you see in the closet in this photograph?

11  A   That's all Heather's clothes.

12  Q   I'm going to ask you what you see in Government's 32(b).

13  A   On the top shelf is a bunch of swimming pool stuff we

14  bought at Dollar General on sale.  Her parents have a pool at

15  their house.  On the second shelf is a little stereo thing and

16  a box that she had and tennis shoes and more of her shoes.

17  Q   So whose items do we see in this photograph?

18  A   They are all Heathers.

19  Q   I'm going to ask you what is shown in the center of the

20  photograph.

21  A   There's a black box that she had bought at Walmart to keep

22  stuff in.

23  Q   Can you circle that for us?

24  A   Sure.

25  Q   Is that your box?

```
1    A   No, it's not mine.

2    Q   I'm going to show you Government's 32(c).  What is that?

3    A   That's .22 rounds, .22 caliber rounds.

4    Q   Is this the inside of the box you just --

5    A   Yes, ma'am.

6    Q   -- circled?

7    A   Yes, ma'am.  It looks like it.

8    Q   What guns in your house did those bullets match?

9    A   Both, the .22 rifle and the .22 pistol.

10   Q   What else is in the box with the bullets?

11   A   Appears to be ink pens.

12   Q   Did you know that the .22 caliber bullets were in this box?

13   A   No, I did not.

14   Q   Did you put them in the box?

15   A   I did not.  The last I seen them they were in a cardboard

16   box in that black tool box.

17   Q   Did you put those bullets or that box in this closet?

18   A   No, I did not.

19   Q   Did you know they were in this closet?

20   A   No, I did not.

21   Q   When did you learn that those bullets were in this closet?

22   A   Two weeks ago when the government showed me the picture.

23   Q   I'm showing you Government's 29(m) again, and I'd like to

24   direct your attention to what you've -- what we've referred to

25   as your wife's side of the bed.  Who was the primary user of
```

1    the things along the left-hand side of this photograph?

2    A    That's her mirror, blow dryer, hair straightener, curling

3    iron.  Everything on that left side's hers.

4    Q    What's on the top of the bed where a person's head would

5    be?

6    A    Top of it looks like her purse.

7    Q    Whose hats are on the wall above that purse?

8    A    Only the left side is her hats, and then there's an -- the

9    Under Armour on the right side is mine.

10   Q    Whose slippers are on the right side of the bed by the --

11   A    Them are mine.  They're moccasins.

12   Q    Do you see the pink stickers and the flower stickers that

13   are on the wall?

14   A    Yes, I do.

15   Q    And do they -- you see the stickers that say "me" and

16   "you"?

17   A    Right there above each side of our bed it says -- on the

18   left-side says "me" and on the right side it says "you."

19   Q    Who does "me" refer to?

20   A    Heather.

21   Q    Who put those stickers up?

22   A    She purchased the stickers at Walmart and put them up.

23   Q    She put them up?

24   A    Uh-huh.

25   Q    You see the -- do you see an end table to the left side of

1    the bed?

2    A   Yes, I do.

3    Q   Can you circle that area of the screen for us?

4    A   (Witness complied with request.)

5    Q   And in the center of the circle that you just made, you see

6    a blue fan?

7    A   Yes, I see the blue fan.

8    Q   What's on that blue fan?

9    A   Stickers and paintings that she does.  It says "Heather" on

10   one side of it, I believe.

11   Q   And on the floor on the left side of the bed, I'm going to

12   circle an object and ask you what it is.

13   A   Heather's phone.

14   Q   Is the mirror on this left side of the wall in that bedroom

15   propped up against the wall?

16   A   Yes, it is.  It's one we got from her mother.  We were

17   going to mount it on the wall, and it got broke in the fight I

18   was talking about where I tried to commit suicide.

19   Q   If we look at Government's Exhibit 34(g), tell us what we

20   see here.

21   A   Heather's nightstand with her fan on it.  Says "Heather"

22   beside it and lotions and lamp and appears to be medicine

23   bottles and a clear zip-up case she's got on the floor.

24   Q   Can you just using the monitor show us where the bed is to

25   make sure the jury is oriented?

1    A    Right here on the floor.

2    Q    The nightstand we were discussing.

3    A    Nightstand, and this is a .22 bullet on the corner there.

4    Q    And is the fan that we were discussing --

5    A    Yes, that's the fan.  That's Heather's fan.  It's got her

6    name on it.

7    Q    Are there objects stored in this nightstand?

8    A    Do what, ma'am?

9    Q    Are there objects stored --

10   A    The little make-up case that she had with her make-up in

11   it.

12   Q    What color objects are stored inside that nightstand?

13   A    There's like a red, pink, and blue.  There were little like

14   zip-up cases that contain her make-up.

15   Q    I have circled the center bottom of the photograph.  What's

16   in that general area?

17   A    That's a clear bag that we kept my medicine, her medicines,

18   Tylenol, sinus medicine, over-the-counter stuff or prescription

19   stuff, kept it in that clear bag.

20   Q    Who maintained the medicines for your household?

21   A    Ma'am?

22   Q    Who kept the medicines for your household?

23   A    She did.  She kept up with them, that side.  If I needed

24   it, she give them to me.  She usually make sure I take my

25   medicines.

1    Q    I'm going to show you a slightly different view in

2    Government's 34(a) and ask you again to just show us where the

3    nightstand, the end table is.

4    A    Right here.

5    Q    You've drawn a circle towards the center top of the screen.

6    Can you show us the objects that are stored inside the end

7    table?

8    A    Uh-huh.  Right here, and here some on the bottom right

9    there.

10   Q    And will you show us the bottles of medications that you

11   were talking about?

12   A    (Witness complied with request.)

13   Q    The left bottom corner of the screen has what in it?

14   A    Has a black case.

15   Q    Well, the left most bottom corner has what?

16   A    That's the mirror that's broke, and right here's a black

17   case.

18   Q    Do that one more time.  Try that again.

19   A    (Witness complied with request.)

20   Q    Whose black bag is that?

21   A    That's Heather's.

22   Q    What's in that black bag?

23   A    I do not know.

24   Q    I'm going to show you Government's 34(b).  What is that?

25   A    That is the Taurus Ultra-Lite .22.

```
1    Q    Is that the revolver we've been discussing?

2    A    Yes.  That's the one you had a minute ago.

3    Q    What is this?

4    A    That's the other side of the pistol.

5    Q    That's 34(c).  34(e) shows what on the left-hand side of

6    this photograph?

7    A    That's Heather's phone and some other items of her on the

8    bed.

9    Q    Is that the phone that we saw on the floor earlier?

10   A    I believe so.

11   Q    What's 34(f)?

12   A    That's her phone.

13   Q    34(e) is a photograph of what?

14   A    Somebody holding three pill bottles.  I've seen this

15   picture clear.  It's three of Heather's, and the two blue

16   bottles in there on the bottom are mine and then just different

17   over-the-counter medicines.

18   Q    What's in 34(j)?

19   A    Those are Heather's prescriptions.

20   Q    And can you see an object faintly to the center right?

21   A    Looks like the fan.  I can see the name up the side.  Yes,

22   blue fan that was on the nightstand.

23   Q    I'm going to show you some photographs that have been

24   admitted of the garage or shop area of the house.  And it

25   begins with Government's Exhibit 38(a).  Do you recognize that?
```

1    A    Yes.  That's a black tool box that's in a little storage

2    shed we have outside the building.

3    Q    What is 38(b) a photograph of?

4    A    That's inside that box, and it's a different rounds of

5    ammo, shotgun shells, and stuff that I inherited from my dad.

6    Q    How about 38(c)?

7    A    That's a counter in my shop door open to a cabinet, and

8    that's a gun box -- ammo box rather.

9    Q    And what is 38(d)?

10   A    That's an ammo box and appears to be a clip beside it.

11   Q    And how about 38(e)?

12   A    That's the interior of an ammo box and different ammo.

13   Q    And 38(f)?

14   A    That's the back of my four-wheeler with the rack sitting on

15   it.

16   Q    And what's in 38(g)?

17   A    It's a cooler sitting on that rack that's on the back of my

18   four-wheeler.

19   Q    And what is 38(h)?

20   A    Shotgun shells inside of the cooler.

21   Q    And how about 38(e)?

22   A    That's a drawer in my cabinet in the shop.

23   Q    And 38(j)?

24   A    More shotgun shells and different ammo.

25   Q    Do you recognize Government's Exhibit 27(a)?

1   A    Unfortunately, I do.  That was me at the time.

2   Q    At the time of your arrest?

3   A    The morning of my arrest, yes.

4   Q    And what is government's 27(b)?

5   A    That's Heather the morning of my arrest.

6          MS. CASE:  Your Honor, at this time I would ask that

7   Mr. Beard be allowed to view the items on the evidence table.

8          THE COURT:  Okay.  Well, I tell you what, before we do

9   that, let's take -- let's take a short break here.  It's 10:45.

10  I'm going to excuse the jury.  Remember the instructions I've

11  been -- we're going to come back in about 15 minutes, 11:00.

12  If you'd leave your pads in your chair, you can be excused.

13     (Jury Out)

14         THE COURT:  You wanted him to do what?

15         MS. CASE:  I was going to ask that he stand here and

16  be able to look at these items and confirm that they came from

17  his residence.

18         THE COURT:  All right.  We'll do that when we come

19  back to court.  We will be in recess.  Mr. Beard, obviously

20  don't talk to anybody during the break.  Court's in recess.

21     (Recess)

22     (Jury In)

23         THE COURT:  You may proceed.

24         MS. CASE:  Thank you, Your Honor.  At this time, I

25  would ask that Mr. Beard be allowed to come down and look at

1    the items on the table which are -- have been admitted as

2    Government's Exhibit 5 through 15.

3              THE COURT:  All right.

4    BY MS. CASE:

5    Q   Mr. Beard, please look at these items and when you're

6    finished, if you'll just return to your seat.  Just look at

7    them generally, see if you recognize them.

8    A   I recognize all of them.

9    Q   If you will please return to your seat.  What are the items

10   marked Government's Exhibit 5 through 15?

11   A   That is an ammunition and the boxes and stuff that I was

12   storing them in and kept them -- had in my shop and in my

13   house.

14   Q   Are these items in substantially the same condition as you

15   had them in your house?

16   A   Yes, ma'am, they are.

17   Q   And were these items in your house on December 2, 2016?

18   A   Yes, ma'am, I believe they all were.

19   Q   I'm going to show you some photographs of these items, and

20   I'm going to ask if you recognize these, starting with

21   Government's Exhibit 39(a).  I'm going to circle things on the

22   screen starting with the center of the screen and ask if you

23   recognize that and tell us what it is.

24   A   Yes, sir.  That is the Taurus .22.

25   Q   What is the object in the middle?

```
1    A    Winchester .22 rifle.

2    Q    How about the top left-hand side of the screen that's

3    running out of the photo?

4    A    That's the box with the .22 caliber bullets in it.

5    Q    And the box beside that to the right?

6    A    That was the one that was in my closet with all the clips

7    in it, the bullets.

8    Q    How about in the top center, the red items?

9    A    That, I believe, is 12 gauge shotgun shells.

10   Q    And if you can see to the left center of the photograph.

11   A    Appears to be a .22 bullet, .22 caliber bullet.

12   Q    How about next to that?

13   A    I believe that is too.

14   Q    And what are the green and yellow items?

15   A    I believe that is .20 gauge shells.

16   Q    And can you tell in the lower right-hand portion that's

17   partially off the screen?

18   A    It's rifle ammunition.  I'm not sure what they fit.

19   Q    And in the center bottom?

20   A    I believe that's miscellaneous rams of .38, 9 millimeter.

21   I think there's a .40 caliber in there.

22   Q    And how about the last item on the lower --

23   A    12 gauge shotgun shells.

24   Q    And these items were in your house in December 2016?

25   A    Yes, they were.
```

1    Q    Government's 39(b).  I won't circle all of them, but in

2    general what is on that photograph?

3    A    That is all the different rounds that were found in that

4    black tool box that was in a plastic shed I have outside my

5    shop.

6    Q    And how about Government's 39(c)?

7    A    That's -- I believe that's the ammo that was inside that

8    metal container, that ammo box.

9    Q    And the last two photographs had yellow sticky notes on the

10   items.  Did you have those yellow post-it notes?

11   A    No, I did not.

12   Q    Those were added after they were taken from your house?

13   A    Yes, they were.  Added by somebody else, yes.

14   Q    After the search was executed as your house, did the grand

15   jury charge you with illegally possessing a firearm?

16   A    They did on November 37th.

17   Q    When did you first appear in court for that charge?

18   A    December 13th or 14th, I believe.

19   Q    Of 2017?

20   A    Yes, ma'am.

21   Q    This year -- or last year.  When did you let the court know

22   that you wanted to plead guilty to that charge?

23   A    I let my lawyer know shortly after that that I wanted to

24   plead out.

25   Q    Do you remember when you actually pled guilty?

1    A    No, I do not.  I've got it on a calendar but --

2    Q    Would it have been this year?

3    A    Yes.  Yes, it was this year, 2018.

4    Q    And in general terms, what did you admit at your guilty

5    plea?

6    A    That I owned and possessed guns and ammunition at the time

7    of my arrest.

8    Q    So you've taken responsibility for what you possessed?

9    A    Yes, I have.

10   Q    When did the government let your lawyer know that we would

11   seek your truthful testimony in this case?

12   A    About a month ago, I believe.  It was three weeks ago.

13   Q    Was that several months after you pled guilty?

14   A    Yes, it was.

15   Q    Did you pleaed guilty knowing that you would likely go to

16   prison?

17   A    Yes, I did.

18   Q    Had anyone -- has anyone made you any promises regarding

19   what will happen if you testify here today?

20   A    No, they have not.

21   Q    Are you required to testify as part of your plea agreement?

22   A    No, I'm not.

23   Q    In fact, have you received a subpoena that required you to

24   come here today?

25   A    I received one a couple of days ago.

1   Q   Does your plea agreement guarantee you a benefit if you do

2   testify?

3   A   No, it does not.

4   Q   Do you hope to get a benefit by testifying?

5   A   I do.

6   Q   Who determines what your sentence will be?

7   A   My judge.

8   Q   Have you and Ms. Beard spoken since you were arrested in

9   December 2016?

10  A   Yes, we have.

11  Q   What, if anything, did Ms. Beard tell you about what she

12  told the agents who searched your home?

13  A   She told me that she told them where the gun was.

14  Q   Have you and I met before?

15  A   Just here in the last week.

16  Q   How many times have we met before?

17  A   Twice.

18  Q   Was that before or after you were indicted?

19  A   Way after.

20  Q   Was that before or after you pled guilty?

21  A   Way after I pled guilty.

22  Q   Was that before or after you learned that your wife would

23  have this trial?

24  A   After I found out she was having the trial.

25  Q   Why did we meet?

1  A    My lawyer approached me and asked me would I testify here

2  today.   And at first I told her a couple times no, and then I

3  decided I would because of some other information that

4  appeared.

5  Q    What instructions did I give in terms of your testimony?

6  A    Tell the truth.

7  Q    Is that what you've done?

8  A    Yes, ma'am, I have.

9  Q    Have you and your wife spoken since you were arrested in

10  December 2016?

11  A    Yes, we spoke numerous times on the phone.

12  Q    Have you been in prison since that time?

13  A    I was first taken to Rankin County jail for about four

14  months.   And after sentencing, I was taken to the prison, to

15  MDOC.

16  Q    When you and your wife spoke, were you in jail?

17  A    Yes, I was.

18  Q    How did you speak with her?

19  A    Over the phone.

20  Q    Are those phone calls recorded?

21  A    Yes, they are.

22  Q    Are you told each time that you use the phone that the call

23  is recorded?

24  A    You know when you first come in.   They tell you that, you

25  know, all the phone calls are recorded.

```
 1   Q    During any of those calls did you or your wife discuss the

 2   Taurus revolver that the agent found at your home in

 3   December 2016?

 4   A    Yes, it was brought up.

 5   Q    And when we met before, did you listen to portions of some

 6   of those phone calls?

 7   A    Yes, I did.

 8          MS. CASE:  Your Honor, may I approach the witness?

 9          THE COURT:  You may.

10   BY MS. CASE:

11   Q    Mr. Beard, I've handed you what's been marked as

12   Government's Exhibit 21(a).  Do you recognize that?

13   A    The audio tape or CD that we listened to the other day, and

14   I initialed it afterwards.

15   Q    You recognize it because you initialed it?

16   A    Yes.

17   Q    Is that in the same condition as you last saw it?

18   A    Yes, ma'am, it is.

19          MS. CASE:  Your Honor, the government would ask to

20   retrieve that exhibit and admit it into evidence.

21          THE COURT:  Any objection?

22          MR. RICH:  No objection, Your Honor.

23          THE COURT:  All right.  Ms. Case, you can retrieve it

24   and exhibit -- you said 21(a)?

25          MS. CASE:  Yes, Your Honor.
```

```
1              THE COURT:  Is admitted.
2         (Exhibit G-21(a) marked)
3    BY MS. CASE:
4    Q    When you listened to that call, did you have a transcript
5    of what you were hearing?
6    A    Yes, I did.
7    Q    And did that transcript accurately reflect what was said in
8    your recorded conversation?
9    A    Yes, it did.
10   Q    Did you make any corrections to the transcript?
11   A    On one of them, one of the words wasn't audible, and I knew
12   it, that she said "bullet."
13   Q    Did I ask you to initial beside each line of the
14   transcript?
15   A    Yes, you did.
16   Q    And did I ask that you sign the transcript?
17   A    Yes, you did.
18             MS. CASE:  Your Honor, may I approach?
19             THE COURT:  You may.
20             MS. CASE:  Mr. Beard, I've handed you what's been
21   marked Government's Exhibit 21(b).  I'll ask if you recognize
22   that.
23   A    Yes, I do.
24   Q    How do you recognize that?
25   A    This is the transcript that you handed me the other day
```

1    while I was listening to the CD.

2    Q   And is that in the same condition as the last time you saw

3    it?

4    A   Yes, ma'am, it is.

5    Q   Does it show your correction to the transcript?

6    A   Yes, it does.

7           MS. CASE:  Your Honor, the government would move into

8    evidence what has been premarked Government's Exhibit 21(b).

9           THE COURT:  Any objection?

10          MR. RICH:  No objection, Your Honor.

11          THE COURT:  21(b) is admitted.

12      (Exhibit 21(b) marked)

13          MS. CASE:  May I retrieve the exhibit?

14          THE COURT:  Yes.

15          MS. CASE:  Well, let me let him have it as well, Your

16   Honor.

17          THE COURT:  All right.

18   BY MS. CASE:

19   Q   During this call, did you and your wife discuss the .22

20   caliber Taurus revolver?

21   A   Yes, we did.

22   Q   How did you refer to the gun?

23   A   As her birthday present.

24   Q   Why did you do that?

25   A   Because I knew we were being recorded.

1  Q   And about when did and your wife have this conversation?

2  A   This would have been the first week or two of when I was

3  arrested, and I was in Rankin County jail.

4  Q   This would have been in December 2016?

5  A   Yes, ma'am.

6  Q   Was that before or after you and your wife were indicted?

7  A   Way before, a year before.

8        MS. CASE:  Your Honor, may we approach for just a

9  moment?

10     (At the Bench:)

11        MS. CASE:  We have physical copies of the transcript

12  for the jury because it can't be shown at the same time that we

13  play the audio, and we also believe a limiting instruction

14  should be read before we play this, and we're about to play it

15  so --

16        THE COURT:  I have the limiting instruction ready.

17  And any objection to handing out the copy of the transcript?

18        MR. RICH:  No.

19        MS. CASE:  Shall I give it to Twana?

20        THE COURT:  Yes.

21     (Bench Conference Concluded)

22        THE COURT:  All right.  Ladies and gentlemen, you're

23  about to receive copies of the transcripts.  Exhibit 21(b) is a

24  typewritten transcript of the oral conversation which can be

25  heard on the tape recording I admitted as 21(a).  The

1  transcript also purports to identify the speakers engaged in

2  the conversation.  I admitted the transcript for the limited

3  and secondary purpose of aiding you in following the content of

4  the conversation as you listen to the tape recording and also

5  to aid you in identifying the speakers.

6          You are specifically instructed that whether the

7  transcript correctly or incorrectly reflects the content of the

8  conversation or the identity of the speakers is entirely for

9  you to determine based on your own evaluation of the testimony

10  you have heard concerning the preparation of the transcript and

11  from your own examination of the transcript in relation to your

12  hearing of the tape recording itself as the primary evidence of

13  its own contents.  And if you should determine that the

14  transcripts -- the transcript is in any respect incorrect or

15  unreliable, you should disregard it to that extent.

16          MS. CASE:  Your Honor, for the record I would ask that

17  we be able to publish Government's Exhibit 21(a) and(b) to the

18  jury.

19          THE COURT:  You may.

20  BY MS. CASE:

21  Q   Before we begin, Mr. Beard, whose voices will we hear on

22  this recording?

23  A   Heather's and mine.

24      (Clip Played)

25  Q   So, Mr. Beard, what were the voices that we heard?

1    A    That was Heather's voice and mine.

2    Q    And what are you and your wife talking about?

3    A    We are talking about the search, and I was curious if they

4    had found that pistol.

5    Q    And so what did you mean when you say "birthday present"?

6    A    It was purchased around the time of her birthday, and I was

7    referring to it as a birthday present because I didn't -- it

8    wasn't supposed to be in the house.  I didn't want to say it,

9    you know, because they might not have been in the house and so

10   I referred to it as a birthday present.

11   Q    I'm holding Government's Exhibit 4, which is the .22

12   caliber Tarus revolver.  Is that what you say -- what you're

13   referring to when you say "birthday present"?

14   A    Yes, it is.

15   Q    What does your wife say after you asked her whether the

16   agents found the birthday present?

17   A    The Taurus .22 pistol, the pistol.

18   Q    So your wife knows what you mean by "birthday present"?

19   A    Yes, she did.

20   Q    And what is her answer to your question about whether the

21   agents actually found the revolver?

22   A    She said, yes, that they found it and they found ammunition

23   and stuff and bullets.

24   Q    And does she acknowledge that she spoke with agents about

25   the gun?

1    A    She told me -- I don't remember if that was the

2    conversation or another conversation that when they asked her

3    was any guns in the house, any other guns, she told them where

4    the Taurus was.

5              MS. CASE:  No further questions, Your Honor.

6              THE COURT:  All right.  Thank you.  Can we collect the

7    transcripts?

8                          CROSS-EXAMINATION

9    BY MR. RICH:

10   Q    Mr. Beard, earlier you said that you married your wife out

11   of love.  Is that correct?

12   A    Yes, sir.

13   Q    What day did you marry her?

14   A    It was September -- right before my -- I think it was

15   September 9th.

16   Q    You think?

17   A    Yes, I don't remember.  It's been two years, and we haven't

18   been getting along in the last two years, 19 months.

19   Q    What's your wife's birthday?

20   A    August 2nd, 1978.

21   Q    And you said earlier that she was with you when you

22   purchased this gun?

23   A    Yes, she was.  We were in my Yukon.

24   Q    And the gun was handed to her?

25   A    It was handed through the window because Ian couldn't come

1   to my side.

2   Q    You said that you bought it for her protection?

3   A    Yes, I did.

4   Q    Okay.  And you said earlier today that you brought it in

5   June or July of 2016.

6   A    It was after we had signed my plea bargain and I knew I was

7   going to prison, or around that time.  My lawyer had told me

8   that I was definitely going.

9   Q    And you're certain you bought it in January or July?

10  A    Yes.

11  Q    You spoke to ATF agents on June 8th of 2017.  Do you

12  remember that conversation -- of 2016.

13  A    Yes, I do.

14  Q    Excuse me.  Let me -- I'm sorry, Mr. Beard.  Let met back

15  up.  I got that date wrong.  June 8, 2017.

16  A    Right.  They came to Greene County.

17  Q    It was after you had pled guilty in Rankin County.

18  A    Yes, I was in MDOC prison at that time.

19  Q    Okay.  And it's your testimony today that you purchased the

20  gun in June or July?

21  A    Right.  I purchased that summer.

22  Q    And during that interview, they told you that it was a

23  federal felony to make a false statement to a federal agent.

24  A    I'm sure they did.

25  Q    And during that interview, you told them that you bought

1    the gun in September?

2    A   I wasn't exactly sure when I bought it.  It was a lot going

3    on then.  I was getting ready to go to prison.

4    Q   But that was only six months after the event?

5    A   Do what?

6    Q   That was closer to the event than we are today.

7    A   I mean, it was a month difference.  I mean June, September.

8    I mean, it was August.

9    Q   June, July, August, September.  And you said in June of

10   2017, a year ago, that you bought it in September.

11   A   I bought it that summer.  I didn't remember the exact date.

12   Q   And they interviewed you for over an hour that day.

13   A   Sir?

14   Q   They interviewed you for over an hour that day.

15   A   I believe so.  They videoed it.

16   Q   And today you said that you bought it for her protection.

17   A   That's right.

18   Q   That was your testimony.  During that interview, June of

19   last year, you told them that you bought it for her for a

20   birthday present.

21   A   Right.

22   Q   All right.  But today you didn't say you bought it for a

23   birthday present.

24   A   It was bought around her birthday.

25   Q   Today you said you used the term "birthday present" in the

1    phone call as code.

2    A    Yes, I did.

3    Q    But you didn't buy it for a birthday present.

4    A    It was bought for protection is what it was bought for.  It

5    was bought for a gift for her.

6    Q    You told agents a year ago you bought it for a birthday

7    present.

8    A    Yes.

9    Q    A year ago during that interview, you didn't tell agents

10   that she was with you when you purchased it.

11   A    I don't believe they asked.  I was trying to protect my

12   wife too at that time.

13   Q    You never said she was with you.

14   A    No, I may not have.

15   Q    You said you bought it for her protection for when you went

16   to prison on the Rankin County charge.

17   A    Yes.

18   Q    And that was a charge of residential burglary?

19   A    Yes.

20   Q    But you didn't go to court?

21   A    I plea bargained.

22   Q    You were explaining the details of -- that led to your

23   arrest in that Rankin County charge earlier.

24   A    Yes.

25   Q    And did you plead guilty in that case because you are

1    guilty?

2    A    Somewhat.   I did not go into the house, but the person that

3    I asked to go with me did go in the house.   And so my lawyer

4    explained to me no matter what I was still guilty, and I was.

5    Q    And you went into the house to retrieve property?

6    A    Yes, I did.

7              MR. RICH:   Your Honor, may I approach for just a brief

8    moment?

9              THE COURT:   Sure.

10        (At the Bench:)

11             MR. RICH:   I'm only asking him questions about

12   circumstances that led to his arrest that -- on that charge

13   because the door is opened for him to explain the circumstance

14   leading to that charge, and he did not plead guilty to

15   possession of firearms in that case.   But it's my understanding

16   that he possessed firearms upon his arrest, and I'd like to ask

17   him a question about that.

18             THE COURT:   Any objection?

19             MS. CASE:   I'm not sure I understand.

20             MS. MIDDLETON:   You're saying that he possessed

21   firearms when he --

22             MR. RICH:   He was indicted --

23             MS. MIDDLETON:   -- was arrested?

24             THE COURT:   We're making a transcript.   This is your

25   witness.

1        MS. CASE:  I'm not sure I understood.  You're saying

2   the door was opened to firearms at that time?

3        MR. RICH:  Because explanation of the circumstances

4   surrounding those charges were asked about, and he was charged

5   with possession of firearms.

6        MS. CASE:  The questions had to do with his -- what

7   led him to being arrested, which was not appearing for a

8   sentencing on a charge he pled guilty to.

9        THE COURT:  Are you objecting to something?

10       MS. CASE:  Yes, Your Honor.

11       THE COURT:  On what basis?

12       MS. CASE:  On the basis that the door that Mr. Rich is

13  speaking of has not been opened.  The questions of Mr. Beard

14  backed from why were agents arresting you in December of 2016,

15  because I did not show up for my sentencing because I had pled

16  guilty to a charge of home invasion.  We did not explore any

17  other charges that were hanging out there.

18       THE COURT:  Right.  His point would be that you didn't

19  go into everything that actually involved the circumstance.

20  But whether the door is open or not, I need to start with why

21  you think it's admissible.

22       MR. RICH:  I think it's admissible to show that there

23  were other charges that he didn't plead to.  He's saying that

24  he pled guilty for a plea bargain.  I think it goes to his

25  motive in that case to plead as it goes to his motive in this

1    case to plead.

2         THE COURT:  All right.  I'm going to allow it.

3      (Bench Conference Concluded)

4    BY MR. RICH:

5    Q    Mr. Beard, you said on that Rankin County charge you

6    decided to reach a plea deal.

7    A    Yes.

8    Q    You were indicted on that case for possession of firearms,

9    weren't you?

10   A    No, no.  I was never indicted on possession of firearms.

11   Q    Were firearms found?

12   A    Firearms were found in my truck the day I was arrested, but

13   I don't believe -- I may have been indicted, but they were

14   dropped.

15   Q    But they were dropped.

16   A    Right.

17   Q    As part of a plea deal.

18   A    As part of the plea.

19   Q    So part of your motive for pleading in that case was to

20   avoid one charge and get a reduced sentence on the house

21   burglary.

22   A    It was getting a reduced sentence, yes.

23   Q    You mentioned earlier that when were you discussing your

24   marriage to your wife that you bought the gun for her

25   protection.  And you mentioned that it was solely for her

```
 1   protection.  You lived in a bad neighborhood.

 2   A   Right.  Both our protection until I went to prison.  I

 3   didn't want to leave her alone there with just her and the dog

 4   in that neighborhood.

 5   Q   And you married her so she could visit you in prison?

 6   A   We were in love, yes, and she could visit me in prison and

 7   be there for me.  I left her with everything I had so she could

 8   take care of me in prison.

 9   Q   Before you married her, you owned that building by

10   yourself?

11   A   Yes.  I was in purchasing, yes, buying it.  It was put in

12   my name before we were married when I paid the tax off on it.

13   Q   And there was a tax sale on that property?

14   A   Right.  The gentleman I was purchasing it from did not pay

15   the taxes, and it came up for sale for taxes.

16   Q   So you're telling the jury your marriage had nothing to do

17   with protecting your property?

18   A   Do what?

19   Q   Your marriage had nothing to do with protecting your

20   property?

21   A   Well, sure.  I mean, I left everything to her.  Hopefully

22   when I got out in a year and a half, two years, I would be able

23   to come home to my wife, my buildings, my cars and stuff.  Yes,

24   I was definitely hoping for that.

25   Q   You mentioned earlier that you didn't go to court in
```

1   October of 2016 in Rankin County because Ms. Beard wouldn't

2   drive you.

3   A    Yes.  We had gotten -- we were -- planned to get up that

4   morning and go to my sentencing.  I got up and I got in the

5   shower.  And we were already late, and I came back out and she

6   was refusing to go with me to drive me or anything because the

7   windshield was busted out of the Yukon.  We had been in a fight

8   prior to that, and I was not going to drive myself there and

9   leave my vehicle in the parking lot.

10  Q    So you were more concerned about the status of your

11  property than going and turning yourself in?

12  A    At that time I was using drugs.  I was -- I wasn't thinking

13  right.  I should have went and turned myself in.  I wouldn't be

14  here.

15  Q    Let's talk about that drug use.  You said that the

16  methamphetamine in the house was yours.

17  A    Yes, it was.

18  Q    The rig that we saw a picture of, and rig -- by "rig," I

19  mean the syringe.

20  A    Yes.

21  Q    That was loaded?

22  A    Yes.

23  Q    Was yours?

24  A    Yes.

25  Q    And you were using methamphetamine multiple times a week?

1  A    Yes.

2  Q    And you were injecting it?

3  A    Yes.

4  Q    And you just said during that time you were messed up.

5  A    Yes.  That syringe had been laying there for three days.

6  Q    And you were using multiple times a week.

7  A    Yes.

8          MR. RICH:  Court's indulgence.

9          THE COURT:  Of course.

10     (Short Pause)

11  BY MR. RICH:

12  Q    Mr. Beard, I'm showing you what's been marked as G-33(j).

13  You identified this earlier as a drawer on your side of the

14  bedroom.

15  A    Yes, sir.

16  Q    And there are multiple methamphetamine baggies in this

17  drawer.

18  A    Yes, there are.

19  Q    And there is, for lack of a better term, a stack of cash in

20  the drawer.

21  A    About $200.

22  Q    And there's also a .22 bullet in the drawer.

23  A    Yes.

24  Q    And that .22 bullet is in your drawer.

25  A    Yes, it is.

1   Q    Where did you get these shotgun shells?

2   A    From my father, and my father was -- lived in Vicksburg

3   when he passed away.  He was a hunter and Warren County deputy

4   at one time.  And different ones he had collected and stuff.

5   When he passed away, that was some of the stuff I got from

6   there.

7   Q    All the ammunition came from your father?

8   A    I'd say 90 percent of it, yes.

9   Q    When you were interviewed last year, you told ATF agents

10   that you bought a bunch of junk from some guy.

11   A    Yeah.  That's where some of it come from, the clips.  The

12   rounds that are -- I don't even know what they are, they are

13   some kind of AK rounds or something that come from him.

14   Q    You've given two statements to ATF agents.  Is that

15   correct?

16   A    No, one that he come to see me at Greene County.

17   Q    Did people come interview you about a week and a half ago?

18   A    No, I came here and we talked here, yes.

19   Q    Two interviews were conducted with you?

20   A    Yes, yes.  I was -- it wasn't ATF.  It was the government

21   there.

22   Q    And in both of those interviews, you never mentioned

23   anything about this ammunition coming from your father.

24   A    Yes, I did.  Maybe not the first one, you know, but I did

25   on the ones here.

1   Q   You said that -- Mr. Beard, you said earlier that your

2   wife -- you saw her fire the gun, this Taurus, twice into the

3   air one evening.

4   A   I didn't see it.  She was behind me.  She fired it.  I spun

5   around.  It was in her hand.  There was a little shed from the

6   back neighborhood went through our fence.  We have a fence, big

7   security fence, be around it.  It was in our property.  She

8   fired it in the air, and I turned around and she was hollering,

9   *Next time I'm going to put one in your ass*.

10  Q   It was loud?

11  A   Yeah.

12  Q   Fired it twice.

13  A   Yeah.  She was behind me.

14  Q   So the gun was loaded.

15  A   Yes, it was loaded.

16  Q   And it frightened you?

17  A   Yes.  It scared the mess out of me.  I wasn't expecting it.

18  Q   And you didn't take the gun away from her that night?

19  A   No.

20  Q   But you took the gun away from her at some point, you said

21  earlier.

22  A   Right.

23  Q   You said you gave it to a man named Todd Bates.

24  A   Todd Bates.

25  Q   And you said you didn't know that the gun was still there.

1    A    Todd was supposed to be holding it, and either Todd or his

2    twin brother, Tim, must have gave it back to her.

3    Q    Mr. Beard, I'd like to -- do you still have a copy of your

4    transcript?

5    A    Yes.

6    Q    I'd like to direct you to that transcript.  You see on the

7    second of that transcript, you asked her, "Heather," on this

8    telephone, "Did they find your birthday present?"

9    A    Right.

10   Q    You asked her.

11   A    Right.

12   Q    You asked her about something that you believed did not --

13   was not still in the house.

14   A    It was not supposed to be in the house.

15   Q    Why would you ask her about something that was not supposed

16   to be in the house?

17   A    I had found out she had been talking to Tim Bates --

18   romantically involved with Tim Bates.

19   Q    This Winchester rifle, you said you weren't sure who put it

20   in the gun safe?

21   A    There was a lot of stuff moved in and out.  Sometimes there

22   were things -- some stuff taken out of there and sold because

23   we needed the money.  And I'm not actually sure which one of us

24   put it in there.  Like I said, it was, at the time, all rusty

25   and brown, and it was a piece of junk.

1   Q    But a week and a half ago you told members of the U.S.

2   Attorney's Office and Agent Robichaux that she put it in the

3   gun safe.

4   A    Right.

5   Q    You made that definitive statement a week and a half ago.

6   A    Got to thinking about it, and I told them the next week it

7   might have been either me or her.

8   Q    And then a year ago when they interviewed you, you said --

9   let me ask you about that interview a year ago.  You were read

10  your *Miranda* rights before that interview, weren't you?

11  A    Yes, I believe so.

12  Q    That interview was video and audio recorded, wasn't it?

13  A    Yes, it was.

14  Q    And again they told you that it was a federal felony to

15  give a false statement to a law enforcement officer.

16  A    That's right.

17            THE COURT:  Mr. Beard, do me a favor and stay close to

18  that mic.  Okay?

19            MR. BEARD:  Okay.

20  BY MR. RICH:

21  Q    During that interview, you said, "I just threw it in the

22  gun cabinet with the air rifles we have."  That was your

23  statement in June of last year.

24  A    That's probably true.

25  Q    At first when you were asked by -- let me ask one more

1  question before we go here.  You mentioned earlier today that

2  Ms. Beard shot that Taurus -- pulled the trigger on that Taurus

3  three times.

4  A    In my face.

5  Q    In your face.

6  A    Yes, in the shop area, the garage area.

7  Q    A year ago you didn't tell law enforcement that, did you?

8  A    No, I did not.

9  Q    A year ago when you -- when you did that interview with law

10  enforcement, you told them that .22 Winchester rifle was not a

11  working firearm.

12  A    That's right.  I did tell them that.

13  Q    You believed that?

14  A    I believed that because it doesn't have a serial number.

15  And the shape it was in and where I found in a vehicle with

16  leaves all over it, I wasn't going to try and fire it.

17  Q    But you've since learned that it is a working firearm.

18  A    After I was told that the ATF fired it, I was showed a

19  report to where they fired it.  So, I mean, I have to go by

20  their report is all I know.

21  Q    Earlier today you mentioned that after you found the

22  firearm you called the owner of the vehicle that you had

23  purchased.

24  A    Buddy of mine I had got it from, yes.

25  Q    A year ago during that interview with ATF, you stated about

1    that firearm, that Winchester rifle, "It was in a vehicle.  It

2    was in the back.  It didn't have a serial number or nothing on

3    it so I Googled it."

4    A   So I what?

5    Q   "I Googled it," in reference to how you knew it was not a

6    working firearm.

7    A   Right, right.

8    Q   You never told them that you called the man who owned it.

9    A   I did.  I just didn't tell them.  I called Dax.  He told me

10   that, and I Googled.  And they used to bring them into the

11   schools when I was six or seven years old.  The game wardens

12   used to do a hunting and safety course in the schools.  Of

13   course, they wouldn't bring a firearm in that would fire.

14   Q   But you didn't tell them that day what you're telling us

15   today.

16   A   I told them I believed that it was a hunting safety course

17   weapon, yes, I did.

18   Q   But you did not tell them that you called the owner of the

19   gun?

20   A   No.  I probably didn't mention Dax's name.

21   Q   So let's go through some things that we've gone over today.

22   So a year ago you didn't tell ATF agents about her shooting the

23   gun three times -- or three times at you unloaded.

24   A   No, I did not.

25   Q   You told the agents that the Winchester rifle was not a

1    working firearm.

2    A    That's right.

3    Q    And it is a working firearm.

4    A    I did not know that at that time.

5    Q    A year ago you told ATF agents that you put the gun in the

6    gun cabinet.

7    A    Okay.  I may have.  I'm sure I did.

8    Q    A week and a half ago you told members of the U.S.

9    Attorney's Office that Heather put the gun in the gun cabinet.

10   A    Right.  Could have been Heather or I.  And at that time too

11   I was trying to protect my wife from getting charges.

12   Q    And now you're not trying to protect her.

13   A    She's been charged.

14   Q    Now you're not trying to protect her.

15   A    No, I'm telling the truth.

16   Q    Since those statements a year ago, between a year ago and

17   today, you believe that your wife is having an affair with

18   someone?

19   A    Having what?

20   Q    An affair.

21   A    She definitely was.  He's living in my house sleeping in my

22   bed.  There's a report from the probation officer that he was

23   naked in my bed.

24   Q    You believe that your wife has sold some of your property.

25   A    My wife sold -- yes, she sold a lot of my stuff.

1    Q    You're unhappy with your wife because she hasn't put enough

2    money on your jail account.

3    A    I have plenty of money on my jail account.  My niece put

4    $3,000 on there for me.

5    Q    But you're unhappy with her because she has not put money

6    on your jail account.

7    A    I'm unhappy with my wife because she has not been loyal to

8    me and stood by me.

9    Q    Since those statements a year ago today, you pled guilty in

10   this case.

11   A    Do what?

12   Q    Since you gave statements to ATF agents a year ago, you

13   pled guilty in this case.

14   A    Yes, I have.

15   Q    And you have not been sentenced in this case.  Correct?

16   A    Correct.

17   Q    But you have received a copy of your presentence report?

18   A    Yes, I have.

19   Q    So now you have an idea of how much time you're facing in

20   the case?

21   A    Yes, I do.

22   Q    And --

23   A    Nine years.

24   Q    And you hope to reduce that by cooperating with the

25   government?

1    A    That's up to the judge.  Yes, I'm praying for it, but it's

2    up to the judge.

3    Q    So in the Rankin County charge case, you were found with

4    firearms.  Is that correct?  Firearms?

5    A    Yes.

6    Q    And you reached a plea deal in that case?

7    A    Yes.

8    Q    In this case, there were guns found in the house.  Correct?

9    A    Yes.

10   Q    And you're cooperating after finding out how much time you

11   were facing?

12   A    I'm cooperating because I was shown definitive proof that

13   my wife had a naked man in my bed.

14   Q    You're cooperating because you're angry with your wife?

15   A    I'm upset with my wife, yes.  But I'm telling the truth.

16   Q    Which the statements that you've made today differ from the

17   statements that you've given to ATF agents in the past.

18   A    Yes.  I was trying to protect my wife when they came to

19   Greene County.  She was not charged at that time.

20   Q    Let me ask you one other question.  I can't remember did

21   you say earlier that you pled guilty in the Rankin County case

22   to home burglary because you were guilty?

23   A    Yes.  Yes, I was guilty.

24        MR. RICH:  Court's indulgence.

25        (Short Pause)

1          MR. RICH:  Your Honor, with tender the witness.

2          THE COURT:  All right.  Redirect?

3          MS. CASE:  Your Honor, may we approach briefly?

4          THE COURT:  Yes.

5        (At the Bench:)

6          MS. CASE:  Your Honor, on redirect I intend to seek to

7    introduce Government's Exhibit 17(a), at least clips of it.

8    This will be under the prior consistent statement rules of

9    evidence.  Mr. Rich has not seen the clipped portions of the

10   interview that he's been discussing with Mr. Beard.  Mr. Beard

11   hasn't seen them either, but unless we -- I was trying to think

12   if he should get an opportunity to see how we clipped it to

13   make sure he does not have an objection to where we start and

14   stop the conversation, principally because there are things

15   from the motion in limine that should not be revealed to the

16   jury.

17         THE COURT:  All right.  It's 12:00 and you probably

18   want to see it before -- you have a right to see it before they

19   use it.  We'll go ahead and take the lunch break at this point.

20   I'm going to instruct you client not to leave the building.

21         MR. RICH:  I think that's a good idea.  Please do.

22         THE COURT:  So if you want to arrange for somebody to

23   bring her lunch or something.  I'll say that after the jury's

24   gone.

25       (Bench Conference Concluded)

1          THE COURT:  All right.  Ladies and gentlemen, it's

2    almost noon.  There is some housekeeping work that I need to do

3    with the attorneys.  And instead of having you sit there

4    through it, I'm going to go ahead and let you take your lunch

5    break.  I'll ask you to come back at 1:00.

6          Remember don't talk to anybody in or around the

7    courthouse.  Don't do any research.  Don't communicate with

8    anybody about the case.  Keep an open mind because you have not

9    heard all the evidence.  Leave your notepads in your chair, and

10   I hope you have a good lunch, and I'll see you at 1:00.

11        (Jury Out)

12        THE COURT:  All right.  Mr. Beard, during the lunch

13   don't speak with anybody about the case.  Okay.  Ms. Beard, I'm

14   instructing you not to leave the building.  There's some

15   machines down in the basement that have some food, and,

16   Mr. Rich, you can arrange to get her something else if that's

17   not sufficient.

18        My understanding is that -- have you ever received a

19   copy of the transcript that's in issue here?

20        MR. RICH:  I have not, Your Honor.  I understand

21   there's clips of certain videos.  I have seen the videos in

22   their whole but not the clipped version.

23        THE COURT:  Okay.  Let me ask you to go ahead and look

24   at that and if there are issues that need to be addressed

25   before the jury comes back in, just send a note back and we can

1  come back in maybe a couple of minutes early and knock that

2  out.  Anything else before we break for lunch?

3         MS. CASE:  No, Your Honor.

4         THE COURT:  Court's in recess.  Thank you.

5    (Recess)

6         THE COURT:  All right.  Ms. Case, I understand there's

7  something that you need to authenticate, but there's no way to

8  do it technologically with the jury in the room.  Is that

9  right?

10        MS. CASE:  That's right, Your Honor.

11        THE COURT:  Okay.  Mr. Rich -- I suppose what you want

12  to do it right now?

13        MS. CASE:  We would like to, yes, Your Honor.  We have

14  four rather short video clips that we'd like to have Mr. Beard

15  authenticate so that then we could proceed with the jury as to

16  what's on them.

17        THE COURT:  All right.  Any objections?

18        MR. RICH:  No, Your Honor.

19        THE COURT:  All right.  You may proceed.

20          EXAMINATION OUTSIDE THE PRESENCE OF THE JURY

21  BY MS. CASE:

22  Q   These clips are marked as Government's Exhibit 17(a)

23  through 17(d), and Mr. Beard we're going to play them

24  one-by-one starting with 17(a), and I'll ask that you review

25  them and tell us if you recognize them.

```
1          (Clip Played)

2     Q    The next one will be 17(b).

3          (Clip Played)

4     Q    This next clip is Government's Exhibit 17(c).

5          (Clip Played)

6     Q    And the last clip is Government's Exhibit 17(d).

7          (Clip Played)

8     Q    Mr. Beard, do you recognize what you just saw and heard?

9     A    Yeah.  That's the videos from Greene County last year.

10    Q    Who's speaking in those videos?

11    A    I was, an ATF officer.

12    Q    Are these accurate recordings of the portions of your

13    interview with ATF?

14    A    Yes.  This is the interview with ATF.

15              MS. CASE:  Your Honor, the government would move to

16    admit into evidence what has been premarked as Government's

17    Exhibits 17(a) through 17(d).

18              THE COURT:  Any objection?

19              MR. RICH:  No objection.

20              MS. CASE:  We would ask that we be able to publish

21    those to the jury.

22              THE COURT:  Of course.  17(a) through(d) are admitted.

23         (Exhibit D-17(a) through 17(d) marked)

24              THE COURT:  Are we ready to bring the jury back in?

25              MS. CASE:  We have one audio clip that might be
```

1   appropriate to go ahead and do it at this time.  It's a short

2   clip as well.  And it will be marked for identification as

3   government's 22(c).

4        (Clip Played)

5   BY MS. CASE:

6   Q   Mr. Beard, do you recognize what you heard?

7   A   Yes.  It was a phone conversation between Heather and I

8   when I was at Rankin County jail.

9   Q   Is that an accurate recording of that phone conversation?

10  A   Yes, it was.  Yes, it is.

11       MS. CASE:  That's all, Your Honor.  At this time we

12  would just ask that that be marked for identification purposes.

13       THE COURT:  All right.  It will be marked for

14  identification.

15       MS. CASE:  This is 22(c).

16       (Exhibit G-22(c) for ID marked)

17       MS. CASE:  I believe that's all we have before the

18  jury comes in, Your Honor.

19       THE COURT:  Okay.  Mr. Rich, anything before we bring

20  the jury back?

21       MR. RICH:  No, Your Honor, other than G-22(c), that's

22  the recording of that jail transcript that I filed the motion

23  on.  And since they haven't sought to introduce it, I don't

24  think it's appropriate for me to make an objection.  But

25  just -- I'm sure the court knows I intend to renew my objection

1   to a portion of that jail call.

2           THE COURT:  I understand.  And based on our

3   conversation yesterday, Ms. Case, I think you indicated that

4   you would bring to it my attention outside the presence of the

5   jury before you tried to introduce it.

6           MS. CASE:  That's right, Your Honor.  We just took the

7   opportunity to authenticate it while we're here.

8           THE COURT:  I understand.  All right.  Anything else?

9           MS. CASE:  No, Your Honor.

10          THE COURT:  All right.  Shone, will you get the jury.

11      (Jury In)

12          THE COURT:  All right.  Thank you.  You may proceed.

13          MS. CASE:  Thank you.

14                      REDIRECT EXAMINATION

15  BY MS. CASE:

16  Q   Mr. Beard, Mr. Rich asked you had a series of questions

17  about what you told ATF agents in this case.  Do you recall

18  when -- do you recall being interviewed by ATF agents?

19  A   I do.

20  Q   And did that interview take place about a year ago?

21  A   Yes.

22  Q   I'm going to play Government's Exhibit 17(b) and ask you

23  some questions about it after it plays.

24  A   Okay.

25  Q   Excuse me, 17(a).

1      THE COURT:  Ms. Case, hang on a second.  I'm sorry.

2    Ladies and gentlemen, I hate to do this to you, but I'm going

3    to ask you go back to the jury room for just a minute.  Okay.

4      (Jury Out)

5      THE COURT:  All right.  Before lunch, I had instructed

6    Ms. Beard not to leave the building.  My understanding is that

7    she did leave the building.  I don't think she left the

8    premises, but she left the building.  I asked probation to run

9    a drug test when she did come back, and my understanding -- and

10   I'll ask the officer here in a second.  My understanding is

11   that she tested positive.

12     Brooke, why don't you come up here for a second.  All

13   right.  Officer Sullivan, will you just tell me the results of

14   the drug test.

15     PROBATION OFFICER:  The defendant tested positive for

16   amphetamines and methamphetamine.  She admitted that she took

17   Adipex that did not belong to her a couple of days ago which

18   would test positive for the amphetamine.  Methamphetamine will

19   only test positive if it is methamphetamine.  She denied use or

20   said it had been several months since she used ice, but that

21   there is no meth anymore.  Nobody makes meth, that it's ice.

22   Of course, ice is methamphetamine, as Your Honor I'm sure is

23   aware.

24     THE COURT:  Okay.  All right.  Thank you.  Stick

25   around, though.  Counsel, my concern is we're getting near the

1   end of the trial here.  She's going to have to make a decision

2   whether to testify or not, and she's just tested positive for

3   methamphetamine.  I've never had this situation before, but

4   here it is, and I guess I would welcome your input on the

5   appropriate next step.  Obviously at some point outside the

6   presence of the jury you need to talk about revoking her bond.

7   But in terms of going forward, I'm not sure what -- I want to

8   hear from both sides.

9          MR. RICH:  Your Honor, I understand we need to have

10  this discussion.  I don't know if this is something that we

11  should do outside of the presence of the current witness.

12         THE COURT:  That's fine.  Would you take him back.

13     (Witness Removed from the Courtroom)

14         THE COURT:  So I guess, let me hear from the

15  government first.

16         MS. CASE:  Your Honor, I'm a little bit stumped is my

17  first reaction.  We might have to back up even before the

18  possibility of testifying to the ability to assist her counsel

19  effectively, and there may need to be a hearing on that.

20         THE COURT:  Mr. Rich.

21         MR. RICH:  Your Honor, I can say that throughout today

22  when Mr. Beard has been present with me yesterday when she was

23  present with me that she participated in her defense.  She

24  asked questions to me that showed me that she was paying

25  attention to testimony during the trial, evidence that was

1   introduced.  She participated in jury selection.  They made

2   notes about potential jurors, and we discussed those notes, and

3   she was with me every step along the way up until now up until

4   this discussion.  She's been participating in her defense.

5          Prior to this trial, we've had multiple telephone

6   conversations.  She's come to my office, and she and I have

7   discussed where the case stood, the evidence in the case and

8   I've never had any -- I've never had any doubt that Mr. Beard

9   knew -- knew the full extent of the charges that she was

10  facing.

11         I've never had any doubt that she did not understand

12  the full extent of the discovery materials that were provided

13  to us, and that she was -- that she had had an inability to

14  make a rational decision on how to proceed, whether to go to

15  trial or reach a plea deal or anything that we've been doing

16  here this week.  There have been no red flags to me, Your

17  Honor.

18         THE COURT:  I suppose -- I suppose one option is to if

19  she chooses to speak, to hear from Ms. Beard and just confirm

20  what Mr. Rich just told me and to see when -- the last time she

21  consumed meth was and whether she's under its influence at this

22  time.  I'm not sure what else to do.

23         MS. CASE:  Your Honor, should there be at least a

24  brief colloquy now to confirm now that she has tested positive

25  to ensure her current state is appropriate?

1          THE COURT:  That's what I'm asking.  That's what I'm
2    suggesting.
3          MS. CASE:  Okay.  Oh, to do it right now?
4          THE COURT:  Right.  You say "colloquy," you mean
5    between me and her.  Right?
6          MS. CASE:  Yes, Your Honor.
7          THE COURT:  That's what I'm proposing.
8          MS. CASE:  We would agree with that, Your Honor.
9          THE COURT:  Mr. Rich, would you like to speak with
10   your client for a minute before we go any further?
11         MR. RICH:  If we could, Your Honor.
12         THE COURT:  Okay.  Why don't you go -- are there any
13   witnesses in the witness room?
14         MR. RICH:  Not that I know of.
15         THE COURT:  All right.  But she is not going past that
16   courtroom door.
17         MR. RICH:  Correct, Your Honor.
18         THE COURT:  All right.
19      (Recess)
20         THE COURT:  All right.  We've had a couple of minutes
21   to allow Mr. Rich to meet with his client, but also I guess I
22   see some reinforcements in the room.  This -- as I said, I'm
23   not sure procedural what is the correct step here.  Ms. Case,
24   have you had a chance -- or Ms. Middleton an opportunity to
25   have somebody look at that already?

1          MS. CASE:  We have attempted to confer in the brief

2     recess.  Just from experiences at other types of court

3     proceedings, if the defendant were to test positive for

4     something like this, the proceeding would probably not proceed.

5     I hate to say that, but that's the direction we're leaning

6     right now, Your Honor.

7          THE COURT:  You think the safe course would be to

8     declare a mistrial and start again Monday morning?

9          MS. CASE:  One moment, Your Honor.

10     (Short Pause)

11          MS. CASE:  To answer that question, Your Honor, what

12     we're attempting to discuss is whether we know when Ms. Beard

13     last was affected by drugs, and we're asking probation if they

14     know that answer.

15          THE COURT:  I asked her the same thing.

16     (Short Pause)

17          MS. CASE:  Reluctantly we believe that's right, Your

18     Honor.  Your suggestion?

19          THE COURT:  All right.  Officer, would you grab a

20     microphone.  Ms. Sullivan, I had asked you when you gave me the

21     report your understanding of how long methamphetamine will

22     remain in the system and show up on a test.  And just for the

23     record here, what was your advice to me?

24          PROBATION OFFICER:  The defendant would have had to

25     use methamphetamine within the last 72 hours, give or take

1   eight hours or so.  But it doesn't stay in your system much

2   longer than that at all.

3            THE COURT:  Okay.  Thank you.  All right.  Mr. Rich,

4   the government has indicated that with that information that

5   the most prudent course here would be to declare a mistrial and

6   start over.  Do you have a position?

7            MR. RICH:  Your Honor, I think my position and my

8   client's position are in conflict.  I would agree that that's

9   prudent.  I've instructed Ms. Beard that what will probably

10  happen as a result of a mistrial is she will probably be taken

11  into custody and will be held in custody until we have the next

12  trial.

13           THE COURT:  Well, I intend to -- I'm sorry.  I

14  interrupted you.  Go ahead and finish.

15           MR. RICH:  During that discussion, she told me she

16  does not want a mistrial declared and that she would wish --

17  she wishes to proceed with the trial that we're currently

18  participating in.

19           THE COURT:  All right.

20           MR. RICH:  I can say normally I would agree.  My

21  client has instructed me.  Her wishes differ than from what I

22  would normally advise.

23           THE COURT:  Will she put on any evidence to contradict

24  the drug test?  Obviously, Ms. Beard, you can testify if you

25  want.  But you have the right to remain silent, and it's a

1    decision that only you can make.  Mr. Rich can't make it for

2    you.  But, Mr. Rich, why don't you chat with your client for a

3    second.  But are you going to put on evidence that the drug

4    test was somehow incorrect?

5            MR. RICH:  Your Honor, the only evidence that we could

6    offer is her statement saying that she did not use.

7            THE COURT:  But she's not -- is she going to exercise

8    her right not to testify?

9            MR. RICH:  Just a moment.

10           THE COURT:  Of course.

11       (Short Pause)

12           MR. RICH:  Your Honor, there's still somewhat of a

13   conflict of positions.  Ms. Beard has informed me that she

14   denies drug use and is -- she believes herself to be competent.

15   I asked her whether she wanted to make a statement, a sworn

16   statement, about either of those.  I told her that I would

17   advise against that and she was unable to come to a decision on

18   either of those and it seems to me out of just pressure of the

19   moment.  During these discussions, she has seemed to be

20   competent.  She's understood what I have told her and what the

21   effects will be here today, the effects of a mistrial versus

22   going forward with a trial.  But at this point, she's not

23   willing to make a statement.

24           THE COURT:  Okay.  Yes, ma'am.

25           MS. CASE:  Your Honor, before the court makes its

1    decision, will Ms. Beard be given a colloquy so that we can

2    maybe assess what her mental state is?

3            THE COURT:  So my concern -- and I'll let both sides

4    address it -- is that according to the probation officer,

5    methamphetamine stays in your system for about 72 hours such

6    that it could be detected, give or take.  This is the second

7    day of trial.  And I don't know what state she was in yesterday

8    when we were selecting the jury.  Counsel indicates that they

9    were communicating and that she was participating.  But if she

10   was under the influence of methamphetamine, I don't know that

11   her participation was the same as it would have been had she

12   not taken methamphetamine.  And with that, I'll let you give me

13   your thoughts.

14           MS. CASE:  Well --

15           THE COURT:  In other words, she's probably not in the

16   same condition she was right now as when she started.

17           MS. CASE:  One concern is that she's is in the same

18   condition and that she's continued to take methamphetamines

19   throughout the trial such that she's maintained whatever the

20   current mental state is, and Mr. Rich would be a good judge of

21   that.  But to assess -- to validate Mr. Rich's belief about

22   Ms. Beard's current mental state, a colloquy would be of

23   assistance at least to the government.

24           THE COURT:  Well, he's just indicated she's not

25   willing to give a statement about her drug use, and I don't

1    know how much –– that's certainly something I would go into.  I

2    just –– I just think there's a taint here that I can't fix so I

3    am going to declare a mistrial.  I was supposed to start a

4    week-long trial next Monday, so my calendar is clean.  How do

5    your calendars look?

6              MS. CASE:  Your Honor, speaking for the government,

7    I've had a death in my family overnight.

8              THE COURT:  I just –– I'm sorry.  Go ahead.

9              MS. CASE:  I expect to be out of town Monday and

10   perhaps Tuesday.

11             THE COURT:  I'm sorry.  So next Wednesday?

12             MS. CASE:  We had looked at our calendars, and the

13   27th is the best day that works for –– the best day in the

14   immediate future that works for the government but ––

15             THE COURT:  Mr. Rich, how do you look on the 20th?

16             MR. RICH:  The 20th, Your Honor?  We have –– I have

17   court in multiple locations that day, Your Honor.  I have a

18   preliminary hearing that morning, and I've got a trial that

19   afternoon.

20             THE COURT:  What about the 21st?

21             MR. RICH:  21st I have court in three different courts

22   that day.

23             THE COURT:  Cherie, let's go off the record for this.

24      (Off Record)

25             THE COURT:  The case will be reset for the 28th.  Let

1    me -- I want to excuse the jury because they are sitting back

2    there.   If there's no objection -- we obviously have some more

3    business to take care of, but if there's no objection I may go

4    back and thank the jury for their service and excuse them.   Any

5    objection to that?

6              MS. CASE:   No, Your Honor.

7              MR. RICH:   No, Your Honor.

8              THE COURT:   All right.   In the interim, we'll take a

9    recess here.   It's 2:00.   The -- obvious next issue has to do

10   with the defendant's bond, and there are a couple of issues on

11   the table there.   One has to do with the fact that she was late

12   yesterday, she was late yesterday afternoon, she was late this

13   morning, on top of what appears to be a violation of her terms

14   of supervised release -- terms of her bond.

15             So procedurally I think the statute says she's

16   supposed to go back before the judge that entered the initial

17   bond, but there may be a -- there may be a way around there,

18   but it's 18 USC Section 3148, I think.   3148.   Let's take a

19   20-minute recess and I'll let everybody take a look at those

20   issues as I excuse the jury.   We're in recess.

21      (Recess)

22             THE COURT:   I want to put one more thing on the record

23   here.   Obviously the drug test that I have indicating, drug

24   use, it is a primary basis for declaring a mistrial.   But I

25   also for the record feel compelled to say that the defendant's

1    behavior in the courtroom was in my opinion abnormal.  I don't

2    normally see defendants reacting throughout the trial the way

3    that this defendant did.  She might just be highly emotional,

4    but it was part of the reason why I was concerned enough to

5    order a drug test, that and her being late and leaving the

6    building when I told her not to.  So it wasn't just the test

7    itself.  I just saw too much going on and felt like I needed to

8    see whether or not she was on drugs because I was concerned

9    that if she was, that it would be basically an invalid trial so

10   that's why I made that decision.  All right.  We're in recess.

11        (Recess)

12        THE COURT:  All right.  I want to do a little

13   housekeeping again with respect to the drugs that the defendant

14   appears to have taken.  Apparently she admitted to taking

15   another medication, something other than the methamphetamine.

16   Officer Sullivan, you have some information on the -- I guess

17   the side effects of the medication that she admitted taking to

18   you?

19        PROBATION OFFICER:  Yes, sir.  Among others are --

20   possible side effects are aggressiveness, irritability,

21   hyperactivity, restlessness, and a long list of others.

22        THE COURT:  Okay.  That's certainly consistent with my

23   observations.  So the next question here, is there a motion

24   from the government with respect to bond.

25        MS. MIDDLETON:  Yes, Your Honor.  The government is

1    requesting that the defendant's bond be revoked.  However, it

2    is our understanding that under 3148(c) the court could -- if

3    the court found the defendant in contempt, the court could

4    proceed sue sponte.  However, if we are proceeding on the

5    revocation, it would have to be before a magistrate judge and

6    in this instance Judge Ball, I believe.

7            THE COURT:  Yeah.  I wondered about that myself.  The

8    statute itself says to the extent practicable that the

9    defendant would be taken in front of the original judge.  And

10   in this case, Judge Ball has no knowledge of all the different

11   things that I've observed in the last 48 hours.  I don't even

12   know if he's available.  First of all, let me hear from the

13   government.

14           MS. MIDDLETON:  The government has no objection to the

15   court proceeding under -- and we do understand that the

16   observations that were made were made by this court, and that

17   information would have to be otherwise conveyed to the

18   magistrate judge and his unavailability would make it

19   practicable for it to be here in the district court.

20           THE COURT:  All right.  Mr. Rich?

21           MR. RICH:  Your Honor, I'd like to check to make sure

22   if Judge Ball's available, if that's what the statute calls

23   for.

24           THE COURT:  I don't know if he is or not, but I think

25   that Judge Ball -- I would have to testify, I think, to tell

1    him all the things I've seen, which doesn't seem practicable to

2    me.  I suppose I have two options.  One, I could proceed as a

3    bond revocation issue or I could treat this as a matter of

4    criminal contempt or summary contempt, more likely, and proceed

5    that route.  Seems to me the cleaner route is to take it as a

6    bond issue.  You want a minute -- as much time as you need.

7    We're not in a rush.  The jury's been excused.

8            MR. RICH:  I think our arguments would be the same

9    regardless of how I proceed, Your Honor.

10           THE COURT:  All right.  Just for the record, is

11   there -- I would propose to handle this as a bond revocation

12   issue that I would handle.  Is there an objection to that?

13           MR. RICH:  No, Your Honor, no objection to that.

14           THE COURT:  All right.  Ms. Middleton, are you

15   handling this?

16           MS. MIDDLETON:  Yes, Your Honor.

17           THE COURT:  All right.  You may proceed.

18           MS. MIDDLETON:  Court's indulgence for just one

19   moment.

20       (Short Pause)

21           MR. RICH:  Your Honor, if I may briefly, Ms. Beard has

22   informed me that she has no objection to her bond being revoked

23   because of the positive screen, but she does have a pet and

24   animal inside her residence and needs to make some arrangements

25   for it if her bond is revoked.

1           THE COURT:  Okay.

2           MR. RICH:  The other issue, Your Honor, for me would

3    be since we're not set for a trial to begin until the

4    28th would be clothing for Ms. Beard for that trial, where that

5    clothing would come from, if it came from her house, the

6    process of getting it from her house and in custody, to bring

7    to the U.S. Marshals, how that would work.

8           So if her bond is revoked, I don't know if it's

9    appropriate for somebody from the marshals to escort her to her

10   residence to get clothing or -- I don't know what the steps

11   need to be, Your Honor.  But she does not oppose her bond being

12   revoked and going into custody because of that screen as long

13   as she has an opportunity to take care of an animal at her home

14   and --

15          THE COURT:  Right.  The -- it appears there have been

16   two individuals accompanying the defendant today and yesterday.

17   One is I think the boyfriend, I assume, from what I saw in the

18   courtroom.  I was working at my window desk this morning when

19   the defendant drove up, and she appeared to be with the

20   boyfriend.  She was certainly with him during lunch.  There

21   was -- which was videotaped by the court security officers at

22   the command center downstairs.

23          There's also another gentleman that I don't know who's

24   I think, been with her today.  And certainly she could make

25   arrangements, you know, to have one of them take care of the

1    dog.  And, yes, you're right, she will need, by the time we go

2    to trial, to have some clothes available.

3          For what it worth, she showed up this morning in

4    that -- in what looked to me to be the Yukon in all those

5    photographs with the windows smashed out.  I think she was in

6    Mr. Beard's vehicle when she showed up.  Maybe not, but you

7    were definitely in a big SUV that looked like the one in the

8    picture with all the windows smashed out.

9          The motion having been made -- I guess the motion

10   having been conceded and based on that plus the fact that it's

11   clearly in order for a wide variety of reasons, not the least

12   of which is the positive drug test, I'm granting the

13   government's motion and revoking the bond.  I will give her

14   some time here to get on the phone to make arrangements for the

15   pet and to have somebody pick up some clothing.  I don't know

16   what you want to do with it, Mr. Rich.  You can keep it at your

17   office or wherever, but that will need to be arranged before

18   she leaves.

19         MR. RICH:  Yes, Your Honor.

20         THE COURT:  Anything else from the government?

21         MS. MIDDLETON:  Your Honor, the government would ask

22   that there be an order entered that this defendant be separated

23   from Mr. Beard at all times while at Madison County as well as

24   she be directed not to interact with any potential witness in

25   this matter until the trial and thereafter.

1    THE COURT:  Right.  Certainly there's already an order

2    entered that I'll just reiterate.  And, Ms. Beard, I'm sure you

3    understand that you're not allowed to have any contact in

4    person, over the phone, through text message, through letters.

5    You're shaking your head.  Do you not understand what I'm

6    saying?

7    MS. BEARD:  I do understand.  I don't want to have any

8    contact with him, Your Honor.

9    THE COURT:  Not just him, but any other potential

10   witnesses in this case.  You're not allowed to have any contact

11   in any format whatsoever.  I will also instruct the marshals to

12   make sure that the defendant is not in the presence of -- are

13   there any other -- I know Mr. Beard's up there.  Are there any

14   other detainees that are related to this case?

15   MS. MIDDLETON:  To our knowledge, there are no other

16   detainees at this time.

17   THE COURT:  Okay.  So I enter an order to make sure

18   that she is kept apart from Mr. Beard.  I will at some point

19   want to talk to the attorneys.  There was obviously testimony

20   given in this case, and we'll need to give a little attention

21   to how we treat that testimony if it's used in the second case.

22   I don't want to indicate to the next jury that there was a

23   mistrial.  That might be prejudicial to the defendant.  All

24   right.  Anything else before we are adjourned?

25   MS. MIDDLETON:  Nothing further.

1          MR. RICH:  Your Honor, do we need an order so we can

2    pick these clothes up from the Madison County Detention Center

3    that she's wearing today?

4          THE COURT:  Do you need an order?  I don't know if you

5    need one or not, but if you do, I'm happy to sign it.

6          MR. RICH:  If I could prepare an order and send it to

7    your clerk or administrator --

8          THE COURT:  That's fine.

9          MR. RICH:  Thank you, Your Honor.

10         THE COURT:  I assume there's no objection.

11         MS. MIDDLETON:  None, Your Honor.

12         THE COURT:  Okay.  Anything else, Mr. Rich?  I may

13   have something from the marshal.

14         DEPUTY MARSHAL:  Yes, sir, Your Honor.  If those

15   clothes are released to her attorney in the event she does get

16   a bond or something else along later, some more clothing would

17   have to be provided to the jail for her to be released in.

18   Normally Madison County will take the clothes that they come in

19   and put them in their property for that event.

20         THE COURT:  I don't anticipate her being released

21   before trial.

22         DEPUTY MARSHAL:  Okay.  Thank you.

23         THE COURT:  So and -- but it's a good point.  If we

24   get to the point posttrial and she's acquitted, then Mr. Rich

25   you'll need to make sure that those clothes are pretty quickly

1    delivered.

2            MR. RICH:  I will.

3            THE COURT:  All right.  Anything else?  We're

4    adjourned.

5        (Recess)

1                        CERTIFICATE OF REPORTER

2

3          I, CHERIE GALLASPY BOND, Official Court Reporter, United

4     States District Court, Southern District of Mississippi, do

5     hereby certify that the above and foregoing pages contain a

6     full, true and correct transcript of the proceedings had in the

7     aforenamed case at the time and place indicated, which

8     proceedings were recorded by me to the best of my skill and

9     ability.

10         I certify that the transcript fees and format comply

11    with those prescribed by the Court and Judicial Conference of

12    the United States.

13

14         This the 18th day of June, 2018.

15

16                        s/ *Cherie G. Bond*
                          Cherie G. Bond
17                        Court Reporter

18

19

20

21

22

23

24

25