
GOVERNMENT
EXHIBIT

P6

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

VS.                    CRIMINAL NO. 3:17-cr-00140-DPJ-FKB-2

HEATHER ELIZABETH WRIGHT-BEARD

TRIAL TRANSCRIPT
VOLUME 1

BEFORE THE HONORABLE DANIEL P. JORDAN III
CHIEF UNITED STATES DISTRICT JUDGE
AND A JURY
JUNE 13, 2018
JACKSON, MISSISSIPPI

APPEARANCES:

FOR THE GOVERNMENT:   MS. KEESHA D. MIDDLETON
                      MS. JENNIFER CASE

FOR THE DEFENDANT:    MR. ROBERT THOMAS RICH

REPORTED BY:   CHERIE GALLASPY BOND
               Registered Merit Reporter
               Mississippi CSR #1012

---

501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

# TABLE OF CONTENTS

OPENING STATEMENTS:

Opening Statement by Ms. Case ..........................5

Opening Statement by Mr. Rich ........................7

    Exhibit G-1 for ID ..............................10

    Exhibit G-2 for ID ..............................10

DALE STALLINGS                                11

    Direct Examination By Ms. Middleton ...............11

    Exhibit G-16(a) ..................................16

    Exhibit G-18(a) and G-18(b) .....................19

    Exhibit G-3 through G-15 ........................22

    Exhibit G-19 ....................................28

    Exhibit G-27(a) through G-27(b) .................30

    Exhibit G-28(a) through G-28(c) .................30

    Exhibit G-29(a) through G-29(r) .................30

    Exhibit G-30(a) through G-30(b) .................31

    Exhibit G-31(a) through G-31(b) .................31

    Exhibit G-32(a) through G-32(c) .................31

    Exhibit G-33(a) through G-33(j) .................31

    Exhibit G-34(a) through G-34(j) .................31

    Exhibit G-35(a) through G-35(d) .................31

    Exhibit G-36(a) .................................31

    Exhibit G-37(a) through G-37(g) .................31

    Exhibit G-38(a) through G-38(j) .................31

3

1    Exhibit G-39(a) through G-39(c) ...................31
2    Exhibit G-20 ....................................37
3   Cross-Examination By Mr. Rich ......................39
4   Redirect Examination By Ms. Middleton .............46
5  DEVIN RICE                                        48
6   Direct Examination By Ms. Case ....................48
7   Cross-Examination By Mr. Rich ......................61
8   Redirect Examination By Ms. Case ..................66

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    (Voir Dire, Jury Selection, and Preliminary Instructions

2    Not Transcribed)

3    (Jury In)

4         THE COURT:  So the trial will now begin.  First the

5    government will make an opening statement which is simply an

6    outline to help you understand the evidence as it comes in.

7    Next the defendants' attorney may, but is not required to, make

8    an opening statement.  Open statements are neither evidence nor

9    arguments.

10         The government will then present its witnesses, and

11   counsel for the defendant may cross-examine them.  Following

12   the government's case, the defendant may, if she wishes,

13   present witnesses whom the government may cross-examine.  After

14   all the evidence is in, I will instruct you on the law, and the

15   attorneys will present their closing arguments to summarize and

16   interpret the evidence for you.  After that, you will retire to

17   deliberate on your verdict.

18         All right.  Ms. Middleton, how much time do you

19   need -- or Ms. Case?

20         MS. CASE:  Not more than ten minutes, Your Honor.

21         THE COURT:  Would you like a warning?

22         MS. CASE:  Not necessary.  Thank you.

23         THE COURT:  All right.  Thank you.

24         MS. CASE:  May it please the court.

25         THE COURT:  Yes, ma'am.

OPENING STATEMENT FOR THE GOVERNMENT

1

2          MS. CASE:  Ladies and gentlemen, a few years ago the

3     defendant, Heather Wright-Beard, met the man who would become

4     her husband, David Beard.  Even before they married, Mr. and

5     Ms. Beard began their live at one.  They lived together near

6     Vicksburg, Mississippi, while they renovated a modest home in

7     west Jackson.

8          In March 2016 they moved into that home.  A few months

9     later, Mr. Beard pled guilty and admitted his role in a home

10    invasion.  He was out of prison while he waited to be

11    sentenced.  Mr. Beard expected he would be in prison for some

12    time so he and the defendant, his fiance, made plans to take

13    care of Ms. Beard while Mr. Beard was in prison.

14         One way that Mr. Beard sought to help his wife was by

15    marrying her.  Yes, he married her for love.  But one

16    motivation for the timing of the Beard's marriage was that

17    Mr. Beard would soon be in prison.  By not delaying their

18    marriage ceremony, Mr. Beard ensured that his wife would have

19    access to his accounts and assets and that she could visit him

20    in prison.

21         Mr. Beard helped his wife financially in other ways as

22    well.  He moved items out of the building that he owned so that

23    his wife could rent it and have a source of income.  He even

24    sold his personal property to raise money for her.

25         Mr. Beard also did several things to give his wife

security during the time that she would have to live alone in
west Jackson without him. He bought her a dog for protection.
He installed security cameras in their home, and he bought his
wife a gun.

That gun is one of two guns that brings us here today.
You see, neither Mr. Beard for Ms. Beard could legally have a
gun. They are both convicted felons. One consequence of their
felony convictions is they cannot possess a gun. Ms. Beard
cannot own a gun. She cannot use a gun. She cannot have easy
access to a gun. And your task is to determine whether the
defendant possessed a gun.

The parties agree there were two guns in the home.
The parties also agree that the defendant is a convicted felon.
The only dispute is whether Ms. Beard possessed a gun around
December 2, 2016. She did.

The court will tell you what it means to possess a
gun. Possession does not require ownership. It simply
requires that a person have control over a gun or that she be
able to exert control over it. More than one person can
possess the same gun, and consider the meaning of possession as
you hear testimony from the witnesses in this trial.

The government anticipates that you will hear
testimony about two guns. First, you will hear that around the
time of their marriage in September of 2016, the defendant and
her husband went to purchase a small revolver. They bought the

1   gun for the defendant's protection.  The defendant held the

2   gun, confirmed that she liked it, and maintained control over

3   it.  She often kept the gun by her bed, and she kept ammunition

4   for that gun in her closet.

5       You will also hear that the defendant knew that a

6   rifle was in her home.  The rifle was in an unlocked gun safe

7   in an unlocked closet in the middle of the home.  The rifle sat

8   alongside the defendant's pellet gun.  The ammunition in the

9   defendant's closet also fit the rifle.

10      The defendant knew that these guns were in her home.

11  She had easy access to both of them.  We have the burden of

12  proving to you beyond a reasonable doubt that the defendant

13  knowingly possessed at least one of these two guns.  We embrace

14  our burden and our opportunity to present this case to you.

15      And at the end of this trial, Ms. Middleton and I will

16  ask you to return the verdict that the facts and the law

17  demand, to find the defendant, Heather Wright-Beard, guilty.

18  Thank you.

19      THE COURT:  All right.  Thank you.  Mr. Rich, do you

20  wish to make an opening statement?

21      MR. RICH:  I do, Your Honor.

22          OPENING STATEMENT FOR THE DEFENDANT

23      MR. RICH:  Ms. Case is correct.  The only issue in

24  this case is knowing possession.  Both sides stipulate that

25  Ms. Beard is a convicted felon.  She has been convicted of a

felony. Both sides agree that there were two guns found in the home. But what we disagree about is knowing possession, knowing possession.

I believe the evidence will show that when law enforcement came into the home a year and a half ago, December 2, 2016, that the Winchester rifle that you heard mention of was concealed in a gun cabinet. I believe that you'll also hear testimony that a Taurus pistol was found, was concealed in a bag behind the mirror.

I believe you'll hear testimony that no one from law enforcement saw Mr. Beard possess a gun. The only testimony that I believe you'll hear is from her husband, who has pled guilty in this case, that Ms. Beard ever possessed either gun. I believe that's the only testimony that you will ever hear of that.

So at the end of the day, that and a lot more evidence that you're going to hear, I believe when you have the decision of knowing possession, we're going to ask you to find the defendant not guilty on this charge.

THE COURT: All right. Thank you. Does either party wish to invoke the rule?

MS. MIDDLETON: Yes, Your Honor. The government would like to invoke.

THE COURT: All right. I don't know any of the witnesses. So if there's -- I'll ask the parties to monitor

1   that.  Are there any in the courtroom?  There's no one in the

2   courtroom for the government.

3          MR. RICH:  Not for the defense, Your Honor.

4          THE COURT:  All right.  Thank you.  The government

5   call its first witness.

6          MS. MIDDLETON:  Your Honor, if I may, before I call my

7   first witness, the government and the defense have a couple of

8   stipulations that we would like to read into the record.

9          THE COURT:  Okay.  Give me one second.

10     (Short Pause)

11         THE COURT:  All right.  Ladies and gentlemen, as you

12  just heard, the parties have entered into an agreement or

13  stipulation as to certain facts.  That means that both sides

14  agree as to what those facts are.  You may treat those facts as

15  having been proven in this case.

16         All right.  Ms. Middleton.

17         MS. MIDDLETON:  Your Honor, the first stipulation is

18  as follows:

19         The government and the defendant stipulate and agree

20  that the Taurus brand model 94 Ultra-Lite 9 bearing serial

21  number RG69194, .22 caliber revolver found at the residence of

22  the defendant, Heather Elizabeth Wright-Beard, on December 2,

23  2016, is a firearm and was manufactured in Brazil.  Prior to

24  December 2nd of 2016, the firearm traveled in and affected

25  interstate and foreign commerce.

1              The government and the defendant stipulate and agree

2    that the Winchester brand model 67A .22 caliber rifle bearing

3    no serial number found at the residence of the defendant,

4    Heather Elizabeth Wright-Beard, on December 2, 2016, is a

5    firearm and was manufactured in Connecticut prior to

6    December 2, 2016.  The firearm traveled in and affected

7    interstate commerce.

8              This stipulation has been signed by the government,

9    Keesha Middleton, and for the defendant, Tom Rich.  It is

10   denoted by Government's Exhibit G-2.

11             We have a second stipulation.

12             THE COURT:  Okay.

13             MS. MIDDLETON:  The government and the defendant

14   stipulate and agree that the defendant, Heather Elizabeth

15   Wright-Beard, is a convicted felon.  Heather Elizabeth

16   Wright-Beard had previously been convicted of a crime

17   punishable by imprisonment for a term in excess of one year,

18   that is, a felony, at the time of the crime alleged in the

19   indictment.

20             It has been signed by the government and by the

21   defendant and is denoted by Government's Exhibit G-1.

22             THE COURT:  Okay.  I'll, I guess, mark those for

23   identification purposes as G-1 and G-2.  If you can approach.

24        (Exhibit G-1 for ID marked)

25        (Exhibit G-2 for ID marked)

1    THE COURT:  Yes.

2    MS. MIDDLETON:  Your Honor, the government calls

3  Special Agent Dale Stallings.

4    (Witness Sworn)

5    MS. MIDDLETON:  May I proceed?

6    THE COURT:  Yes.

7                    DALE STALLINGS,

8    having first been duly sworn, testified as follows:

9                    DIRECT EXAMINATION

10  BY MS. MIDDLETON:

11  Q    Good afternoon.

12  A    Good afternoon.

13  Q    Would you please state and spell your name for the record.

14  A    Dale Stallings D-A-L-E S-T-A-L-L-I-N-G-S.

15  Q    Mr. Stallings, where are you employed?

16  A    I work for the Bureau of Alcohol, Tobacco, Firearms, and

17  Explosives.

18  Q    Is that commonly known as ATF?

19  A    It is.

20  Q    What's your position with ATF?

21  A    I'm a special agent.

22  Q    How long have you worked as a special agent with ATF?

23  A    For approximately ten and a half years.

24  Q    Agent Stallings, were you working as a special agent on

25  December 2 of 2016?

```
1    A    I was.
2    Q    And did you participate in the execution of an arrest
3    warrant and search warrant on that particular date?
4    A    I did.
5    Q    Do you recall the location?
6    A    Yes.  It was at 4645 Van Winkle Park Drive in Jackson,
7    Mississippi.
8              THE COURT:  Let me -- can everybody on the jury hear
9    him okay?
10   BY MS. MIDDLETON:
11   Q    I believe the last question was at what location, and you
12   said 4645 Van Winkle Park Drive?
13   A    That's correct.
14   Q    Is that location within the Southern District of
15   Mississippi?
16   A    It is.
17   Q    Agent, I want to turn your attention to the execution of
18   the arrest warrant at 4645.  What was your role?
19   A    My role during the execution of the warrant was to provide
20   perimeter security around the building.
21   Q    For those of us who are not law enforcement and not
22   familiar with perimeter security, what does that entail?
23   A    Generally you have a couple of agents or officers who take
24   a position on the corners of the buildings to where they have a
25   view of any exterior windows or doors in order to provide
```

1  safety in case anything should happen from those locations.

2  Q   Okay.  While serving as perimeter, who executed the arrest

3  warrant?

4  A   It was the United States Marshal's task force.

5  Q   Do you know who they were arresting?

6  A   They had a warrant for David Beard.

7  Q   At the time that arrest warrant was executed, do you know

8  how many people were in the residence at that time?

9  A   There were two occupants in the residence.

10  Q   Who were they?

11  A   It was David Beard and Heather Wright-Beard.

12  Q   Do you see Heather Wright-Beard in the courtroom today?

13  A   I do.

14  Q   Please point her out and identify what she's wearing.

15  A   She's sitting at the defense table wearing a black jacket

16  and a white blouse.

17       MS. MIDDLETON:  Let the record reflect that the

18  witness has identified the defendant, Heather Elizabeth

19  Wright-Beard.

20       THE COURT:  It will.

21  BY MS. MIDDLETON:

22  Q   When the marshals executed the arrest warrant, what, if

23  anything, was found?

24  A   During the execution of the arrest warrant, the marshals

25  observed a shotgun shell in plain view.

1    Q    When you say "in plain view," do you know where exactly it

2    was?

3    A    It was in a closet sitting on top of a gun safe.

4    Q    What's significant about the finding of a shotgun shell?

5    A    Prior to the execution of the warrant, the marshals task

6    force had information that David Beard was a convicted felon.

7    Q    What does that mean in relation to the shotgun shell?

8    A    That means he's prohibited from possessing any firearms or

9    ammunition.

10   Q    After the finding of the shotgun shell, what happened?

11   A    After the shotgun shell was discovered, ATF sought a search

12   warrant.

13   Q    Did they get a search warrant?

14   A    They did.

15   Q    Once a search warrant was received or once ATF got the

16   search warrant, does ATF do anything in particular before

17   actually going in and physically searching the residence?

18   A    We will document the scene.  We will do a -- we'll take

19   photographs of the exterior of the building, do a video

20   walk-through prior to the search to show the condition of the

21   residence, and we will do a rough sketch of the floor plan of

22   the residence.

23   Q    Let's talk a little bit about the video.  Did you say why

24   you video the residence?

25   A    Yes, just to show the condition of the residence prior to

1    the search.

2    Q    Who took that video?

3    A    I did.

4    Q    Did you download that video on any type of media?

5    A    I downloaded it to a DVD.

6         MS. MIDDLETON:  May I approach the witness?

7         THE COURT:  Yes.

8    BY MS. MIDDLETON:

9    Q    I'm handing you what's previously been marked as

10   Government's Exhibit G-16(a).  Do you recognize it?

11   A    I do.

12   Q    What is it?

13   A    It's a DVD containing the recording of the pre-search

14   walk-through.

15   Q    You have reviewed it before?

16   A    I have.

17   Q    How do you know?

18   A    I initialed it after reviewing it.

19   Q    Is this copy -- a true and correct copy of the video that

20   you took of 4645 Van Winkle Park Drive on February 2, 2016.

21   A    It is.

22        MS. MIDDLETON:  At this time, we would like to offer

23   into evidence Government's Exhibit G-16(a).

24        THE COURT:  Any objection?

25        MR. RICH:  No objection.

1          THE COURT:  G-16(a) is admitted.

2      (Exhibit G-16(a) marked)

3          MS. MIDDLETON:  May I retrieve the recording and

4   publish to the jury?

5          THE COURT:  Yes.

6   BY MS. MIDDLETON:

7   Q   While that's playing, can you please tell us what we're

8   seeing?

9      (Clip Played)

10  A   That's the front of the residence, the front door.

11  Q   Okay.  What's this one?

12  A   As you walk in, that's a kitchen area.

13  Q   There's a room to the left here?

14  A   Yes, living room area.

15  Q   Okay.  Now -- and the living area is right adjacent to the

16  kitchen.  What's this room you're walking into now?

17  A   Well, the one showing right now is a closet next to the

18  living room area.

19  Q   Okay.

20  A   To the left of that door is the entrance into the bedroom.

21  Q   This bedroom?

22  A   Yes.

23  Q   How many bedrooms are in the house?

24  A   There's one.

25  Q   And this is the condition the residence was in when you got

1    there, before the warrant was executed.   Correct?

2    A    Prior to the search warrant being executed.

3    Q    What's this area?

4    A    A small hallway.   There's a closet that is showing right

5    now.

6    Q    What's significant about this closet in particular?

7    A    That's the closet where the gun safe was located where the

8    shotgun shell was observed.

9    Q    What about this area?

10   A    That's a room.   It had a washer and dryer and I believe it

11   had a freezer in it as well.

12   Q    The video is kind of dark.   Were the lights off in some

13   areas?

14   A    Some of the lights were off.   That's a bathroom area.

15   Q    The size of the house, would you say large, small, or how

16   would you describe it?

17   A    The front of the residence I would describe it as being

18   small.   In the back there was a large garage which is what's

19   being shown on the video right now.

20   Q    This is the garage?

21   A    Yes.

22   Q    And that door that was showing there, is that the only way

23   to get into the garage or did you enter from the house?   Was it

24   two ways to get into the garage?

25   A    There's the interior door coming from the house, which is

1    the one I walked through in the video to reach this section,

2    and then there was the -- a garage door -- I don't believe we

3    ever opened that door or not.

4    Q    So pretty much of the rooms in the house, you have a living

5    room, bathroom, kitchen, bedroom, garage, gun closet.  There

6    weren't like two bathrooms, two bedrooms.  It was a pretty

7    small space.

8    A    That's correct.

9    Q    Other than the video, you also mentioned that a sketch or

10   drawing of the residence was done.

11   A    Yes.

12   Q    Did you prepare it?

13   A    I did not.

14   Q    Do you know who prepared it?

15   A    It was ATF Special Agent Edwin Reliford.

16   Q    Did you review it for its accuracy?

17   A    I did.

18        MS. MIDDLETON:  May I approach the witness?

19        THE COURT:  Yes.

20   BY MS. MIDDLETON:

21   Q    I hand you what's been previously marked as Government's

22   Exhibit G-18(a) and G-18(b).  Do you recognize it?

23   A    I do.

24   Q    What is it?

25   A    It's the sketch of the floor plan of the residence as well

1  as the second page is a legend where we designated each room

2  with a number.

3  Q   And do these exhibits fairly and accurately reflect the

4  layout of 4645 Van Winkle Park Drive as it existed on

5  December 7, 2016.

6  A   It does.

7        MS. MIDDLETON:  At this time, we would like to offer

8  G-18(a) and G-18(b) into evidence.

9        THE COURT:  Any objection?

10       MR. RICH:  No objection.

11       THE COURT:  G-18(a) and(b) are both admitted.

12   (Exhibit G-18(a) and G-18(b) marked)

13       MS. MIDDLETON:  May I publish to the jury?

14       THE COURT:  You may.

15  BY MS. MIDDLETON:

16  Q   Okay.  Agent Stallings, is this the sketch that you were

17  talking about in regards to the residence?

18  A   It is.

19  Q   And if you would, utilizing the screen, I want you to just

20  make a mark, whether it be an X, denoting and explaining each

21  one of the rooms that are shown on this drawing.

22  A   Right here is the kitchen area.

23  Q   Uh-huh.

24  A   This is the living room.  This is the --

25  Q   The master bedroom?

1    A    Yes.  The master bedroom.  It has the number 1 written in

2    it right next to the bed.

3    Q    And how many closets are in the residence?

4    A    There's a closet in the living room, and there's a closet

5    in the hallway.

6    Q    Let me help you here.  This -- is this the area in which --

7    the first closet you're talking about with the gun safe?

8    A    Yes, it is.

9    Q    Okay.  And there's a closet here?

10   A    Correct.

11   Q    And that's a closet in the living room?

12   A    It is.

13   Q    Okay.  And this is the only bedroom in the house.  Correct?

14   A    That's correct.

15   Q    Okay.  Let's talk -- go back to the execution of the search

16   warrant.  Once the video was taken, once you took the video,

17   what other role did you undertake?

18   A    My role after taking the video was to photograph any items

19   that were found that may have any evidentiary value.

20   Q    Did you participate in the search or just photograph?

21   A    No, I was photographing -- I was more or less floating from

22   room to room.  Whenever someone would find something, they

23   would request me to come photograph it.

24   Q    That was the procedure that they would let you know when

25   something was found and you would photograph?

1  A   That's correct.

2  Q   What, if anything, was found on that day at 4645?

3  A   There were firearms, ammunition, and drug paraphernalia

4  found.

5       MS. MIDDLETON:  Your Honor, may I ask the witness to

6  step down and examine Government's Exhibit G-3 through 15?

7       THE COURT:  Yes.

8  BY MS. MIDDLETON:

9  Q   Agent, I want to you examine all of these items and let me

10 know when you're done.

11 A   (Witness Examines Items)  I'm finished.

12 Q   Do you recognize those items?

13 A   I do.

14 Q   What are they?

15 A   That is all the evidence that was taken from the residence

16 during the search warrant.

17 Q   You took these items into evidence?

18 A   That's correct.

19 Q   And some of the items have seals on them in particular.

20 Were these items sealed when they were taken into evidence?

21 A   Once we retrieved the item from the residence and took them

22 back to our office, they were then packaged and sealed.

23 Q   Have they been open at any point in time prior to trial?

24 A   Yes, they have.

25 Q   When?

1    A    I wasn't present when it occurred, but I was informed that

2    some of the items were opened in order for them to be examined

3    by the defense.

4    Q    Other than review of the items by defense counsel, have

5    there been any other changes?

6    A    The only other knowledge I have is that one of the firearms

7    was test fired.

8    Q    Other than what you just stated, are these items in the

9    same or substantially the same condition as they were when they

10   were taken from 4645 Van Winkle Park Drive?

11   A    They are.

12          MS. MIDDLETON:  Your Honor, at this time we would like

13   to offer G-3 through 15 into evidence.

14          THE COURT:  Any objection?

15          MR. RICH:  No objection.

16          THE COURT:  All right.

17   (Exhibit G-3 through G-15 marked)

18          MS. MIDDLETON:  Your Honor, at this time I would ask

19   if Agent Stallings can open some of the items and publish to

20   the jury.

21          THE COURT:  You may.  Somebody has walked in.  I want

22   to just make sure it was not a witness in back to the left

23   here.

24          MR. RICH:  No.

25          MS. MIDDLETON:  No.

BY MS. MIDDLETON:

Q   All right.  Let's talk about first G-3.  Agent, what is G-3?

A   G-3 is a Winchester model 67A .22 caliber rifle.

Q   And where was this rifle found?

A   This rifle was found in the gun safe in the closet in the hallway.

Q   And in particular, the gun safe that was found in -- do you know whether or not that gun safe was open?

A   It was.

Q   Was this rifle test fired?

A   It was.

Q   Why?

A   We had received a statement from David Beard that he believed that it wasn't a functioning firearm and that he referred to it as a training rifle.

Q   Were you present for the test firing of this rifle?

A   I was.

Q   Did it function as a firearm?

A   It did.

Q   Let's take a look at G-4.  Agent Stallings, what is G-4?

A   G-4 is a Taurus model 94 Ultra-Lite 9, .22 caliber revolver.

Q   Do you know where there particular revolver was found?

A   Yes, it was found in the bedroom.

1    Q    Do you know who found it?

2    A    It was found by MBN Agent Devin Rice.

3    Q    Do you know what type of bullets this particular revolver

4    holds?

5    A    .22 caliber bullets.

6    Q    Do you know -- Agent, are you aware or do you know if any

7    .22 caliber bullets were found at 4645 Van Winkle Park Drive?

8    A    Yes, there were.

9    Q    Where?

10    A    There were -- it was .22 caliber ammunition.  There was one

11    found in the living room area.  There was a box containing

12    .22 caliber ammunition in the closet of the bedroom.

13    Q    And do you see that particular box anywhere in this

14    evidence here?

15    A    I do.  And make a correction.  I referred to it as a closet

16    in the bedroom.  It's a closet in the living room.

17    Q    Thank you.  Which exhibit has the .22 caliber bullets?

18    A    It's Government's Exhibit 5.

19    Q    Could you, please -- and inside of G-5, does it contain

20    currently right now .22 caliber bullets?

21    A    It does.

22    Q    Do you know how many of those bullets are in that box?

23    A    314.

24    Q    Let's discuss generally G-6 through G-15, beginning with

25    G-6.

1  A   G-6 is one round of .22 caliber ammunition.

2  Q   And, Agent, is that .22 caliber ammunition the same as the

3  ammunition that's in G-5?

4  A   It is.

5  Q   Where was this found?

6  A   This was found in room number 2, which I believe is the

7  living room area.

8  Q   Let's take a look at G-7.  What's contained in G-7?

9  A   G-7 is a camouflage box, and this box contains several

10  magazines for different firearms.

11  Q   And where was this found?

12  A   This was found in the same closet that contained the gun

13  safe.

14  Q   The same closet in which the Winchester rifle was found in?

15  A   That's correct.

16  Q   Right off the kitchen?

17  A   Yes.

18  Q   G-8.  What's contained in G-8?

19  A   G-8 contains 24 rounds of multi-caliber assorted

20  ammunition.

21  Q   And there's several different caliber ammunition that's

22  included in G-9?

23  A   Yes.  It was recovered from the same camouflage box.

24  Q   So the ammunition found in G-8 was inside the camouflage

25  box that was in the gun safe?

1    A    That's correct.

2    Q    G-9:  What is G-9?

3    A    G-9 is one round of .22 caliber ammunition which was found

4    in room number 3, which is the bedroom.

5    Q    Okay.  Do you know on which side of the room it was found?

6    A    If you're standing at the foot of the bed in the bedroom

7    facing the bed, it would be on the left-hand side.

8    Q    Thank you.  Let's take a look at G-10.  What is G-10?

9    A    G-10 is six rounds of a sorted multi-caliber ammunition.

10   Q    Where was it found?

11   A    It was found in room number 5.

12   Q    Which is?

13   A    Which I believe refers to the closet -- the closet in the

14   hallway where the gun safe was located.

15   Q    G-11?

16   A    G-11 is a bag that contains 30 rounds of assorted

17   multi-caliber ammunition which was found in room 8, which is

18   the large garage at the back of the residence.

19   Q    G-12?

20   A    G-12 is 79 rounds of assorted multi-caliber ammunition

21   which was found in room 8.  That's the garage at the back of

22   the residence.

23   Q    Will you open it.

24   A    (Witness Complied with Request.)

25   Q    Now let's take a look at G- -- G-13.

1   A   G-13 is a black bag that contains 52 rounds of assorted

2   ammunition, and this item was found in room 8, the garage.

3   Q   Let's take a look at G-14 and G-15.

4   A   G-14 is an ammunition can which contains 483 rounds of

5   assorted multi-caliber ammunition.

6   Q   Finally let's take a look at G-15.  You're going to have to

7   pick that one up.

8   A   G-15 is a black plastic toolbox that contains 687 rounds of

9   multi-caliber ammunition.

10   Q   Where was that found?

11   A   This was found in room 8 the garage.

12   Q   In total, approximately how much ammunition was found at

13   the residence?

14   A   Approximately 1700 rounds.

15   Q   And this evidence was found where?  Just -- was it just

16   contained to one particular room or --

17   A   No, it was found throughout the residence.

18   Q   Of the evidence that was collected, was there any type of

19   list or anything to keep track of the evidence?

20   A   Yes.  We kept a property log.  As we found items, we would

21   document what was found.

22   Q   Okay.

23         MS. MIDDLETON:  May I approach?

24         THE COURT:  Yes.

25   BY MS. MIDDLETON:

1  Q    I hand you what has previously been marked as G-19.  Do you

2  recognize it?

3  A    I do.

4  Q    And what is it?

5  A    This is the property inventory list that was maintained

6  during the search.

7  Q    Did you prepare it?

8  A    I did not.

9  Q    Have you -- who prepared it?

10  A    This list I believe was prepared by Special Agent Edwin

11  Reliford.

12  Q    You have reviewed it for its accuracy?

13  A    I have.

14  Q    And is G-19 a true and accurate copy of the property

15  inventory list which reflects the evidence that was seized at

16  4645 Van Winkle Park Drive?

17  A    It is.

18        MS. MIDDLETON:  At this time, we would like to offer

19  Government's Exhibit G-19, which is two pages, into evidence.

20        THE COURT:  Any objection?

21        MR. RICH:  No objection.

22        THE COURT:  All right.  G-19 is admitted.

23     (Exhibit G-19 marked)

24        MS. MIDDLETON:  May I publish?

25        THE COURT:  Yes.

BY MS. MIDDLETON:

Q    This is page 1 of G-19.  What's the date on this document?

A    The date is December 2, 2016.

Q    Is that the same day on which the search warrant was
executed?

A    It is.

Q    Does this document, including the page that's showing on
the screen and including page 2, list everything that you
seized from 4645?

A    It does.

Q    Now, you mentioned earlier that you were the photographer
at the residence.

A    That's correct.

          MS. MIDDLETON:  May I approach?

          THE COURT:  Yes.

BY MS. MIDDLETON:

Q    Agent I've just handed you G-27(a) through G-27(b), G-28(a)
through 28(c), G-29(a) through 29(r), G-30(a) and 30(b),
G-31(a) and G-31(b), G-32(a) through G-32(c), G-33(a) through
G-33(j), G-34(a) through G-34(j), G-35(a) through G-35(d),
G-36(a), G-37(a) through G-37(g), G-38(a) through G-38(j) and
finally G-39(a) through G-39(c).

    Please take a look at all those photos and let me know when
you're done examining them.

A    (Witness Complied with Request)  I'm finished reviewing

1  them.

2  Q   Do you recognize those photos?

3  A   I do.

4  Q   What are they photos of?

5  A   These are photographs from when we executed the search

6  warrant.  They are photographs of the residents that were

7  present as well as items that were seized, and it's also

8  photographs of all the evidence collectively photographed.

9  Q   Do these photographs fairly and accurately depict the

10  residents that were present at the scene as well as the scene

11  and the evidence collected at 4645 Van Winkle Park Drive?

12  A   It does.

13      MS. MIDDLETON:  Your Honor, at this time we offer

14  Government's Exhibit G-27(a) through G-27(b), G-28(a) through

15  G-28(c), G-29(a) through G-29(r), G-30(a) through G-30(b),

16  G-31(a) through G-30(b) (sic), G-32(a) through G-32(c), G-33(a)

17  through G-33(j), G-34(a) through G-34(j), G-35(a) through

18  G-35(d), G-36(a), G-37(a) through G-37(g), G-38(a) through

19  G-38(j), and G-39(a) through G-39(c) into evidence.

20      THE COURT:  Any objection?

21      MR. RICH:  No objection.

22      THE COURT:  All right.  Those exhibits are admitted

23  into evidence.

24      (Exhibit G-27(a) through G-27(b) marked)

25      (Exhibit G-28(a) through G-28(c) marked)

1    (Exhibit G-29(a) through G-29(r) marked)

2    (Exhibit G-30(a) through G-30(b) marked)

3    (Exhibit G-31(a) through G-31(b) marked)

4    (Exhibit G-32(a) through G-32(c) marked)

5    (Exhibit G-33(a) through G-33(j) marked)

6    (Exhibit G-34(a) through G-34(j) marked)

7    (Exhibit G-35(a) through G-35(d) marked)

8    (Exhibit G-36(a) marked)

9    (Exhibit G-37(a) through G-37(g) marked)

10   (Exhibit G-38(a) through G-38(j) marked)

11   (Exhibit G-39(a) through G-39(c) marked)

12        MS. MIDDLETON:  Your Honor, may we publish?

13        THE COURT:  You may.

14   BY MS. MIDDLETON:

15   Q    I want to turn your attention to G-30(a).  What is this a

16   photo of?

17   A    That's a photograph of a piece of furniture --

18   Q    Uh-huh.

19   A    -- in the living room area, and there is a -- one round of

20   ammunition on top of the furniture.

21   Q    Would you please indicate utilizing your screen where the

22   ammunition is located?

23   A    (Witness complied with request).

24   Q    And you said that is a round of what, .22?

25   A    Yes.

1  Q    What is G-30(b)?

2  A    That's a close-up photo of the same round of ammunition.

3  Q    Okay.  Let me turn your attention to G-32(a).  What are we

4  seeing in this photo?

5  A    That is the closet in the living room area.

6  Q    Do you know what items of -- who those clothes are

7  attributable to?

8  A    The closet contained clothing for women as well as shoes.

9  Q    What are we seeing in 32(b)?

10 A    On the middle shelf is the black box containing the .22

11 caliber ammunition.

12 Q    Is this an interior shot of the same closet in G-31 -- that

13 was G-32(a), the previous photo?

14 A    It is.

15 Q    And these are the shoes that you're referring to?

16 A    That's correct.

17 Q    Okay.  And that photograph, the black box, is that the same

18 black box that's G-5?

19 A    It is.

20 Q    With the .22 rounds of ammunition?

21 A    Yes.

22 Q    What are we seeing in G-32(c)?

23 A    That's a photograph of the contents of the box.  That's .22

24 caliber ammunition and a couple of writing pens.

25 Q    Let's take a look at G-34.  What are we seeing in that

1　photograph of G-34(a)?

2　A　This is a photograph that was taken in the bedroom to

3　the -- if you're standing at the foot of the bed facing the bed

4　to the left against the wall, against the wall here is a

5　mirror, and down on the floor here is a black bag where the .22

6　caliber revolver was located.

7　Q　And is that the same .22 caliber revolver that is G-4?

8　A　Yes.

9　Q　Is this a photo of G-4?

10　A　It is.

11　Q　That's another shot of G-4?

12　A　It is.

13　Q　What are we seeing in G-34(e)?

14　A　This is a photograph on top of the bed of a cell phone.

15　Q　Where was this cell phone?

16　A　Cell phone was on the left side of the bed close to where

17　the black bag containing the revolver was found.

18　Q　On the floor, on the shelf, or where was it?

19　A　On the floor.

20　Q　When looking at G-29(c), we just discussed the cell phone.

21　Where in this photo is the cell phone?

22　A　It is on the floor right here.

23　Q　And earlier you mentioned a mirror.

24　A　Yes.

25　Q　Where is it in this photo?

1   A   The mirror is leaned against the wall right here.

2   Q   Okay. So the area that we're looking at on the left of the

3   screen, is this -- does this photo represent a close-up shot of

4   that area in that corner?

5   A   Yes, it does.

6   Q   More particularly, this photo -- you indicated that a black

7   bag was found over in that corner.

8   A   That's correct.

9   Q   There are also some -- appears to be medicine bottles on

10   the floor there.

11   A   Correct.

12   Q   What is G-34(i)?

13   A   It's close-up of medication bottles that were on the floor

14   next to the mirror.

15   Q   What are we seeing here in G-34(a)?

16   A   That's a close-up of a few of the medicine bottles.

17   Q   What's the name on the medicine bottles?

18   A   Heather Wright.

19   Q   These are the same medicine bottles that were found on the

20   floor immediately near the black bag?

21   A   That's correct.

22   Q   What are we seeing in G-37(a)?

23   A   That's a photograph of the interior of the gun safe, and

24   that is the Winchester rifle.

25   Q   That's in the brown?

1    A    Yes.

2    Q    Thank you.  What were these two other items that are in

3    there?

4    A    Those were air rifles.

5    Q    And is it illegal to possess an air rifle?

6    A    No, it's not.  They are not considered firearms.

7    Q    What are we seeing in G-37(c)?

8    A    That's a photograph of the interior of the camouflage box

9    with the magazines.

10   Q    The same camouflage box that's on the table with the

11   magazines in it?

12   A    That's correct.

13   Q    That another photo of the camera box?

14   A    It is.

15   Q    What is this a photo of?

16   A    That's a photograph of the top of the gun safe.  There are

17   some shotgun shells on top of it.

18   Q    It's the same gun safe in which the Winchester was found

19   and the magazines.

20   A    That's correct.

21   Q    That's right off the kitchen.

22   A    Yes.

23   Q    Out of all of those photos that you took and that were

24   collected, did you keep -- or how did you keep track of all of

25   these photos?

1  A   We used a photo log.  Anytime we took a photo, we would

2  write it down on the log.

3  Q   Did you prepare it?

4  A   I prepared part of it.

5  Q   What part did you not prepare?

6  A   The third and fourth page I didn't prepare and I believe

7  the first three lines of the first page.

8  Q   You have reviewed it to make sure that these photographs --

9  that everything that's logged on this log is accurate?

10  A   I have.

11       MS. MIDDLETON:  May I approach?

12       THE COURT:  Yes.

13  BY MS. MIDDLETON:

14  Q   I hand you what's been marked as G-20.  Do you recognize

15  it?

16  A   I do.

17  Q   What is it?

18  A   It's the photo log.

19  Q   And is this a true and correct copy of the photo log that

20  was utilized to document the photos taken of the evidence and

21  the scene 4645 Van Winkle Park Drive?

22  A   It is.

23       MS. MIDDLETON:  At this time, we would like to offer

24  into evidence Government's Exhibit G-20, which is four pages.

25       THE COURT:  Any objection?

1    MR. RICH:  No objection.

2    THE COURT:  G-20 is admitted.

3    (Exhibit G-20 marked)

4    MS. MIDDLETON:  May I publish to the jury?

5    THE COURT:  Yes.

6  BY MS. MIDDLETON:

7  Q    Agent, I turn your attention to page 1 of the photo log.

8  In particular, I want to turn your attention to number 19.

9  What does number 19 -- photo number 19 reference?

10 A    It references a photograph of the cell phone that was

11 discovered next to the bed.

12 Q    It's an LG cell phone?

13 A    Yes.

14 Q    What are those numbers?  I assume those are numbers.

15 A    Yes.  That is the pin code to unlock the phone.

16 Q    How did you get the pin code -- how was the pin code --

17 A    The pin code was provided by Heather Beard.

18 Q    And that's the same phone that was in the photograph that

19 you circled on the floor on G-29(m)?

20 A    Yes.

21 Q    According to this photo log, where was the Taurus revolver,

22 the G-4 -- Exhibit G-4 found?

23 A    Room number 3, which was the bedroom.

24 Q    When you say "in the bedroom," you're referring to the same

25 photo that you discussed that you circled by the black

1  nightstand?

2  A    Yes.  The photograph with the black bag and the mirror.

3  Q    Of the rooms in the house, where were firearms and

4  ammunition found in all -- when you're talking about the rooms

5  in the house?

6  A    The firearms -- one was found in the bedroom.  That would

7  be the Taurus revolver.  The Winchester rifle was found in the

8  gun safe in the closet off the hallway.  There was ammunition

9  found in the living room, the bedroom, the closet and the --

10  where the gun safe was as well as the garage out the back of

11  the house.

12  Q    So in total in the eight rooms in the house, we're talking

13  about ammunition was in the living room, the bedroom, the

14  garage, the gun closet, which is right off the kitchen, and a

15  closed in the living room.

16  A    Yes.

17  Q    Other than the photographer, did you undertake any other

18  role in this investigation?

19  A    Once the evidence was brought back to our office to be

20  properly packaged and labeled, one of my other duties is as the

21  evidence vault custodian.  Once the evidence was prepared for

22  the vault, I checked it into the vault.

23  Q    You checked everything in once it was --

24  A    Yes.

25            MS. MIDDLETON:  Court's indulgence.

1      (Short Pause)

2          MS. MIDDLETON:  Your Honor, as I understand it, when I

3   was admitting photographs, one of the exhibits I misspoke and

4   said G-30 twice, and it should be we were also admitting

5   G-31(a) and(b).

6          THE COURT:  All right.  So noted.  Thank you.

7          MS. MIDDLETON:  I tender the witness.

8          THE COURT:  All right.  Cross.

9                     CROSS-EXAMINATION

10  BY MR. RICH:

11  Q    Agent Stallings, you mentioned earlier that you were

12  present when the arrest warrant was executed for Mr. Beard.

13  A    I was.

14  Q    What was the purpose for that arrest warrant?

15  A    To my knowledge, I knew that the U.S. Marshal task force

16  had an active arrest warrant for David Beard, and they

17  requested that we be there in support.

18  Q    When you were present at the home that day, did you ever

19  see Ms. Beard possess either the Winchester rifle or the Taurus

20  revolver?

21  A    No.

22  Q    I want to ask you some questions about this evidence, this

23  physical evidence up here.  You talked about this rifle.  You

24  said that you were present when it was test fired.  Can you

25  tell me how was it fired?  How was it successfully fired?

1    A    It was test fired in our office.  This was after the search

2    warrant had concluded.  I don't remember the exact date.  I

3    believe it's noted on the evidence tag.  But the way we'll test

4    fire any firearm is we'll take a round of ammunition that fits

5    the firearm.  We'll remove the bullet from it and remove powder

6    from it where all we are left with is a casing and a primer.

7        That casing and primer is then inserted into the firearm.

8    We have a barrel that we use that we stick -- it's a large

9    barrel that we stick the barrel of the firearm into just in

10   case for safety reasons anything should come out of the

11   firearm.  Pulled the trigger.  The hammer struck the primer,

12   and it set the primer off.

13   Q    But you test fired this firearm specifically because you

14   had information that it would not fire.

15   A    That's correct.

16   Q    And it did fire?

17   A    It did fire.

18   Q    As to the revolver, you mentioned and we saw in a

19   photograph that it was found in a black bag.

20   A    That's correct.

21   Q    Now, you've mentioned a lot of things about evidence that

22   you're the custodian for the vault.

23   A    Yes.

24   Q    That were you tasked with filming the scene that day?

25   A    Yes.

1  Q    You were tasked with documenting all this evidence?

2  A    I didn't keep the property log.  I just -- a partially kept

3  the photo log, but my main task was to photograph.

4  Q    I saw a photo in there of someone wearing gloves while

5  holding the revolver.  Were those your hands?

6  A    No, it was not.

7  Q    But it's important to keep proper documentation and

8  preservation of physical evidence in a case?

9  A    Correct.

10 Q    Where is the black bag?

11 A    We do not have the black bag.

12 Q    I see a Crown Royal bag here where evidence was found,

13 marked as G-11, with assorted ammunition.  I see a black camera

14 bag, a green metal box and medical chest and another box --

15 excuse me, two other boxes up here that hold ammunition.  Is

16 that correct?

17 A    That's correct.

18 Q    And you were able to keep the containers that held that

19 evidence.  Is that correct?

20 A    That's correct.

21 Q    Is Ms. Beard charged with possessing any of this

22 ammunition?

23 A    To my knowledge, she's just charged with possession of the

24 firearms.

25 Q    And so the container that held one of these pieces of

1    evidence at issue, this Taurus pistol, you don't have that bag?

2    A    We generally don't keep containers that firearms are kept

3    in.   The purpose for keeping the containers that the ammunition

4    was in is because we were dealing with the large amount of

5    ammunition and the vast majority of it is loose.   And so these

6    containers provided a means for us to package it and keep it

7    together.

8    Q    Let me ask you this about the picture with the rubber

9    gloves.   I'm showing you what's been marked as G-34(b), a

10   photograph of this Taurus revolver with someone holding it

11   wearing rubber gloves.   Would you agree that one purpose of

12   wearing rubber gloves while coming into contact with a firearm

13   is to preserve any markings that may be on it?

14   A    It is.

15   Q    Any fingerprints that may be on it?

16   A    Yes.

17   Q    So this Taurus pistol was found in a black bag.

18   A    Correct.

19   Q    And any container that that pistol could be in could have

20   affected potential markings on it.

21   A    I'm not a forensic scientist.   I imagine they could be

22   rubbed off.

23   Q    You found a number of magazines during the search.

24   A    Yes.

25   Q    What is a magazine?

1    A    Magazine -- it holds ammunition for the firearm.

2    Q    I'm holding what's been marked as G-7, a box of magazines.

3    And I count eight magazines in this box.  Can you confirm that

4    for me?

5    A    There's eight magazines.

6    Q    Were any guns that matched those magazines found in the

7    house?

8    A    No, they weren't.

9    Q    Agent Stallings, I want to show you what's been marked as

10   G-32(a).  It's a photo of the closet that you identified as

11   containing women's clothing.  Is this the photo that you

12   identified it as?

13   A    It is.

14   Q    I'm also going to show you what's been marked as G-32(b),

15   the interior of the closet.  When this photograph was taken,

16   clothes were removed prior to taking that photograph.  Is that

17   correct?

18   A    I don't recall if any had been removed.  I didn't remove

19   any clothing, but another agent may have.

20   Q    I'm going to show you again photograph G-32(a).  Do you see

21   clothing on the right side of that closet on the upper half of

22   the closet?

23   A    I do.

24   Q    Do you see clothing on the left half of the closet on the

25   upper half of the closet?

1   A   There appears to be clothing on the left-hand side.

2   Q   In G-32(b), do you see clothing on the left side of the

3   closet?

4   A   I do.

5   Q   And there's no clothing on the right side of the closet?

6   A   No.

7           THE COURT:  Mr. Rich, we've been going about an hour

8   and a half.  If you're close, then we'll finish it.  If not,

9   would this be an appropriate time for a break?

10          MR. RICH:  I'm close, Your Honor.  I'm close.  I only

11  foresee a few more minutes.

12  BY MR. RICH:

13  Q   Agent Stallings, I'm showing you what's been marked as

14  G-34(a), the picture of the location of the black bag.  Is that

15  correct?

16  A   That's correct.

17  Q   Looks like the mirror has been broken in this picture.  Was

18  the mirror broken at any point in time?

19  A   Yes.  During the search -- I wasn't present when it

20  happened, but the mirror was broken.

21  Q   But prior to the black bag being located, I'm showing you

22  G-29(m), the photograph of the bedroom with the mirror intact.

23  Is that how the bedroom looked prior to the bag being found?

24  A   That's not a photograph that I took, but it does appear to

25  be the condition of the room prior.

1   Q   And the black bag was concealed behind the mirror?

2   A   Yes.

3   Q   There's a lot of ammunition on this table, Agent Stallings.

4  You found .22 ammunition.  Is that correct?

5   A   Yes, .22 caliber ammunition was recovered.

6   Q   You found 12 gauge shotgun ammunition.

7   A   That's correct.

8   Q   Twenty gauge shotgun ammunition.

9   A   I believe.  I'd have to look at the particular calibers to

10  confirm.

11   Q   You found 223 ammunition, for a 223 rifle.

12   A   Again I'd have to take a look.

13   Q   I'm handing you a box.  It's marked 9 millimeter.  Do you

14  agree that's 9 millimeter ammunition?

15   A   Yes, it's 9 millimeter ammunition.

16   Q   I'm handing you a box that's been marked as 243 ammunition.

17  Do you agree that that's 243 ammunition?

18   A   It is.

19   Q   I'm handing you a box that's been marked as 270 ammunition.

20  Do you agree that that's 270 ammunition?

21   A   It is.

22   Q   And you mentioned earlier that you found 12 gauge shotgun

23  ammunition and .22 gauge shotgun ammunition.

24   A   Correct.

25   Q   And large amounts.

1    A    Yes.

2    Q    But you did not find guns that matched any of that

3    ammunition?

4    A    We did not.

5    Q    So in this case, the presence of ammunition alone is not

6    proof of the presence of a gun, a particular gun, caliber gun?

7    A    It is not.

8         MR. RICH:  No further questions, Your Honor.

9         THE COURT:  All right.  Thank you.  Redirect?

10                    REDIRECT EXAMINATION

11   BY MS. MIDDLETON:

12   Q    Agent Stallings, you were asked a question about during the

13   search warrant whether or not you saw the defendant, Heather

14   Beard, possess a firearm or possess any type of weapon.  When a

15   search warrant is executed, are any occupants of that residence

16   allowed to have any type of item that may pose a threat,

17   specifically a firearm?

18   A    No, they are not.

19   Q    You were also asked a question regarding the containers

20   that are here today, the containers that are holding lose

21   ammunition.  The black bag, do you -- does ATF consider that

22   evidence?

23   A    We don't consider the bag itself as evidence.  The

24   ammunition within the bag is the evidence.

25   Q    Now, if there was a holster, would you have taken a

1  holster?

2  A    We typically don't.

3  Q    Defense counsel also asked you a question about specific

4  calibers of ammunition.  What caliber of ammunition is in that

5  black box?

6  A    In the black box, it contained .22 caliber ammunition.

7  Q    In this box, .22 caliber?

8  A    Yes.

9  Q    And that same .22 caliber ammunition fits this weapon?

10 A    It does.

11 Q    And it was found where?  Where was the ammunition found?

12 A    The ammunition was found in that box within the closet in

13 the living room area.

14 Q    I want to turn your attention to your post -- your prevideo

15 that you took before the execution of the search warrant.  You

16 were asked some questions about clothing in the closet.  I want

17 you to take a look at this video and tell me what you see in

18 the center of that screen.  Here.

19 A    The black box.

20 Q    The clothing is there.

21 A    Yes.

22 Q    But the black box is also there.

23 A    Yes.

24       MS. MIDDLETON:  No further questions.

25       THE COURT:  All right.  Thank you.  Can this witness

1   be finally excused?

2          MS. MIDDLETON:  Yes, Your Honor.

3          THE COURT:  All right.  Thank you.  Ladies and

4   gentlemen, we'll go ahead and take our afternoon break.  It is

5   3:40.  Let me ask you to come back at 3:55 and we will be in

6   recess until then.  Court's in recess.

7       (Jury Out)

8       (Recess)

9       (Jury In)

10         THE COURT:  All right.  Whose next?

11         MS. CASE:  Your Honor, the government calls Devin

12  Rice.

13      (Witness Sworn)

14                        DEVIN RICE,

15    having first been duly sworn, testified as follows:

16                      DIRECT EXAMINATION

17  BY MS. CASE:

18  Q   Agent Rice, will you please introduce yourself and spell

19  your name.

20  A   Devin Rice D-E-V-I-N R-I-C-E.

21  Q   What is your occupation?

22  A   I'm an agent with the Mississippi Bureau of Narcotics.

23  Q   How long have you been a law enforcement officer?

24  A   Approximately seven years.

25  Q   On December 2nd, 2016, were you present for the execution

1  of an arrest warrant at 4645 Van Winkle Park Drive in Jackson,

2  Mississippi?

3  A    Yes.

4  Q    Is there a home at that address?

5  A    Yes.

6  Q    What types of buildings were in the area around that

7  property?

8  A    It was like a special shop building set up.

9  Q    Who was to be arrested that morning?

10  A    David Beard, I believe.

11  Q    And what was your role during the arrest?

12  A    I was assisting initially as a perimeter while contact was

13  attempted to be made with Mr. Beard.  Mr. Beard came to the

14  door.  I was still on the perimeter, and I was informed that

15  they were -- I guess ATF and the marshals were going to wait

16  and apply for an additional search warrant for the residence at

17  which time I still stayed outside until we were advised that

18  the search warrant was signed.

19  Q    Did you participate in the search of the home at 4645 Van

20  Winkle Park Drive?

21  A    Yes.

22  Q    And what was your role during that search?

23  A    My main role was searching what would be labeled as the

24  master bedroom.

25  Q    And what types of items were you looking for?

1    A    I believe weapons, firearms, and possibly drugs as well

2    since we were there -- myself and other agents were there with

3    the Bureau of Narcotics.

4    Q    Did you walk through the entire home?

5    A    I don't know that I went in every single room.  But after

6    doing searching in the master bedroom, I made my way through

7    the house at different times looking.

8         MS. CASE:  Your Honor, I would ask that I be able to

9    publish what has been admitted as Government's 28(b) and(c).

10        THE COURT:  You may.

11   BY MS. CASE:

12   Q    Agent Rice, I'm showing what is G-28(b) and(c).  What is

13   shown here?

14   A    It appears to be the front of the dwelling of the Beard's.

15   Q    How about Government's Exhibit 28(c)?

16   A    The door that the agent is standing by with the yellow

17   cutout is the front door, and the window I believe was an old

18   door but was closed in, sealed off.

19   Q    At the front of the home?

20   A    Yes.

21   Q    Is this the home where the arrest and the search took

22   place?

23   A    It is.

24   Q    I'm going to show you what has been admitted as

25   Government's Exhibit 18(a) and ask if you recognize that.

1   A   It appears to be the sketch of the approximate layout of

2   the building.

3   Q   Is that a fair representation of the floor plan of the home

4   that was searched that day?

5   A   To the best of my knowledge that I can recall.

6   Q   Let me show you Government's Exhibit 29(l).  What do you

7   see here?

8   A   What appears to be the, I guess you could say, master

9   bedroom.

10  Q   Is that the room that you searched that day?

11  A   Yes.

12  Q   How about this view what is represented in Government's

13  Exhibit 29(m)?

14  A   Again that's the master bedroom, and the angle of the

15  photograph is looking back towards what would be behind that

16  wall would be the outside of the front of the building.  The

17  bed there in the center and behind the photographer would have

18  been a dresser or chest of drawers.

19  Q   Are the photographs, the two photographs you saw of the

20  bedroom, Government's 28(l) and(m), fair representations of the

21  bedroom at 4645 Van Winkle Park Drive?

22  A   To the best of my knowledge.

23  Q   At the time of your search?

24  A   Correct.

25  Q   How many bedrooms were in that home?

1   A    I believe all in all it was just that one bedroom.

2   Q    Can you tell the jury where in this room you searched?

3   A    Primarily I was on the -- if you're looking at the photo,

4   the left side of the photograph where you can see a mirror, a

5   large mirror propped up against the wall as well as where some

6   equipment is plugged in and what appears to be some type of

7   nightstand in the corner as well.

8   Q    Do you recall were there men or women's items on that

9   particular side of the bed?

10  A    I believe it was mostly women.

11  Q    I'm going to show you Government's Exhibit 34(g).  Can you

12  tell the jury what is shown in this photo?

13  A    A fan, lotion looks like.

14  Q    Let me back up.  Can you help orient the jury where is this

15  photo?  Where in the house?

16  A    This is the -- what I call the nightstand that was in the

17  same far corner of the bedroom on that side.

18  Q    When you say "that side," would you say that's the left or

19  the right side, if you're looking at the head of the bed

20  standing at the foot of the bed?

21  A    At the angle photograph, it would be the far left corner.

22  Q    Left corner.  Can you touch that screen in front of you and

23  circle where that nightstand is?

24  A    (Witness complied with request).

25  Q    And what of significance did you find during your search of

1   that portion of the bedroom?

2   A   Behind the mirror or -- which is here, stands all the way

3   to the floor.   Want me to just mark it?

4   Q   Can you show that again?

5   A   The mirror is here propped up against the wall.

6   Q   So you've circled on Government's 29(m) the left portion of

7   the photograph.

8   A   Yes.

9   Q   Okay.   So tell us what you found of significance in that

10  area.

11  A   In the photo, you can see that the mirror -- the base of

12  the mirror on the floor is not flush with the wall.   It's not

13  up next to it.   And I recall from the top here pulling that

14  area back.   And at the bottom in that void by the floor, I

15  recovered a black bag or case small, and inside of that case I

16  recovered a silver with black handle revolver.

17  Q   And you said you found a black bag.   How big was that bag?

18  A   Like a large digital camera size.

19  Q   How much larger than the revolver would it have been?

20  A   Not very much.

21  Q   And what else was behind the mirror?

22  A   There was other junk really.   I believe there was a

23  zip-lock bag of some sort, and it had pill bottles labeled in

24  them as well.   I believe they were labeled Ms. Beard's name on

25  them.

1  Q    What did you do after you found the revolver?

2  A    I notified the ATF agent that I had recovered a revolver at

3  which time an ATF agent came into the room, photographed the

4  pistol -- the revolver and I assume took more photographs at

5  the location where I recovered it.

6  Q    Did you do anything to the revolver before ATF agent

7  arrived?

8  A    I took it out of the case, opened the action to render it

9  safe, and I do believe there was not any ammunition in the

10  revolver at the time.

11  Q    You said that you called the ATF agents.  Do you remember

12  which agent you called?

13  A    I do not.

14  Q    Did you find anything else of significance during your

15  search?

16  A    No.

17  Q    I'm going to show you one more time if we -- if you can

18  circle for us the area of the room that relates to the gun that

19  you found.

20  A    In this void behind the mirror that's on the left side of

21  the bedroom.

22  Q    And if we progress through these photographs from 29(m),

23  Government's 29(m) to Government's 34(g), that takes us from

24  the entry to the bedroom to where in the bedroom?

25  A    All the way in that far left corner by the black

1  nightstand.

2  Q   And what is shown at the bottom of that nightstand near the

3  bottom of that nightstand?

4  A   Bottles, a case of pill bottles here.

5  Q   Is that the bag of bottles that you were discussing?

6  A   Yes, appeared to be.

7  Q   Let me show you -- while we're on this photograph, is there

8  anything of relevance on the nightstand itself that you see in

9  this photograph?

10 A   There's I think some kind of makeup or marker bag.

11 Q   I've circled the front right corner of that nightstand.  Do

12 you know what's inside that circle?

13 A   It appears to be a bullet of some sort.

14 Q   Do you know who recovered that bullet?

15 A   I do not.

16 Q   I'm going to show you Government's Exhibit 34(a).  What is

17 shown here?

18 A   It appears to the black case.  There's a glare on the

19 picture, but it appears to the black case behind the mirror

20 that was broken.

21 Q   Can you help -- help orient the jury by showing where the

22 mirror is that you're discussing?

23 A   The broken edge is here.  It continues about -- right there

24 is the floor.

25 Q   So if one was standing and looking at themselves in the

1  mirror, that would be the right side of the mirror?

2  A  Yes.

3  Q  And how did that mirror break?  Do you know?

4  A  At some point moving the mirror -- I believe after I found

5  the revolver and the revolver was placed for photographic

6  depiction, I believe the mirror on that right side was broken.

7  Q  Can you -- to help us make sure we're oriented to where we

8  are in the bedroom, can you highlight for the jury where the

9  nightstand is, the black nightstand is in Government's 34(a)?

10  A  (Witness Complied with Request.)

11  Q  And in that mirror we see a person or multiple people.  Can

12  you describe what's shown in terms of that body?

13  A  I'm assuming the right side of the photo, which you see

14  blue jeans here, is going to be an agent.  And then this mirror

15  reflection of two feet possibly of the same agent or another

16  agent taking the picture.

17  Q  So on the left side of the screen is a reflection in the

18  mirror?

19  A  Yes.

20  Q  If you would, show the jury where the gun was found.

21  A  Inside of this what looks like in the picture the black

22  case.

23  Q  Was this photograph taken before or after you found that

24  gun?

25  A  After.

1  Q   Is it fair to say this is a recreation?

2  A   It is.

3  Q   And how did the agents who were taking this photograph know

4  how to recreate this scene?

5  A   When I located the revolver in the black case and called an

6  ATF agent in the room, I advised the agent where I had found

7  and showed -- leaned the mirror back and showed him that it was

8  on the -- in that void area at the base of the mirror by the

9  floor.

10  Q   What is under the black bag that you circled on this

11  screen?

12  A   I guess you're referring to the pill bottles in the case?

13  Q   I'm going to show you Government's Exhibit 34(b).  Can you

14  tell the jury what is shown?

15  A   That appears to be the revolver that I recovered.

16  Q   This is the revolver that was in the black bag?

17  A   Yes.

18  Q   Do you know what caliber this is?

19  A   The barrel is stamped .22 long rifle.

20  Q   What's shown in Government's 34(c)?

21  A   The other side of the revolver.

22  Q   Do you know who manufacturers this revolver?

23  A   Taurus.

24  Q   Is that the handgun that you found -- is that a photograph

25  of the handgun that you found in the black bag?

1   A    Yes.

2         MS. CASE: Your Honor, may I retrieve an exhibit from

3   the table?

4         THE COURT: You may.

5   BY MS. CASE:

6   Q    I'm going to hand you what's been admitted as Government's

7   Exhibit 4. Do you recognize that?

8   A    Yes. It's the revolver that's photographed.

9   Q    And the revolver you found in the black bag?

10   A    Yes.

11         MS. CASE: May I retrieve that, Your Honor?

12         THE COURT: Yes.

13   BY MS. CASE:

14   Q    We saw in the photograph some pill bottles that you

15   referenced. Government's 34(i) depicts what?

16   A    It appears to be the same bag that had the pill bottles in

17   them where the revolver was recovered.

18   Q    And how about Government's 34(j)?

19   A    I believe those are the same three pill bottles as in the

20   previous photo that you can make out the name Heather Wright on

21   them.

22         MS. CASE: Your Honor, may I approach the witness?

23         THE COURT: Yes.

24   BY MS. CASE:

25   Q    Agent Rice, I've handed you what's been admitted as

1   Government's Exhibit 27(b).  Do you recognize that?

2   A    Yes, ma'am.

3   Q    What is that?

4   A    Ms. Beard.

5   Q    Do you know what -- if that's a fair representation of

6   Heather Beard at the time of the search on December 2, 2016?

7   A    Yes, that's how I recall her.

8            MS. CASE:  May I retrieve the exhibit?

9            THE COURT:  Yes.

10           MS. CASE:  May I publish to the jury?

11           THE COURT:  I think it's in evidence.

12           MS. CASE:  It is.

13  BY MS. CASE:

14  Q    I'm showing Government's Exhibit 27(b), and that is as you

15  remember Ms. Beard on the day of the search?

16  A    Yes, ma'am.

17  Q    Do you see Ms. Beard in the courtroom today?

18  A    I do.

19  Q    Can you identify her for the jury?

20  A    Blonde female at the defense table, black blouse -- white

21  blouse, back jacket.

22           MS. CASE:  Your Honor, can the record reflect he has

23  identified the defendant?

24           THE COURT:  So reflect.

25  BY MS. CASE:

1   Q   Was Ms. Beard present when law enforcement was searching

2   her home on December 2, 2016?

3   A   Yes.

4   Q   Was she aware that a revolver was found behind the mirror

5   in the bedroom?

6   A   Yes.

7   Q   What, if anything, did Ms. Beard say after you found the

8   revolver?

9   A   After I completed my search of the bedroom, I believe

10  Ms. Beard was in the -- not dining room but living room foyer

11  area, which is just adjacent to the bedroom before you go into

12  the front door and kitchen area.  Multiple agents were there

13  with her in that room.  As I was in and out of different areas

14  of the house, and I remember -- recall at one time someone

15  posed a question to Ms. Beard, *Where did you get the gun?*  And

16  I recall to some effect Ms. Beard saying, *I got the gun from*

17  *him* or *He gave me the gun for a birthday present.*

18  Q   For a birthday present?

19  A   Correct.

20  Q   Do you remember anything else related to the revolver that

21  Ms. Beard said that day?

22  A   I don't.

23       MS. CASE:  Court's indulgence, Your Honor.

24  (Short Pause)

25       MS. CASE:  Government tenders witness.

1        THE COURT:  All right.

2                 CROSS-EXAMINATION

3  BY MR. RICH:

4  Q    Agent Rice, you mentioned earlier that you were present

5  when David Beard was arrested.

6  A    Yes.

7  Q    Ms. Beard was not arrested that day?

8  A    That I don't know.

9  Q    You did not arrest her that day?

10  A    No, I did not.

11  Q    You did not see her arrested that day?

12  A    I know she was detained.  But when I was finished at the

13  scene, I don't recall if she was arrested and taken to another

14  location or not.

15  Q    She was initially cuffed.

16  A    I believe so.

17  Q    And then she was unhandcuffed.

18  A    I don't believe that I saw her unhandcuffed at any time.

19  Q    Okay.  Who directed you to search the bedroom?

20  A    I don't remember anyone specific.

21  Q    You said you searched the left side of the bedroom looking

22  at the photograph.

23  A    Correct.  The photograph in your hand.

24  Q    Showing you what's been marked as G-29(1), the photograph

25  of the bedroom, you said you searched the left side of the

1   bedroom looking at that photograph.

2   A   Correct.  And the angle of that photograph is more angled

3   towards the right side.

4   Q   Okay.  I'm going to show you what's been marked as G-29(m),

5   a more straight-on photograph.  Is this the same bedroom?

6   A   Yes.

7   Q   Okay.  You mentioned someone searched the right side of the

8   bedroom.

9   A   Best I recall there was at least three or four officers in

10  that room at some point.

11  Q   You said that this mirror on the left side that I've marked

12  on the left side of the bedroom, that's the mirror that you

13  pulled away?

14  A   Correct.

15  Q   And directly behind it is -- or close behind it is the

16  nightstand?

17  A   Correct, past it.

18  Q   I'm showing you what's been marked as G-34(g), which is a

19  picture of that nightstand.

20  A   Yes.

21  Q   I've highlighted for you something on the corner of this

22  nightstand.  You identified that earlier as a .22 caliber

23  bullet.

24  A   That's what it looks like to me, yes.

25  Q   This is directly next to the mirror or very close proximity

1   to the mirror you've stated.

2   A    Yes.

3   Q    And you found the gun behind the mirror but not this bullet

4   next to it, you mentioned.

5   A    I don't recall that bullet being there on the corner of the

6   table at the time that I searched.

7   Q    Okay.  I wanted to ask you about -- again about this

8   photograph straight on from the bedroom.  You said that about

9   the bullet not being there.  Agent Rice, you see something --

10  you see something blue to the right of that mirror?  Do you see

11  where I'm pointing?

12  A    Under the --

13  Q    The charger cords.

14  A    Yes.

15  Q    It appears -- would you agree it appears to be a blue

16  bucket, some blue container?

17  A    Yes.

18  Q    And that appears to be between the mirror and that

19  nightstand?

20  A    Yes.

21  Q    I'm again showing you what's been marked as G-34(g).  This

22  is a photograph with pill bottles -- what's been identified as

23  pill bottles in the bottom of the photograph.  Is that correct?

24  A    Correct.

25  Q    Okay.  And you said earlier that this photograph is a

1  recreation?

2  A   To the best of my knowledge.

3  Q   Okay.  And you said earlier that you don't recall that

4  bullet that's in this photograph also being on the bedside

5  table when you searched behind the mirror.

6  A   Not in that exact location.

7  Q   So before this picture was taken, you testified that things

8  were put back to recreate the scene.

9  A   I testified that the revolver that I recovered in the black

10  case was put back.  I don't know about any other evidence that

11  was recovered because I didn't find that bullet or I don't know

12  who found that bullet.

13  Q   Okay.  And I think I may have shown you the wrong

14  photograph, Agent Rice.  I apologize.  I believe you were

15  testifying to this about 34(a) earlier, the black bag next to

16  those pill bottles.  Is there a blue container in this

17  photograph between the mirror and the nightstand?

18  A   Doesn't appear to be.

19  Q   Does there appear to be something blue inside the

20  nightstand?

21  A   Where you pointed, yes.

22  Q   I'm going to show you a photograph that you said was taken

23  prior to searching.  Does it appear to be anything blue from

24  the nightstand in this picture?

25  A   No.  But I do not know that this picture was taken prior to

1 the search. I don't know who took pictures.

2 Q But you'd agree in one picture there's something blue from

3 the nightstand and now there's not something blue in the

4 nightstand.

5 A It appears.

6 Q Agent Rice, do you know of any other photographs that were

7 recreated?

8 A No, because I don't recover -- I don't recall recovering

9 any other evidence of value.

10 Q You mentioned earlier that you overheard Ms. Beard say

11 something or respond to a question about the gun being a gift,

12 a birthday gift. Is that correct?

13 A That's correct.

14 Q Do you remember her exact quote?

15 A I do not.

16 Q Did you make a report in this case?

17 A I did not.

18 Q Did you take a written statement from her?

19 A I did not.

20 Q Did you take a recorded statement from her?

21 A Did not.

22 Q Can you recall the exact wording of the question posed to

23 her?

24 A To the best of my knowledge from what I recall was, *Where*

25 *did you get the gun?*

1  Q    Do you know when Ms. Beard's birthday is?

2  A    I do not.

3  Q    Did she say when she gained knowledge of the gun?

4  A    How do you mean?

5  Q    Did she say -- did she say, *I received it after my*

6  *birthday?*  Did she say -- I'll ask you that.

7  A    I don't know at what time, all I know is best I recall she

8  made mention it was a birthday present.

9  Q    So you don't know if she received it that day or six months

10  prior?

11  A    I don't know which day she received it.

12            MR. RICH:  I tender the witness.

13            THE COURT:  All right.  Redirect?

14                    REDIRECT EXAMINATION

15  BY MS. CASE:

16  Q    Agent Rice, would it have been possible to photograph the

17  location of the revolver before you found it?

18  A    I'm sorry?

19  Q    Would it have been possible to photograph the location of

20  the revolver before you found it?

21  A    In the condition I found it, no, I was not be able.

22  Q    Why not?

23  A    It was concealed inside the black case behind the mirror.

24  Q    Behind a mirror.  Is -- are the photograph that we saw of

25  the black bag's location accurate recreations of where you

1  found the black bag?

2  A    Yes.  Other then the mirror being broken and part of it

3  missing.

4  Q    So the mirror would have been intact when you found the

5  black bag?

6  A    Yes.  As it was in one of the other photographs, I believe.

7  Q    The location of the black bag in the bedroom is

8  geographically accurate?

9  A    To the best of my knowledge.

10  Q    Government's 34(a) shows the black bag?

11  A    Yes.

12  Q    And you would have the knowledge because you found the

13  revolver.  Correct?

14  A    That's correct.

15  Q    Who told the photographing agents how to place the black

16  bag?

17  A    I would have because I was the one that found it.

18  Q    When agents execute a search warrant, do they move items

19  about a room?

20  A    Yes.

21  Q    If photographs are taken during a search, is it likely that

22  an item will be shuffled -- an item's position will change in

23  various photographs because a search is ongoing?

24  A    Yes.

25  Q    I'd like to show you Government's Exhibit 28(l), and I'll

1  direct you to the foot of the bed if you can tell us what

2  object is shown at the foot of the bed, what large piece of

3  furniture.

4  A   Under that red like cover or blanket I guess like a trunk

5  or a chest, wooden trunk or chest.

6  Q   If I show you -- let me back up.  What types of items are

7  on top of that trunk?

8  A   Looks like a black ashtray, something clear with a leopard

9  print, makeup bag or some kind of bag.

10  Q   Now, I will show you Government's Exhibit 34(a).  What

11  piece of furniture is shown in the center of that photograph?

12  A   I believe that's the same trunk that was under the red

13  sheet.

14  Q   Where's the red sheet?  Can you tell in the photograph?

15  A   Appears to be in the bottom right where the time stamp is.

16  Q   Where's the leopard print bag that you were referring to?

17  A   Directly above that between something white and the red

18  sheet.

19  Q   What's on top of that trunk now?

20  A   Appears to be laptop or laptop computers.

21  Q   Is it fair to say that objects have been moved during the

22  course of the search?

23  A   Between these photos, yes.

24  Q   Mr. Rich asked, but the statement that you overheard

25  Ms. Beard make after the revolver was found, you say you don't

1  remember the particulars of the phrase that she used?

2  A   Correct.

3  Q   But you do remember what, about what she said?

4  A   The fact that she said along the lines that she got the

5  revolver for a birthday present, either referring to David

6  Beard, I would assume.   And I thought it was odd that I

7  recalled she saying that because Mr. Beard being a convicted

8  felon would be gifting Ms. Beard a revolver, who is under my

9  impression was also a convicted felon.

10         MS. CASE:  No further questions, Your Honor.

11         THE COURT:  All right.   Thank you.   You can step down.

12  Ms. Case, do you have a short witness?

13         MS. CASE:  I do not, Your Honor.

14         THE COURT:  You said you do not?

15         MS. CASE:  I do not.

16         THE COURT:  Well, why don't y'all come up for a minute

17  and let's coordinate.

18     (At the Bench:)

19         MS. MIDDLETON:  We expect our next witness to be

20  fairly lengthy.

21         MS. CASE:  Maybe like an hour and a half.

22         THE COURT:  How are we in terms of progress today?

23         MR. RICH:  I think we can finish tomorrow.

24         MS. MIDDLETON:  Yeah.

25         THE COURT:  You do?

1           MS. MIDDLETON:  Depending on you.

2           MR. RICH:  If it's dependent on me, I think we can

3   finish tomorrow.

4           THE COURT:  I'll let the jury go, and I'll tell them

5   there's a chance they may stay a little later tomorrow, phrase

6   it out that way.

7        (Bench Conference Concluded)

8           THE COURT:  Okay.  The next witness I understand is

9   going to be fairly lengthy.  It doesn't make any sense to put

10  somebody on the stand at 4:35 and stop them 25 minutes later

11  and break it up like that.  I believe we're making appropriate

12  progress in this case.  I'm going to let you go for the night.

13  It's hard to predict sometimes how long things will take.

14  There's -- in criminal trials, both parties have a right to

15  have the trial -- put on the case they need to put on.  I'm not

16  going to rush it.  It could finish tomorrow or it could spill

17  over into Friday morning.  So I would ask you to, I guess, be

18  prepared in the event that you get the case tomorrow, say,

19  around tomorrow afternoon sometime, make arrangements in case

20  we need to stay a little bit past 5 or as long as it takes, if

21  you're in the deliberation process, if that makes sense.  It's

22  hard to predict.  It will either be tomorrow afternoon or

23  probably first thing Friday, one of the two.

24          All right.  Now, I need to remind you of the

25  instructions I've given you before that don't -- this is where

it gets important because you're going to go home and whoever,
your spouse or your roommate or whatever, is going to say, *Hey,*
*what's going on? What kind of case is it*? And all that. You
just have to tell them, *I can't tell you.*

The reason for all of these, you know, you may say
something pretty innocent and your roommate says*, Oh, I heard*
*about that*, and blurt something. Or you may go do some
research and find something that may be -- believe it or not,
not everything on the Internet is true. It may not be
accurate, but because you found it outside the courtroom, the
attorneys would be deprived of an opportunity to explain to you
why what you found was wrong. So the case has been decided on
what happens here. So it's now really important.

No research, no communication about the case. I want
to again remind you you have to keep an open mind until you
hear all the evidence and until you've heard the instructions
on the law. Sometimes I'm in trial and we get like a five-day
trial and the jury's checked out after day four. They think
they know what's going on. And on day 5, some witness says
something and all of the sudden I see all those jurors grabbing
their notepads and start scribbling and they start panicking
because they realize they haven't really been paying attention
like they should have.

You never know what's going to happen in a trial.
You've got to keep an open mind until we get to the very end.

1  Again if it happens to be anything in the media, which I don't

2  expect, I'll need for you to let me know tomorrow morning.

3       With that, I'll ask you to put the notepads in the

4  jury room and we will see you -- we'll start at 9:00 sharp

5  tomorrow morning.  Thank you.

6     (Jury Out)

7       MS. CASE:  Your Honor, we have no further need for

8  agent Devin Rice, and he can be released, if that's acceptable.

9       THE COURT:  Is he subject to recall?

10       MR. RICH:  No, Your Honor.

11       THE COURT:  All right.  He may be released.  All

12  right.  Anything else we need to put on the record before we

13  adjourn for the night?

14       MS. MIDDLETON:  Nothing for the government.

15       MR. RICH:  Nor the defense.

16       THE COURT:  Okay.  Ms. Beard, I'm going to advise you

17  one more time you've got to be here on time.  If I say 2:00, I

18  don't mean 2:05.  Everybody else was here ready to go.  I would

19  get here early tomorrow, if I was you.  All right.  Anything

20  else?  No?  All right.  We're adjourned.  Thank you.

21     (Recess)

22

23

24

25

CERTIFICATE OF REPORTER

I, CHERIE GALLASPY BOND, Official Court Reporter, United States District Court, Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true and correct transcript of the proceedings had in the aforenamed case at the time and place indicated, which proceedings were recorded by me to the best of my skill and ability.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

This the 16th day of June, 2018.

s/ *Cherie G. Bond*
Cherie G. Bond
Court Reporter

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

VS.                    CRIMINAL NO. 3:17-cr-00140-DPJ-FKB-2

HEATHER ELIZABETH WRIGHT-BEARD


TRIAL TRANSCRIPT
VOLUME 2


BEFORE THE HONORABLE DANIEL P. JORDAN III
CHIEF UNITED STATES DISTRICT JUDGE
AND A JURY
JUNE 14, 2018
JACKSON, MISSISSIPPI


APPEARANCES:

FOR THE GOVERNMENT:   MS. KEESHA D. MIDDLETON
                      MS. JENNIFER CASE

FOR THE DEFENDANT:    MR. ROBERT THOMAS RICH


REPORTED BY:   CHERIE GALLASPY BOND
               Registered Merit Reporter
               Mississippi CSR #1012

---

501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

1                        TABLE OF CONTENTS

2

3   DAVID BEARD                                          81

4       Direct Examination By Ms. Case  ....................81

5           Exhibit G-21(a)  ...............................133

6           Exhibit 21(b)  .................................134

7       Cross-Examination By Mr. Rich  ....................138

8       Examination By Ms. Case (outside jury presence)  ...159

9           Exhibit D-17(a) through 17(d)  .................160

10          Exhibit G-22(c) for ID  .......................161

11      Redirect Examination By Ms. Case  .................162

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Good morning.  Let me -- we have more than

2  one snag this morning so we'll work through this.  The first

3  snag is that our alternate -- one of our alternate jurors was

4  parking his car over at the Westin and somebody hit his car so

5  he's not here.  He's -- last word I got is that he's dealing

6  with all that and will be here as soon as he can.  He's not

7  here.

8       The other issue is that the defendant is not here.

9  And, Mr. Rich, I know -- she called in -- just for the record,

10  she called into the office, spoke to my law clerk, said that

11  she had an altercation with her boyfriend last night or

12  something.  Anyway, I think you've now spoken with her.

13       MR. RICH:  Yes, Your Honor.  I spoke with her in your

14  law clerk's office.  She said she was calling from somewhere

15  called Old Town Road Specialties.  She said that her phone was

16  smashed during that altercation with her boyfriend and she was

17  left without a vehicle.

18       I tried to call her this morning prior to court

19  around -- I can tell you the exact time, Your Honor.  I called

20  her at 7:56 this morning, and I also called her at 7:37 this

21  morning, and both calls went directly to voicemail.  I can't

22  confirm if that's because the phone was turned off or if it

23  verifies her story or not.

24       She said that someone was there -- someone by the name

25  of Chico who could give her a ride.  I don't know his complete

1   name.  She said she could be here in 15 to 30 minutes when she

2   gets dressed.  I told her to please come on.

3          She did say that she had some broken toes which caused

4   her to be in severe pain.  I said if she could get through it

5   and could sit at counsel table with me without receiving any

6   medical attention for those toes, please come on, and she said

7   she could.

8          THE COURT:  All right.  Do you have any idea

9   whether -- whether the jury could tell that she's been in an

10  altercation?

11         MR. RICH:  Without seeing her, I don't know.

12         THE COURT:  She didn't say anything getting --

13         MR. RICH:  She didn't say about any bruising, any

14  scratches.  I don't know.

15         THE COURT:  Okay.  Well, we'll just have to cross that

16  bridge, you know, when she does get here.  Shone told me there

17  were a couple of other issues that y'all want to take up, and

18  we'll go ahead and do that now.  Ms. Middleton -- Ms. Case?

19         MS. CASE:  Your Honor, the government anticipates the

20  next witness being David Beard, and his -- he has pled guilty

21  and is detained in this case.  His counsel is Ms. Jessica

22  Borne, and Ms. Borne has asked if the court would like to

23  advise Mr. Beard of any of his Fifth Amendment rights, and she

24  has also asked that during Mr. Beard's testimony that she be

25  allowed to sit within a reasonable distance so that she can

1    communicate with him if needed.

2              THE COURT:  What's your position?

3              MS. CASE:  We are amenable to both of those requests.

4              THE COURT:  Okay.  When you -- you're not talking

5    about having her sit over here by the witness stand, are you?

6              MS. CASE:  We are, Your Honor.

7              THE COURT:  I've never had that request, and I've

8    never seen that done.  Why would she have to be sitting there

9    basically holding his hand?

10             MS. CASE:  I have just seen that previously, Your

11   Honor, where the witness' counsel can be available in a body

12   language sort of way of, *Let me stop and talk to you* or

13   something like that.

14             THE COURT:  Mr. Rich, do you have a position on this?

15             MR. RICH:  I don't have any objection.

16             THE COURT:  All right.  Where exactly -- I have been a

17   little apprehensive about Mr. Beard and Ms. Beard from a

18   security standpoint already, and we have three of our marshals

19   here.  I was -- in fact, I was going to instruct Singleton -- I

20   was going to instruct you to tell the boyfriend that he was not

21   going to be in the courtroom.  I was getting some bad vibes

22   about him yesterday.  So where exactly would she sit?  Because

23   I think I'm going to have the marshal sitting if not right

24   where you are, maybe a little to the left.

25             MS. CASE:  Anywhere that the marshals feel is safe,

1    even between the two counsel tables sort of in line with where

2    we are she would have fairly clear view of her client there.

3            THE COURT:  Okay.  I think that's better.  You just

4    may pull up a chair right between the tables, and I'm okay with

5    that.  The parties don't have any objection to it, I take it.

6            All right.  We'll -- and I think that she's going to

7    have to be here before I -- before we bring him in before I

8    give him his Fifth Amendment instruction.  Were there any other

9    issues that we need to take up?

10           MS. CASE:  None that come to mind, Your Honor.

11           MR. RICH:  Not from the defense, Your Honor.

12           THE COURT:  All right.  Well, we'll take a recess and

13   I have sent word back to the jury that we're short an

14   alternates right now because of the car wreck, and I said

15   there's some other things that we're dealing with.  I didn't

16   tell them what it was.  Just be thinking about it, I suppose,

17   if the defendant gets here before the alternate I feel like we

18   could get by with one alternate if that person is going to be

19   gone for most of the morning.

20           And I don't know that that's the case, but I can't

21   imagine losing two more jurors in the span of what we think

22   will be one day.  So I would think about dropping that

23   alternate and moving forward assuming that she gets here and he

24   does not.

25           All right.  If there's nothing else, we'll be in

1    recess until she shows up.  Just let me know.

2        (Recess)

3        THE COURT:  All right.  Obviously we're not starting

4    on time.  I'm not going to waste any time right now dealing

5    with that.  I am going to deal with it, but not right now.  The

6    jury's been sitting back there for over 30 minutes waiting.

7    Let's take care of Mr. Beard's instructions and then we'll get

8    it moving.  Are we ready to bring them in?

9        MS. MIDDLETON:  Yes, Your Honor.

10       THE COURT:  Okay.

11       (Witness Enters Courtroom)

12       THE COURT:  All right.  Mr. Beard, good morning.

13       MR. BEARD:  Good morning.

14       THE COURT:  Mr. Beard, at this point I need to give

15   you some standard instructions, standard warnings having to do

16   with your Fifth Amendment right to the remain silent.  Sir, you

17   understand that if you want to testify you can, but that if you

18   do not wish to testify you don't have to.  Do you understand

19   that?

20       MR. BEARD:  Yes, sir.

21       · THE COURT:  Okay.  Do you also understand that whether

22   or not you testify is a decision that you and you alone must

23   make?  I assume you spoke with your attorney, Ms. Borne, who's

24   here in the courtroom.  But at the end of the day, you're the

25   one who has to decide whether you want to go forward.  Do you

1   understand that?

2            MR. BEARD:  Yes, sir.

3            THE COURT:  Do you understand that?

4            MR. BEARD:  Yes, sir.

5            THE COURT:  Okay.  Do you understand that once you

6   respond to a question that you would then have to give

7   responses to relevant followup questions?  Do you understand

8   that?

9            MR. BEARD:  Yes, Your Honor.

10           THE COURT:  Okay.  All right.  Counsel, is there

11  anything else you want me to cover here?

12           MS. CASE:  Nothing further, Your Honor.

13           THE COURT:  Okay.  Are we ready to bring the jury in?

14           MS. CASE:  We are, Your Honor.

15           THE COURT:  Okay.

16      (Jury In)

17           THE COURT:  Good morning.  I'm sorry for these delays.

18  You know, real trials, it's not like watching TV where

19  everything happens in 30 minutes.  Life gets in the way

20  sometimes, and I understand one of you had a problem with your

21  car.  I'm not sure who that was, but I'm sorry about that.

22           We are ready to proceed.  I do need to ask you whether

23  any of you have anything you need to report to me about the

24  instructions I gave you at the end of the day.  No?  All right.

25  Government call its next witness.

1          MS. CASE:  Government calls David Beard.

2          THE COURT:  All right.

3     (Witness Sworn)

4          THE COURT:  You may proceed.

5                    DAVID BEARD,

6     having first been duly sworn, testified as follows:

7                    DIRECT EXAMINATION

8  BY MS. CASE:

9  Q   Mr. Beard, will you please introduce yourself and spell

10 your name.

11 A   I'm David Calvin Beard D-A-V-I-D C-A-L-V-I-N B-E-A-R-D.

12 Q   Are you known as any other name or nickname?

13 A   I'm known as Cornbread.

14 Q   Do you know the defendant, Heather Beard?

15 A   Yes, I do.  She's my wife.

16 Q   Do you see her in the courtroom today?

17 A   I do.  She's sitting in the black shirt.

18         MS. CASE:  Your Honor, can the record reflect that

19 Mr. Beard has identified the defendant?

20         THE COURT:  It is will so reflect.

21 BY MS. CASE:

22 Q   Mr.  Beard, were you arrested on your home on December 2,

23 2016?

24 A   Yes, ma'am.

25 Q   Where is that home?

1  A   4645 Van Winkle Park Drive Jackson, Mississippi.

2  Q   Do you own other property in that area?

3  A   I own the one next to it, which is 4645 -- 4745.   I haven't

4  been there in two years.

5  Q   Can you describe the area around your home and that other

6  property?

7  A   It's an industrial park with a dead-end drive and big

8  commercial buildings.

9  Q   I'm going to show you -- I'm showing you what's marked

10  Government's Exhibit 28(b).   What is shown in this photograph?

11  A   That is the front of my building.   My Yukon and Heather's

12  Firebird.

13  Q   And when you say your building, is that your home?

14  A   That's our home.   In the front of it we have an apartment

15  we built.

16  Q   And the other property that you own in the area, where is

17  that?   Is that shown?

18  A   It's to the left.   If you look it's the building to the

19  left, and we used to own the one to the right too.

20  Q   Okay.   What is shown in Government's Exhibit 28(c)?

21  A   That's the front door to our house, to our building.

22  Q   Roughly how many square feet was your house at 4645 Van

23  Winkle Park Drive?

24  A   The living area is about 1,000 square foot, 900 to a

25  thousand.   The shop area is about another 3,000.

1   Q   How many bedrooms did your home have?

2   A   Just one.

3   Q   I'm going to show you Government's Exhibit 18(a) and ask if

4   you recognize this.

5   A   That is a floor plan of our living area.

6   Q   Is that generally accurate floor plan of that house?

7   A   Yes, ma'am.  It's pretty accurate.

8   Q   And if you could, use this as a guide and you can touch the

9   monitor in front of you and just point out each room in the

10   residential part of that house.

11   A   This is the front door.  That's the front door right here.

12   Q   One moment.  Let me fix this.  Try that again.

13   A   Right there's the front door.  This is our kitchen area.

14   This goes to the living room.  Then here's our bedroom right

15   here, and then in the back I have a closet here.  There's a

16   sink and there's a pantry area, washer/dryer.  These are our

17   tub and our shower and our toilet.

18   Q   Okay.  Who was present at your house at the time that you

19   were arrested on December 2, 2016?

20   A   Heather and I.

21   Q   Were you at your house when law enforcement officers

22   searched your home on that day?

23   A   No, I was not.

24   Q   Even so, are you familiar with the evidence that the

25   officers and the agents took from your house that day?

1    A    Yes, I am.

2    Q    What types of items were taken out of your house by law

3    enforcement officers?

4    A    Two guns, ammunition, and electronics.

5    Q    Any drug paraphernalia?

6    A    And drug paraphernalia.

7    Q    I'm going to show you a series of photographs that have

8    been admitted of the interior of your home and ask that as I

9    show them that you tell the jury what's shown on the screen.

10   And we're going to start with Government's 29(a).

11   A    That is me standing there in custody in my front kitchen

12   area right there by the front door.

13   Q    When was this photograph taken?

14   A    The morning of December 2nd.  That is our dining area right

15   in our kitchen.  When you step from the front door, it's right

16   to the right.

17   Q    How about -- that was 29(b).  How about 29(c)?

18   A    That would be the hallway that goes back to the shop and to

19   my closet, and then there's another doorway that leads into the

20   living room.

21   Q    The doorway on the left most side of the photo leads into

22   where?

23   A    The living room.

24   Q    And the doors through the center of the --

25   A    That leads to the garage area, pantry area and to my

1   closet.  He's facing my closet.

2   Q   29(d) is -- what is that?

3   A   That's that hallway that he was just standing in.  To the

4   left of the trash can is a closet, to the right is a sink, and

5   then through that other doorway to the left is our pantry and

6   also a door that goes out into the garage area.

7   Q   So in this photograph, the photographer moved forward

8   several feet?

9   A   Yes, ma'am.

10  Q   And how did the photographer change his position for 29(e)?

11  A   He's kind of off to the right.  The doorway to the left is

12  into the living room.

13  Q   That's the left most side of the photo?

14  A   Yes, ma'am.  The doorway to the right you could see my

15  closet right there.

16  Q   In the center of the photograph.  I'm going to show you

17  29(f) and ask what's here.

18  A   That's the interior of my closet.

19  Q   I'm going to draw a circle around the object in the center

20  of this photograph and ask you what that is.

21  A   That is a gun safe.

22  Q   When did you get that gun safe?

23  A   I got it back in the earlier part of the summer.

24  Q   Of 20- --

25  A   '16.

1    Q    And what's in 29(g)?

2    A    That's the interior of the closet.

3    Q    That's similar to the prior photograph?

4    A    Yes, ma'am.

5    Q    And how about what's shown in 29(h)?

6    A    That's the sink that's right across from the closet in that

7    little hallway.

8    Q    And what's in 29(i)?

9    A    That is a view of our living room from the kitchen.  That's

10    a little pass-through window, and you can see the wall and

11    stuff in other living room.

12    Q    Okay.  And I'm going to skip to 29(k) and ask you what's in

13    that photograph?

14    A    That is our living room picture of the -- that would be the

15    front wall outside the shop were the door -- the window, and

16    that's our living room right there.

17    Q    Okay.  And what's in 29(j)?

18    A    That's a picture standing in our living room.  Looking

19    straightforward is our bedroom and to the right is Heather's

20    closet.

21    Q    So can you mark on the screen for the jury and show the

22    entrance to the bedroom.

23    A    Yes.  That's our bedroom.

24    Q    And is that headboard in the back, is that the bed?

25    A    That is the bed frame we had just purchased.  We had not

1    put it up yet.  Our mattresses were on the floor.

2    Q    Can you show in this photograph where a dog crate is?

3    A    Where what is?

4    Q    Dog crate.

5    A    It's right here, right there.

6    Q    Would you show the jury -- you mentioned a closet, where

7    that is?

8    A    It's right behind -- it's right there.

9    Q    So that's the dark spot on the right side of the

10   photograph?

11   A    Yes, ma'am.

12   Q    And what's shown in 32(a)?

13   A    That is Heather's closet.

14   Q    Is that what you just showed on the right side of the

15   photograph?

16   A    Yes, ma'am.  That's it.

17   Q    Now, what do we see in 29(l)?

18   A    That's our bedroom, our bed that would be the left wall

19   once you come through the doorway.

20   Q    And how about 29(m)?

21   A    That's a straight view of our bed standing at the foot of

22   the bed.

23   Q    Is the photographer standing near the doorway to the

24   bedroom?

25   A    He's inside the doorway about at the foot -- there's a

1  Cedar chest right there at the foot of the bed, and he's

2  standing kind of in front of it.

3  Q   What's shown in 29(n)?

4  A   The photographer turned around.  That would be the back

5  wall in our bedroom.

6  Q   And 29(o)?

7  A   That is our pantry.  A freezer to the left and washer and

8  dryer in the very back.  My closet where I hung my clothes and

9  stuff are right there to the your right, and my clothes are in

10  crates on the floor there.

11  Q   Can you circle your clothing that you're discussing?

12  A   Yes.

13  Q   And how about the crates that you mentioned?

14  A   Right there.

15  Q   What's in 29(p)?

16  A   It's just supplies.  We had been remodeling.  Heather had

17  been doing a bunch of painting.  It's tape and such that she

18  had that we both had used.

19  Q   What about 29(q)?

20  A   That is a bathtub that we had installed.

21  Q   And finally 29(r)?

22  A   That's our shower to the left, and to the right's a doorway

23  that goes to our toilet.

24  Q   Who lived in this home with you?

25  A   Just Heather and I.

```
1    Q    Anyone else?

2    A    No.

3    Q    When did Ms. Beard move into the house?

4    A    In March with me.

5    Q    March of what year?

6    A    2016.

7    Q    Who else had a key to the house?

8    A    Nobody.  We had went on a little vacation, and we had some

9    friends living next door.  We let them have a key to it for a

10   few days, but that was it.

11   Q    Did any people such as those stay temporarily at your

12   house?

13   A    Another friend stayed one or two nights helping me with

14   some pluming, putting a new sink, but that was it.

15   Q    When was the last time you remember a guest staying at your

16   house?

17   A    End of June, August.

18   Q    And that's 2016?

19   A    Yes.

20   Q    And when people stayed at your house, where did they sleep?

21   A    On the couch.

22   Q    Let me ask you about your relationship with Ms. Beard.

23   When did you and Heather Beard meet?

24   A    We met -- we met at the end of December of 2015.

25   Q    In 2015?
```

1    A    Yes, ma'am.

2    Q    And what was her name at that time?

3    A    Heather Elizabeth Wright.

4    Q    And tell the jury about your relationship with Ms. Beard

5    before you married her.

6    A    We actually started dating in January, and it was -- kind

7    of moved quick.  We had moved in with her family -- her cousin

8    in Flowers, Mississippi.  We lived there for a while and then

9    we split up.  And a friend of mine has a house in Vicksburg.  I

10   was staying there.  She moved in with me, and we decided to

11   remodel the apartment in one of my buildings because I actually

12   lived in other one.  We remodeled and started.  We had a friend

13   of ours doing it.  We were paying him.  And we moved in March,

14   and we continued -- she did a lot of the work.

15   Q    And when you say you remodeled the apartment, you mean

16   4645 Van Winkle Park Drive?

17   A    Yes, ma'am.

18   Q    The one that we just saw photographs of?

19   A    Yes, ma'am.  The ones you were showing the pictures.

20   Q    When did you and Ms. Beard marry?

21   A    We married I believe it was September.

22   Q    Of 2016?

23   A    2016, the beginning of September.

24   Q    Did you marry Ms. Beard because you love her?

25   A    Yes, I did.

1    Q    Besides love, is there another reason that you married her

2    when you married her?

3    A    There it was for a reason, yes.  We knew at the time

4    because before I met Heather, I had caught a state case.  And I

5    knew I was going to plea bargain it.  I was going to go to the

6    state facility.  So we knew we could not visit because her

7    history and my history we couldn't visit each other without

8    being married so that was one of the reasons.  Plus I wanted to

9    take care of her, let her live in my house and stuff while I

10   was gone because I thought I would be coming home in October.

11   Q    Did you have illegal drugs and drug paraphernalia in your

12   house --

13   A    Yes, I did.  I did.

14   Q    -- at 4645 Van Winkle Park Drive?

15   A    Yes, I did.

16   Q    Did you actually use meth at that time?

17   A    Yes.

18   Q    Methamphetamine?

19   A    Yes.

20   Q    Did you have ammunition in your house at 4645 Van Winkle

21   Park Drive?

22   A    Yes.

23   Q    Did you have guns in your house at that address?

24   A    Yes.

25   Q    What guns were in your house on December 2, 2016?

1    A    In the gun cabinet there was a .22 rifle, Winchester rifle.

2    And in the bedroom there was a .22 pistol, a Taurus .22 pistol.

3    Q    So those two guns use the same ammunition?

4    A    Ma'am?

5    Q    So are you saying those two guns use the same ammunition?

6    A    Yes, ma'am, they do.

7    Q    How did you come to possess the rifle?

8    A    I had bought a vehicle from a friend, and in the -- it was

9    a Jeep.  There was no top.  It was all covered in leather -- I

10   mean leaves.  And when I was cleaning it out, I found the

11   rifle.  It was all rusted up and everything.  I even called the

12   guy and asked him did he want it back.  He said he didn't know

13   it was in there.  We just kind of just threw it in the shop.

14   He kind of moved around.  And when we were packing my closet

15   up, either Heather or I put it in the closet.

16          MS. CASE:  Your Honor, may I approach and retrieve

17   Government's Exhibit 3?

18          THE COURT:  Yes.

19   BY MS. CASE:

20   Q    Mr. Beard, I'm holding Government's Exhibit 3.  Do you

21   recognize this?

22   A    Yes, that's the .22 rifle.

23   Q    Is this the one you were talking about?

24   A    Yes, ma'am, that is it.

25   Q    I have placed on the screen a photograph, Government's

1    Exhibit 37(a).  Do you recognize that?

2    A    Yes.  That's the interior of my gun cabinet.

3    Q    What's shown inside the gun cabinet?

4    A    To the left is that .22 Winchester.  Beside it is Heather

5    and I's -- the pellet rifles are called Gamo pellet rifles.

6    They are for plinking, and there's some arrows that go to my

7    bows.

8    Q    How did you say the rifle got placed in that gun safe?

9    A    Like I said, it was in the shed.  When we were packing this

10   closet up, either Heather or I, one of us put it in there.  I

11   don't know exactly which one put it in there.

12   Q    Who -- did both of you know that the gun was in the house?

13   A    Absolutely.

14   Q    Who had a key to that gun safe?

15   A    It wouldn't lock.  There's no lock.  When I got it from my

16   buddy, he didn't have the key, and I took the top lock out to

17   get the key.  It had never been fixed.  It didn't --

18   Q    Okay.  How about the closet that the gun safe was in?  Who

19   had the key to that?

20   A    We both did.  For a while, it didn't even have a lock on

21   it.

22   Q    So before the rifle was put here, where was it in your

23   house?

24   A    In the garage area.  We had the garage area that I did work

25   out of.

1  Q    Was there a case that it was in?

2  A    No.  It was laying on back of a four-wheeler -- of the

3  four-wheeler, or was laying on the rack, just laying around up

4  in a corner, stuck in a corner.  It looks a lot better now than

5  it did when I had it.  You can see in the pictures it was all

6  rusted and everything.

7  Q    Now, you mentioned some other items in this gun safe.  I'm

8  going to circle two black guns that are in the -- near the

9  center of that photograph.  What are those?

10  A    Those are Gamo whispers, air rifles, single shot pellet air

11  rifles.

12  Q    Whose rifles are those?

13  A    The left one is Heather's, and the right one is mine.

14  Q    How do you know whose is whose?

15  A    The yellow dot on the bottom.  You can tell by the scope.

16  I put a better scope on mine.

17  Q    Why did you have those two guns?

18  A    We shoot at different targets.  We used to live in Flowers

19  in the woods, and at the lake house we'd shoot turtles in the

20  lake.  We did plinking, shoot at metal targets or paper

21  targets.

22  Q    I'm going to show you Government's 29(g) again, and I'm

23  going to circle some objects in the center of that photograph

24  and ask you what those are.

25  A    The paper targets laying across the top right there with

1    circles on them, and then right below it is a plinking target.

2    That's in the box.  You shoot it.  It makes a plinking noise,

3    and it flips over and resets.

4    Q    You're talking about small little BB type --

5    A    Uh-huh.

6    Q    -- objects?

7    A    Little pellets, like air rifle pellets you give your kids.

8    Q    And who all shot the two air guns that we saw in the

9    previous photograph?

10   A    We both shot each of ours.  Heather shot hers, and I shot

11   mine.

12   Q    I'm going to leave 29(g) on the screen for a minute and

13   circle the gun safe that we saw earlier and ask you where the

14   lock is on that gun safe.

15   A    Right there in the center of that you can see the lock is

16   missing.  There's a hole where the lock used to go.

17   Q    So the cabinet cannot be locked?

18   A    No, it could not.  There's a lock assembly sitting in my

19   bedroom.

20   Q    I'm going to show you some more photographs of -- that are

21   related in the closet where these items are, and I'd ask you to

22   tell the jury what you see on 37(b).

23   A    That is a shelf inside my closet and a little metal box

24   that's got clips for pistols in it.

25   Q    Let me show you 37(c) and ask what you that is.

1    A    That's inside that box.  That's different clips for

2    pistols.

3    Q    Are those -- do those clips have ammunition in them?

4    A    Some of them do.  I can see that the top one there has

5    rounds in it.

6    Q    Can you circle that for us?

7    A    Yes.  (Witness Complied with Request).

8    Q    How about 37(d)?  What's here?

9    A    That is the top of my gun case, and that's four shotgun

10   shells sitting on top of it.

11   Q    There?

12   A    Yes, ma'am, and right there, yes, ma'am.

13   Q    What do we see in 37(e)?

14   A    It's some kind of container with a bullet in the bottom of

15   it.  I believe it was in my closet.  I'm not sure.

16   Q    How about 37(f)?

17   A    That I believe was on top of my gun cabinet.  There's a

18   bullet sitting there and the pellets for the air rifles and a

19   little flashlight.

20   Q    The pellets are in the tin can in the middle of the screen?

21   A    They are in the silver container.  That's the pellets.

22   There's one right there beside the bullet.  Right there on the

23   bottom left, that's one of the pellets that go in the pellet

24   gun.

25   Q    Were you allowed to possess the gun such as the .22 caliber

1   rifle that was in that gun safe?

2   A   No.   When I received the gun or got it out of the vehicle,

3   I was under the understanding it was a hunting safety course

4   rifle and did not fire.   I found out that the agents had fired

5   the gun.   It does fire.   I was not allowed to have it.

6   Q   Why were you not allowed to that have rifle?

7   A   Because I have a felony on my record.

8   Q   Did Heather Wright-Beard, your wife, also have a felony

9   conviction before December 2016?

10  A   Yes, she does.

11  Q   Did your status as convicted felons prevent either of you

12  from possessing the air guns that we talked about?

13  A   No, it does not.

14  Q   Why not?

15  A   Because anybody can buy them.   You go into Walmart,

16  children can buy them.

17  Q   And you said you were arrested at your house on December 2,

18  2016.   Right?

19  A   Yes, ma'am.

20  Q   What time of day were you arrested?

21  A   It was around 6, 6:30.   It was early in the morning.

22  Q   And why were you arrested?

23  A   Because I had a state charge that I was supposed to go to

24  my sentencing on October 31st, and I did not go.   And they

25  issued a warrant for my arrest for failure to appear, and the

1  U.S. marshals came and got me.

2  Q    Tell the -- what charge led to that?

3  A    Rankin County called it home invasion.  MDOC calls it

4  residential burglary.

5  Q    Tell the jury what you did that led up to that home

6  invasion charge.

7  A    Before I met Heather, I had another young lady living with

8  me.  She had ran off with my vehicle, my Yukon, some laptops

9  and jewelry and stuff like that, and disappeared with another

10  guy.  And I found out where she was a week later, and me and an

11  employee of mine went there to get my stuff back.  And my

12  employee ran inside the house and threatened somebody in the

13  house.  We left.  They called the police.  I got pulled over;

14  he did not.  I got pulled over, and I took the charge.

15  Q    You say your Yukon.  How did you get -- how did you come to

16  possess the Yukon?

17  A    My dad died in 2013; my mom unfortunately in '15.  I

18  inherited when she passed away.  The rings the girl had stolen

19  I inherited from my dad.

20  Q    I'm going to return your attention to Government's 28(b)

21  and ask you again what this is.

22  A    That's pictures in front of the building.  That's Heather's

23  Firebird I had bought her, and that's my Yukon to the right.

24  Q    The vehicle on the right of the photo is the Yukon?

25  A    Is the Yukon.

1   Q   When was that photograph taken?

2   A   I guess December 2nd, yes.

3   Q   You had that vehicle on December 2nd, 2016?

4   A   Yes, I did.  I think I still do.

5   Q   So you were able to keep the Yukon that was the subject of

6   your home invasion charge?

7   A   Right.  The gentleman that was driving it that night was

8   not pulled over, or I never mentioned him in the case or

9   nothing.

10   Q   So, nevertheless, did you plead guilty to the home invasion

11   charge?

12   A   Yes, I did.

13   Q   Were you sentenced for that crime?

14   A   I was sentenced to five years.

15   Q   Now, you said you were arrested on December 2, 2016,

16   because you did not appear for your sentencing hearing.

17   A   Right.  I was originally arrested October 10th of 2015, I

18   believe.

19   Q   Well, the arrest that brings us here today --

20   A   The arrest that brings us here today is December 2nd.

21   Q   And can you tell us the sequence of events that led up to

22   you not appearing at your sentencing hearing?

23   A   We were supposed to go to sentencing on October 1st.  We

24   had prepared everything, and then all of the sudden we got a

25   call from my lawyer.  He was going to put it off a week.  Then

1  we were supposed to go October 8th, and then we got a call

2  about three days before that, that the judge had something to

3  do for two weeks.  So we were going to do it like the 16th or

4  something of October, two weeks later that Monday -- it was

5  October 31st.

6      October 31st that morning, we had got up, and we had been

7  in a big fight about three or four days.  We busted the windows

8  out of our vehicles, front windshield, side windshield, stuff

9  like that.  And me and Heather got in an argument, and she said

10  she wasn't going to drive me to my sentencing or go with me to

11  my sentencing so I just didn't go.

12  Q   So you just didn't show up for your sentencing?

13  A   I did not show up for my sentencing.

14  Q   When did you plead guilty for that home invasion charge?

15  Do you remember?

16  A   I believe it was in July -- it was June or July of 2016.

17  Q   In the summer of 2016?

18  A   Yes, ma'am.

19  Q   And at the time you pled guilty or around that time, what

20  length of sentence did you expect to receive?

21  A   Five years.

22  Q   On the home invasion charge?

23  A   Home invasion charge yes, ma'am.

24  Q   How much of that sentence did you expect to serve in

25  prison?

1   A    About two and a half years.  I had to do 50 percent of it

2   in the state of Mississippi.

3   Q    And when was your original sentencing hearing set for the

4   home invasion charge?  What date?

5   A    It started -- it was supposed to have been October 1st.

6   Q    Okay.

7   A    Then it got moved to the 8th and then to the 31st.

8   Q    So first time was October 1st 2016?

9   A    When I was supposed to go, yes, ma'am.

10  Q    And in relation to that, when did you and Ms. Beard get

11  married?

12  A    Three weeks before that.

13  Q    Did Ms. Beard know that you were headed to prison before

14  the two of you decided to get married?

15  A    Yes, she did.

16  Q    And what arrangements did you make in anticipation of the

17  year or two that you expected to be in prison?

18  A    We had had some problems with the taxes on the building.

19  So we lost one of the buildings to taxes, and I sold a bunch of

20  my stuff so we could come up with the money.  And Heather had

21  talked to the tax people and got it as low as we could.  The

22  gentleman we were buying it from did not buy the taxes.  We got

23  the taxes paid off and we were selling things.  I had bought

24  her a dog for protection.  I had bought her the pistol for

25  protection.  We live in a bad neighborhood.

1  Q   And is one of the things that you did in anticipation of

2  going to prison to marry Ms. Beard?

3  A   Yes, it was part of it.

4  Q   Was there any -- why did you and Ms. Beard marry knowing

5  that were you going to prison?

6  A   Because I love my wife. We were in love at the time. And,

7  you know, I was hoping she could be able to visit me and, you

8  know, stand by me while I was in prison, you know, and take

9  care of me, help me out.

10  Q   Was there any financial benefit that occurred as a result

11  of that marriage?

12  A   For her, yes; not for me.

13  Q   What would it have been for Ms. Beard?

14  A   She was getting rent off of one of my buildings, and my

15  nephew at the time was paying me for buying my parents' house

16  from me, and he was paying me 500 a month, and I was giving her

17  300 and I was taking 200 of it so I would have canteen in

18  prison. My nephew was mailing her 3 and me 2.

19  Q   And that was -- the spousal relationship provided that

20  benefit?

21  A   Yes.

22  Q   You said you were renting a property. Can you explain

23  that?

24  A   Yes. My original building -- the first one I bought that's

25  next door to the left, she was renting it to -- it was a guy

1    that worked at a shop right there on our street, him and his

2    girlfriend were living in that building because I had an

3    apartment built in it originally.  I've had that building since

4    '09.

5    Q    All right.  Did you have items in that building before you

6    rented it out?

7    A    We moved everything out so we could rent it out, yes,

8    ma'am.  We had -- I had my race car in there and some other

9    stuff.

10   Q    And where did that rent money -- who received that rent

11   money?

12   A    She did.

13   Q    And you mentioned some things you did for physical

14   security.  Did you install anything in the house for security?

15   A    Installed security cameras and a DVR.  Like I said, I

16   bought a pit bull, you know, and I bought her the pistol.

17   Q    So you mentioned that you bought a pistol.  Why did you buy

18   a gun?

19   A    Because on the back -- behind our building is a

20   neighborhood street, Dixie Avenue, in South Jackson.  That's a

21   rough neighborhood.  It has a lot of gang violence, gunfire and

22   stuff.  On the holidays, they don't shoot fireworks.  They

23   shoot guns.  So I mean, it's -- she needs it for protection.

24   We've had numerous people break in or people attempting to

25   break in breaking into vehicles there.  The shops all up and

1   down the street are always getting broke into.

2   Q   Who would have been living in the home with Ms. Beard after

3   you went to prison?

4   A   Was not supposed to be anybody.

5   Q   Did you buy the gun before or after you and Ms. Beard

6   married?

7   A   It was before.

8   Q   Do you know approximately when you bought the gun?

9   A   Yeah, it was June, July, in the summer.  We had been at a

10  soccer game that day in Madison or Ridgeland.

11  Q   Was it -- do you know in relation to your marriage how far

12  in advance of your marriage it would have been?

13  A   About a month and a half.

14  Q   Can you tell the jury how you bought the gun?

15  A   I had been putting feelers out for small caliber action.  I

16  wanted a little 25 automatic, and a friend of mine had called

17  me and told me he had that .22 pistol.  And we had met at Sonic

18  on Highway 51 in Ridgeland, and I purchased it right there in

19  the parking lot of the Sonic while we were eating.

20  Q   Who was with you when you bought the gun?

21  A   It was Heather and I and Heather's daughter, Hope.

22  Q   Who did you buy the gun from?

23  A   Guy's name is Ian.  I don't know his last name.  He lives

24  over in south Jackson.  He's somebody I had done business with

25  and met before and stuff.

Q    What type of gun did you say you asked for?

A    I was asking for a small caliber pistol, just something small for her.

Q    And what did you actually buy?

A    I bought a 9 shot .22 Taurus Ultra-Lite.

Q    You said .22 Taurus?

A    Yes, ma'am, Taurus.22 Ultra-Lite, a nine shot.

Q    What does .22 refer to?

A    .22 caliber.

Q    How much did you pay for the gun?

A    I paid 160.

Q    When you bought this gun from Ian, who did Ian give the gun to?

A    He walked up to the passenger side window.  We were talking through the passenger window.  We were at Sonic.  He couldn't come to my window because the ordering thing is right there. And he -- Heather rolled down the window, and we was talking to him and he passed it through the window to me.  Heather handed it to me through the window.

Q    What, if anything, did Ms. Beard say when you all received the gun?

A    I looked at it first, and then, you know, handed it back to her.  And she looked at it, and I said, *Is this what you want?* And she said, *Yeah.*  I handed her the money, and she handed it to Ian.

1   Q   So you -- you said Ian got his money how?

2   A   I pulled it out of my pocket, counted it, Heather was right

3   there beside me in the front seat.  I handed it to her and she

4   handed it to Ian.

5   Q   Okay.  Why didn't you just go to a store that sells a gun

6   and buy this gun?

7   A   Why did I --

8   Q   Why did you not go to a store to buy this gun?

9   A   I was a felon.  I can't go buy a gun.

10  Q   Who had control of the gun after you bought it?

11  A   I gave it to her.  It was her gun.

12  Q   When you say "her" who is that?

13  A   Heather's.

14  Q   Where did Ms. Beard keep the revolver?

15  A   It varied between her purse and the nightstand.  She'd have

16  it somewhere in the bedroom over by her nightstand.

17  Q   Could you have used that gun if you wanted to?

18  A   I could have probably found it and used it, yes.

19  Q   Did you ever?

20  A   I did grab it one day.  We were in a bad argument, and I

21  grabbed it and put to it my head and was going to try and

22  commit suicide.  And me and her tussled over the gun, and I

23  took it and threw it.  A window in our bedroom is busted

24  because I threw it and busted that window.

25  Q   Did you ever see Ms. Beard with the revolver after she had

1   it at the Sonic?

2   A   Yes, numerous times.

3   Q   Tell us about what you remember.

4   A   One of them I was standing in my shop area.  She opens the

5   door, puts it in my face, pulled the trigger three times and

6   said -- started off walking and said, *It's just that easy.*  The

7   gun was empty.  She put it my face and pulled the trigger three

8   times.

9       Then on one night we seen somebody in the cameras at the

10  back of the building.  We figured it was the kid from the

11  building behind us -- the house behind us.  I went out through

12  the garage area going to holler and grab him.  All of the

13  sudden behind me I hear two gunshots.  I turn around at the

14  fence, and there's Heather hollering, *The next time I'm going*

15  *to shoot you in your ass.*  She discharged a gun in the air

16  twice.

17  Q   That time that the gun was -- that Ms. Beard discharged the

18  gun, was that before or after you married?

19  A   I believe it was -- I believe it was after we were married.

20  Q   Can't be sure?

21  A   I'm not exactly sure the date.

22  Q   And the time that she unloaded it and pulled the trigger in

23  your direction, was that before or after you married?

24  A   I believe that was after we married.

25  Q   What did you do after she pointed the revolver at you and

1  pulled the trigger?

2  A    I got the pistol, and a friend of mine had come by that day

3  or the next day, and I gave it to him to keep -- get it out of

4  the house.  I said, *Don't give it back to her until I go to*

5  *prison*.  But apparently he gave it back to her.  I later found

6  out that she was seeing my friend's twin brother.  They were

7  seeing each other before I went to prison.

8  Q    When you say you took the revolver and gave it to another

9  person to keep --

10 A    A gentleman named Todd Bates.

11 Q    What instruction did he have?

12 A    Do not give it back to her until after I go to prison.

13 Q    So you intended for her to have the gun again?

14 A    Yes.  It was bought for her for protection for while I was

15 in prison.

16 Q    After you handed the gun to your friend, when is the next

17 time you remember seeing it?

18 A    When y'all showed me pictures of it a few weeks ago.

19 Q    Y'all --

20 A    The prosecutor.

21 Q    The government?

22 A    The government.

23 Q    Did you know that the revolver was back in your house?

24 A    No, I did not.

25        MS. CASE:  Your Honor, may I approach and pick up

```
 1   Exhibit 4?

 2              THE COURT:  Yes.

 3   BY MS. CASE:

 4   Q   Mr. Beard, I'm showing you what's been admitted as

 5   Government's Exhibit 4, and I'll ask if you can recognize that.

 6   A   Yes, that's the Taurus .22 Heather liked that I bought,

 7   that I purchased for Heather.

 8   Q   This is the gun we've been talking about?

 9   A   Yes, ma'am, that's it.

10   Q   This is the gun that you bought for Ms. Beard before you

11   went to jail?

12   A   Yes, ma'am, that is it.

13   Q   If we can, I'd like to go through some more photographs of

14   the home.  I'm going to start with Exhibits 31(a) and(b) and

15   ask you what is shown here on 31(a), specifically in this sort

16   of center of the table?

17   A   That is a laptop -- not a laptop.  A tablet that was

18   Heather and I's -- Heather and mine.

19   Q   If we look at --

20   A   That's our laptop -- I mean, our tablet.  It says

21   Heather -- David and Heather Beard.

22   Q   So that's Government's 31(b).  Is that a shared laptop?

23   A   Yes.

24   Q   Shared iPad, excuse me.  If we can look at Government's

25   Exhibit 30(a) and I ask you what is on this photograph?
```

1    A    As you enter our living room, that's a table that's right

2    against the wall.  That's right before the closet, Heather's

3    closet.

4    Q    What is shown on that table to the left of the stack of

5    DVDs?

6    A    That's a .22 bullet.

7    Q    Can you draw a circle around that for us.

8    A    (Witness complied with request.)

9    Q    And I'll show you -- I'll show you Government's 30(b) and

10   ask you what that is.

11   A    That is a .22 caliber bullet.

12   Q    Is that a close-up of the bullet we just saw?

13   A    Yes, ma'am.

14   Q    Does that bullet fit either of the two guns that was in

15   your house?

16   A    Fits both.

17   Q    And what's that bullet on that table in your living room on

18   the day you were arrested?

19   A    I'm not sure.  I don't know.  Apparently it was.  I

20   don't -- I don't remember it being there.

21   Q    I'm going to return your attention to Government's Exhibit

22   29(m).  Tell us again what room this is.

23   A    That is standing at the foot of our bed taking the picture.

24   That's our bedroom.

25   Q    You say "our."  Whose bedroom?

1   A   That's Heathers and mine.

2   Q   How many beds were in the house?

3   A   Just one.

4   Q   And if you're at the foot of the bed and looking at the

5   bed, which side of the bed did you sleep on?

6   A   I slept on the right.

7   Q   What side did your wife sleep on?

8   A   Ma'am?

9   Q   What side did your wife sleep on?

10  A   She slept on the left.

11  Q   Who was the primary user of the shelves on the right side

12  of the bed?

13  A   That is mine.

14  Q   I'm going to show you some photographs from that side of

15  the bedroom and ask if you can tell the jury what we see.  And

16  the first thing I'm going ask you to do is compare two

17  photographs.  The first is 33(a).  And if you would, start by

18  looking at the plastic shelves at the top.

19  A   Yes.

20  Q   I'm going to change the photograph to 33(b) --

21  A   Okay.

22  Q   -- and ask that you look at those shelves again.  So

23  comparing Government's 33(a) and(b), have items been moved

24  around?

25  A   Yes, they have.  To the left of the plastic case is some

1    scales.  They were down in the lower shelf.  On the second

2    shelf there's another set of scales with a baggie on it.  They

3    were in another place.  The plastic thing on the top, you can

4    tell the drawers were opened.  My cigarettes and stuff aren't

5    there on top but the scales are now.  It was cigarettes in the

6    other photo.

7    Q    Are the cigarettes still there?

8    A    Cigarettes are at the bottom now next to the last shelf by

9    the locks that went to the gun cabinet.

10   Q    Is it fair to say that the items on these shelves are in

11   the same general area in the bedroom that they would have been

12   when were you arrested?

13   A    Yes.  They were on my side.

14   Q    So I'm going to ask you about a couple of items in this

15   area.  What is shown on the top shelf on the left side?

16   A    That is a set of scales.

17   Q    This is the top left-hand corner?

18   A    Yes, ma'am.  That's them.

19   Q    What is shown -- I'm going to circle the middle of the next

20   shelf.  What is shown there?

21   A    There's another set of scales with a bag sitting on it, and

22   on the ashtray is a syringe with methamphetamine in it.

23   Q    What's the black bottle?

24   A    That's Bod body spray.

25   Q    Whose is that?

1   A   Me.  That's mine.

2   Q   Whose are the other objects we've circled so far?  Are the

3   other objects --

4   A   Mine also.

5   Q   -- yours also?

6   A   Mine, yes.

7   Q   How about the cigarettes on this shelf?

8   A   That's mine.  I smoke Marlboro Light in the soft pack.

9   Heather smokes a hard pack, the box.

10   Q   On the very top of this shelf there's a wallet.  Whose

11   wallet is that?

12   A   That's my wallet, and that's my money and pocket knives and

13   stuff in that top drawer.

14   Q   That's 33(c).  On 33(d), that's --

15   A   That's my identification card and my driver's license.

16   Q   From the wallet that --

17   A   From the wallet.

18   Q   It came out of the wallet?

19   A   Yes, they were in my wallet.

20   Q   33(d) is a close-up of some of what we've seen, and I'm

21   going to circle what's on the shelf between the Santa cup and

22   the Bod spray and ask you what that is.

23   A   That's a set of scales, plastic baggie and a syringe with

24   methamphetamine in it.

25   Q   You said those are yours.

1  A   They are mine.

2  Q   How about in 33(g)?  What do we see towards the right of

3  that photograph?

4  A   That's close-up of the scales, baggie and the syringe.

5  Q   What's on the scale?

6  A   A baggie with apparently some kind of white powder in it.

7  Methamphetamine probably.

8  Q   What's to the right of 33(h)?

9  A   Another set of scales, a remote, and some of my car keys.

10 Q   How about what's in 33(i)?

11 A   That's a pair of scales that were up on top of it.

12 Q   And 33(j), what are those plastic bags in the center used

13 for?

14 A   Empty -- they are empty methamphetamine bags from where I

15 had purchased methamphetamine.

16 Q   And what is in the corner of the bin above the Energizer

17 battery?

18 A   A .22 caliber bullet.

19 Q   Did I circle it?

20 A   Yes, ma'am, that's it.

21 Q   These items on the piece of furniture, those are your

22 items?

23 A   Yes, ma'am, they are.

24 Q   I'm going to continue with some photos around the bedroom

25 and ask you where we are in the bedroom in this photograph.

1    A    That is the cedar chest at the foot of our bed.

2    Q    What's in -- that was 35(a).  What's in 35(b)?

3    A    That appears to be Heather's driver's license and one of my

4    old phones.

5    Q    What about 35(c)?

6    A    That's Heather's driver's license.

7    Q    What's in 35(d)?

8    A    That is a pair of laptops I had bought us.  One was hers,

9    and one was mine.

10   Q    And what furniture is in the bedroom in the opposite side

11   of the bed?

12   A    That's a dresser in the back that we both use.  And then

13   there's like a clothes rack that we both use hanging -- our

14   clothes are hanging to the right.  All the bins on the floor

15   are Heather's stuff, and there's a dog kennel with our dog in

16   it.

17   Q    Can you show us the bins that you're talking about that

18   Ms. Beard used?

19   A    (Witness complied with request.)

20   Q    And the clothing rack that you all used?

21   A    (Witness complied with request.)

22   Q    Where generally on the dresser is Ms. Beard's --.

23   Ms. Beard's effects?

24   A    All this is her stuff.

25   Q    So you've circled --

1    A    I circled her.

2    Q    -- things on the right side of the photograph?

3    A    Ma'am?

4    Q    You've circled things on the right side of the photograph?

5    A    Yes.  Things on the right side is hers.

6    Q    And is the right side on the left side of the photograph

7    where the door to the bedroom is?

8    A    To the right.  It's right here about where the bin is, the

9    bottom where the doorway's right there.  You come in and that

10   will all be to your right.

11   Q    Okay.  So that was Government's Exhibit 29(n).  You circled

12   a few things on Government's 29(n) for where you wife kept her

13   belongings.  Are there any other places that she kept her

14   clothes in the house?

15   A    Her closet and in our bedroom and that was about it.

16   Sometime it would be back in the laundry room.  After she'd

17   wash and dry them she may hang them up there.

18   Q    I'm going to show you Government's 18(a) again, the floor

19   plan.  I'm going to ask -- you said her closet.  If you could

20   explain where Ms. Beard's closet is.

21   A    It's right here outside of our bedroom.

22   Q    And the bins of clothing that you highlighted on 29(n),

23   where are those?

24   A    Those are right here on this side of the doorway.  We hang

25   clothes, and there's a bin right there inside that doorway, and

1   that's the dresser there beside it.

2   Q   And can you show us which side of the bed would have been

3   Ms. Beard's?

4   A   Where I sleep?

5   Q   Where your wife slept.

6   A   Right here.

7   Q   I'm going to show you Government's 32(a) and ask you what

8   is shown.

9   A   That's Heather's closet, the doorway to her closet.

10   Q   Whose items do you see in the closet in this photograph?

11   A   That's all Heather's clothes.

12   Q   I'm going to ask you what you see in Government's 32(b).

13   A   On the top shelf is a bunch of swimming pool stuff we

14   bought at Dollar General on sale.  Her parents have a pool at

15   their house.  On the second shelf is a little stereo thing and

16   a box that she had and tennis shoes and more of her shoes.

17   Q   So whose items do we see in this photograph?

18   A   They are all Heathers.

19   Q   I'm going to ask you what is shown in the center of the

20   photograph.

21   A   There's a black box that she had bought at Walmart to keep

22   stuff in.

23   Q   Can you circle that for us?

24   A   Sure.

25   Q   Is that your box?

1    A    No, it's not mine.

2    Q    I'm going to show you Government's 32(c).  What is that?

3    A    That's .22 rounds, .22 caliber rounds.

4    Q    Is this the inside of the box you just --

5    A    Yes, ma'am.

6    Q    -- circled?

7    A    Yes, ma'am.  It looks like it.

8    Q    What guns in your house did those bullets match?

9    A    Both, the .22 rifle and the .22 pistol.

10    Q    What else is in the box with the bullets?

11    A    Appears to be ink pens.

12    Q    Did you know that the .22 caliber bullets were in this box?

13    A    No, I did not.

14    Q    Did you put them in the box?

15    A    I did not.  The last I seen them they were in a cardboard

16    box in that black tool box.

17    Q    Did you put those bullets or that box in this closet?

18    A    No, I did not.

19    Q    Did you know they were in this closet?

20    A    No, I did not.

21    Q    When did you learn that those bullets were in this closet?

22    A    Two weeks ago when the government showed me the picture.

23    Q    I'm showing you Government's 29(m) again, and I'd like to

24    direct your attention to what you've -- what we've referred to

25    as your wife's side of the bed.  Who was the primary user of

1  the things along the left-hand side of this photograph?

2  A    That's her mirror, blow dryer, hair straightener, curling

3  iron.  Everything on that left side's hers.

4  Q    What's on the top of the bed where a person's head would

5  be?

6  A    Top of it looks like her purse.

7  Q    Whose hats are on the wall above that purse?

8  A    Only the left side is her hats, and then there's an -- the

9  Under Armour on the right side is mine.

10  Q    Whose slippers are on the right side of the bed by the --

11  A    Them are mine.  They're moccasins.

12  Q    Do you see the pink stickers and the flower stickers that

13  are on the wall?

14  A    Yes, I do.

15  Q    And do they -- you see the stickers that say "me" and

16  "you"?

17  A    Right there above each side of our bed it says -- on the

18  left-side says "me" and on the right side it says "you."

19  Q    Who does "me" refer to?

20  A    Heather.

21  Q    Who put those stickers up?

22  A    She purchased the stickers at Walmart and put them up.

23  Q    She put them up?

24  A    Uh-huh.

25  Q    You see the -- do you see an end table to the left side of

1    the bed?

2    A    Yes, I do.

3    Q    Can you circle that area of the screen for us?

4    A    (Witness complied with request.)

5    Q    And in the center of the circle that you just made, you see

6    a blue fan?

7    A    Yes, I see the blue fan.

8    Q    What's on that blue fan?

9    A    Stickers and paintings that she does.  It says "Heather" on

10   one side of it, I believe.

11   Q    And on the floor on the left side of the bed, I'm going to

12   circle an object and ask you what it is.

13   A    Heather's phone.

14   Q    Is the mirror on this left side of the wall in that bedroom

15   propped up against the wall?

16   A    Yes, it is.  It's one we got from her mother.  We were

17   going to mount it on the wall, and it got broke in the fight I

18   was talking about where I tried to commit suicide.

19   Q    If we look at Government's Exhibit 34(g), tell us what we

20   see here.

21   A    Heather's nightstand with her fan on it.  Says "Heather"

22   beside it and lotions and lamp and appears to be medicine

23   bottles and a clear zip-up case she's got on the floor.

24   Q    Can you just using the monitor show us where the bed is to

25   make sure the jury is oriented?

1   A   Right here on the floor.

2   Q   The nightstand we were discussing.

3   A   Nightstand, and this is a .22 bullet on the corner there.

4   Q   And is the fan that we were discussing --

5   A   Yes, that's the fan.  That's Heather's fan.  It's got her

6   name on it.

7   Q   Are there objects stored in this nightstand?

8   A   Do what, ma'am?

9   Q   Are there objects stored --

10  A   The little make-up case that she had with her make-up in

11  it.

12  Q   What color objects are stored inside that nightstand?

13  A   There's like a red, pink, and blue.  There were little like

14  zip-up cases that contain her make-up.

15  Q   I have circled the center bottom of the photograph.  What's

16  in that general area?

17  A   That's a clear bag that we kept my medicine, her medicines,

18  Tylenol, sinus medicine, over-the-counter stuff or prescription

19  stuff, kept it in that clear bag.

20  Q   Who maintained the medicines for your household?

21  A   Ma'am?

22  Q   Who kept the medicines for your household?

23  A   She did.  She kept up with them, that side.  If I needed

24  it, she give them to me.  She usually make sure I take my

25  medicines.

1  Q   I'm going to show you a slightly different view in

2  Government's 34(a) and ask you again to just show us where the

3  nightstand, the end table is.

4  A   Right here.

5  Q   You've drawn a circle towards the center top of the screen.

6  Can you show us the objects that are stored inside the end

7  table?

8  A   Uh-huh.  Right here, and here some on the bottom right

9  there.

10  Q   And will you show us the bottles of medications that you

11  were talking about?

12  A   (Witness complied with request.)

13  Q   The left bottom corner of the screen has what in it?

14  A   Has a black case.

15  Q   Well, the left most bottom corner has what?

16  A   That's the mirror that's broke, and right here's a black

17  case.

18  Q   Do that one more time.  Try that again.

19  A   (Witness complied with request.)

20  Q   Whose black bag is that?

21  A   That's Heather's.

22  Q   What's in that black bag?

23  A   I do not know.

24  Q   I'm going to show you Government's 34(b).  What is that?

25  A   That is the Taurus Ultra-Lite .22.

1  Q   Is that the revolver we've been discussing?

2  A   Yes.  That's the one you had a minute ago.

3  Q   What is this?

4  A   That's the other side of the pistol.

5  Q   That's 34(c).  34(e) shows what on the left-hand side of

6  this photograph?

7  A   That's Heather's phone and some other items of her on the

8  bed.

9  Q   Is that the phone that we saw on the floor earlier?

10 A   I believe so.

11 Q   What's 34(f)?

12 A   That's her phone.

13 Q   34(e) is a photograph of what?

14 A   Somebody holding three pill bottles.  I've seen this

15 picture clear.  It's three of Heather's, and the two blue

16 bottles in there on the bottom are mine and then just different

17 over-the-counter medicines.

18 Q   What's in 34(j)?

19 A   Those are Heather's prescriptions.

20 Q   And can you see an object faintly to the center right?

21 A   Looks like the fan.  I can see the name up the side.  Yes,

22 blue fan that was on the nightstand.

23 Q   I'm going to show you some photographs that have been

24 admitted of the garage or shop area of the house.  And it

25 begins with Government's Exhibit 38(a).  Do you recognize that?

1    A    Yes.    That's a black tool box that's in a little storage

2    shed we have outside the building.

3    Q    What is 38(b) a photograph of?

4    A    That's inside that box, and it's a different rounds of

5    ammo, shotgun shells, and stuff that I inherited from my dad.

6    Q    How about 38(c)?

7    A    That's a counter in my shop door open to a cabinet, and

8    that's a gun box -- ammo box rather.

9    Q    And what is 38(d)?

10   A    That's an ammo box and appears to be a clip beside it.

11   Q    And how about 38(e)?

12   A    That's the interior of an ammo box and different ammo.

13   Q    And 38(f)?

14   A    That's the back of my four-wheeler with the rack sitting on

15   it.

16   Q    And what's in 38(g)?

17   A    It's a cooler sitting on that rack that's on the back of my

18   four-wheeler.

19   Q    And what is 38(h)?

20   A    Shotgun shells inside of the cooler.

21   Q    And how about 38(e)?

22   A    That's a drawer in my cabinet in the shop.

23   Q    And 38(j)?

24   A    More shotgun shells and different ammo.

25   Q    Do you recognize Government's Exhibit 27(a)?

1    A    Unfortunately, I do.  That was me at the time.

2    Q    At the time of your arrest?

3    A    The morning of my arrest, yes.

4    Q    And what is government's 27(b)?

5    A    That's Heather the morning of my arrest.

6         MS. CASE:  Your Honor, at this time I would ask that

7    Mr. Beard be allowed to view the items on the evidence table.

8         THE COURT:  Okay.  Well, I tell you what, before we do

9    that, let's take -- let's take a short break here.  It's 10:45.

10   I'm going to excuse the jury.  Remember the instructions I've

11   been -- we're going to come back in about 15 minutes, 11:00.

12   If you'd leave your pads in your chair, you can be excused.

13       (Jury Out)

14        THE COURT:  You wanted him to do what?

15        MS. CASE:  I was going to ask that he stand here and

16   be able to look at these items and confirm that they came from

17   his residence.

18        THE COURT:  All right.  We'll do that when we come

19   back to court.  We will be in recess.  Mr. Beard, obviously

20   don't talk to anybody during the break.  Court's in recess.

21       (Recess)

22       (Jury In)

23        THE COURT:  You may proceed.

24        MS. CASE:  Thank you, Your Honor.  At this time, I

25   would ask that Mr. Beard be allowed to come down and look at

1    the items on the table which are -- have been admitted as

2    Government's Exhibit 5 through 15.

3              THE COURT:  All right.

4    BY MS. CASE:

5    Q    Mr. Beard, please look at these items and when you're

6    finished, if you'll just return to your seat.  Just look at

7    them generally, see if you recognize them.

8    A    I recognize all of them.

9    Q    If you will please return to your seat.  What are the items

10   marked Government's Exhibit 5 through 15?

11   A    That is an ammunition and the boxes and stuff that I was

12   storing them in and kept them -- had in my shop and in my

13   house.

14   Q    Are these items in substantially the same condition as you

15   had them in your house?

16   A    Yes, ma'am, they are.

17   Q    And were these items in your house on December 2, 2016?

18   A    Yes, ma'am, I believe they all were.

19   Q    I'm going to show you some photographs of these items, and

20   I'm going to ask if you recognize these, starting with

21   Government's Exhibit 39(a).  I'm going to circle things on the

22   screen starting with the center of the screen and ask if you

23   recognize that and tell us what it is.

24   A    Yes, sir.  That is the Taurus .22.

25   Q    What is the object in the middle?

1   A   Winchester .22 rifle.

2   Q   How about the top left-hand side of the screen that's

3   running out of the photo?

4   A   That's the box with the .22 caliber bullets in it.

5   Q   And the box beside that to the right?

6   A   That was the one that was in my closet with all the clips

7   in it, the bullets.

8   Q   How about in the top center, the red items?

9   A   That, I believe, is 12 gauge shotgun shells.

10   Q   And if you can see to the left center of the photograph.

11   A   Appears to be a .22 bullet, .22 caliber bullet.

12   Q   How about next to that?

13   A   I believe that is too.

14   Q   And what are the green and yellow items?

15   A   I believe that is .20 gauge shells.

16   Q   And can you tell in the lower right-hand portion that's

17   partially off the screen?

18   A   It's rifle ammunition.  I'm not sure what they fit.

19   Q   And in the center bottom?

20   A   I believe that's miscellaneous rams of .38, 9 millimeter.

21   I think there's a .40 caliber in there.

22   Q   And how about the last item on the lower --

23   A   12 gauge shotgun shells.

24   Q   And these items were in your house in December 2016?

25   A   Yes, they were.

1   Q  Government's 39(b).  I won't circle all of them, but in

2 general what is on that photograph?

3   A  That is all the different rounds that were found in that

4 black tool box that was in a plastic shed I have outside my

5 shop.

6   Q  And how about Government's 39(c)?

7   A  That's -- I believe that's the ammo that was inside that

8 metal container, that ammo box.

9   Q  And the last two photographs had yellow sticky notes on the

10 items.  Did you have those yellow post-it notes?

11   A  No, I did not.

12   Q  Those were added after they were taken from your house?

13   A  Yes, they were.  Added by somebody else, yes.

14   Q  After the search was executed as your house, did the grand

15 jury charge you with illegally possessing a firearm?

16   A  They did on November 37th.

17   Q  When did you first appear in court for that charge?

18   A  December 13th or 14th, I believe.

19   Q  Of 2017?

20   A  Yes, ma'am.

21   Q  This year -- or last year.  When did you let the court know

22 that you wanted to plead guilty to that charge?

23   A  I let my lawyer know shortly after that that I wanted to

24 plead out.

25   Q  Do you remember when you actually pled guilty?

1   A   No, I do not.  I've got it on a calendar but --

2   Q   Would it have been this year?

3   A   Yes.  Yes, it was this year, 2018.

4   Q   And in general terms, what did you admit at your guilty

5   plea?

6   A   That I owned and possessed guns and ammunition at the time

7   of my arrest.

8   Q   So you've taken responsibility for what you possessed?

9   A   Yes, I have.

10   Q   When did the government let your lawyer know that we would

11   seek your truthful testimony in this case?

12   A   About a month ago, I believe.  It was three weeks ago.

13   Q   Was that several months after you pled guilty?

14   A   Yes, it was.

15   Q   Did you pleaed guilty knowing that you would likely go to

16   prison?

17   A   Yes, I did.

18   Q   Had anyone -- has anyone made you any promises regarding

19   what will happen if you testify here today?

20   A   No, they have not.

21   Q   Are you required to testify as part of your plea agreement?

22   A   No, I'm not.

23   Q   In fact, have you received a subpoena that required you to

24   come here today?

25   A   I received one a couple of days ago.

1   Q   Does your plea agreement guarantee you a benefit if you do

2   testify?

3   A   No, it does not.

4   Q   Do you hope to get a benefit by testifying?

5   A   I do.

6   Q   Who determines what your sentence will be?

7   A   My judge.

8   Q   Have you and Ms. Beard spoken since you were arrested in

9   December 2016?

10   A   Yes, we have.

11   Q   What, if anything, did Ms. Beard tell you about what she

12   told the agents who searched your home?

13   A   She told me that she told them where the gun was.

14   Q   Have you and I met before?

15   A   Just here in the last week.

16   Q   How many times have we met before?

17   A   Twice.

18   Q   Was that before or after you were indicted?

19   A   Way after.

20   Q   Was that before or after you pled guilty?

21   A   Way after I pled guilty.

22   Q   Was that before or after you learned that your wife would

23   have this trial?

24   A   After I found out she was having the trial.

25   Q   Why did we meet?

1   A   My lawyer approached me and asked me would I testify here

2  today.  And at first I told her a couple times no, and then I

3  decided I would because of some other information that

4  appeared.

5   Q   What instructions did I give in terms of your testimony?

6   A   Tell the truth.

7   Q   Is that what you've done?

8   A   Yes, ma'am, I have.

9   Q   Have you and your wife spoken since you were arrested in

10  December 2016?

11   A   Yes, we spoke numerous times on the phone.

12   Q   Have you been in prison since that time?

13   A   I was first taken to Rankin County jail for about four

14  months.  And after sentencing, I was taken to the prison, to

15  MDOC.

16   Q   When you and your wife spoke, were you in jail?

17   A   Yes, I was.

18   Q   How did you speak with her?

19   A   Over the phone.

20   Q   Are those phone calls recorded?

21   A   Yes, they are.

22   Q   Are you told each time that you use the phone that the call

23  is recorded?

24   A   You know when you first come in.  They tell you that, you

25  know, all the phone calls are recorded.

1  Q    During any of those calls did you or your wife discuss the

2  Taurus revolver that the agent found at your home in

3  December 2016?

4  A    Yes, it was brought up.

5  Q    And when we met before, did you listen to portions of some

6  of those phone calls?

7  A    Yes, I did.

8         MS. CASE:  Your Honor, may I approach the witness?

9         THE COURT:  You may.

10  BY MS. CASE:

11  Q    Mr. Beard, I've handed you what's been marked as

12  Government's Exhibit 21(a).  Do you recognize that?

13  A    The audio tape or CD that we listened to the other day, and

14  I initialed it afterwards.

15  Q    You recognize it because you initialed it?

16  A    Yes.

17  Q    Is that in the same condition as you last saw it?

18  A    Yes, ma'am, it is.

19         MS. CASE:  Your Honor, the government would ask to

20  retrieve that exhibit and admit it into evidence.

21         THE COURT:  Any objection?

22         MR. RICH:  No objection, Your Honor.

23         THE COURT:  All right.  Ms. Case, you can retrieve it

24  and exhibit -- you said 21(a)?

25         MS. CASE:  Yes, Your Honor.

1          THE COURT:  Is admitted.

2      (Exhibit G-21(a) marked)

3  BY MS. CASE:

4  Q    When you listened to that call, did you have a transcript

5  of what you were hearing?

6  A    Yes, I did.

7  Q    And did that transcript accurately reflect what was said in

8  your recorded conversation?

9  A    Yes, it did.

10  Q    Did you make any corrections to the transcript?

11  A    On one of them, one of the words wasn't audible, and I knew

12  it, that she said "bullet."

13  Q    Did I ask you to initial beside each line of the

14  transcript?

15  A    Yes, you did.

16  Q    And did I ask that you sign the transcript?

17  A    Yes, you did.

18          MS. CASE:  Your Honor, may I approach?

19          THE COURT:  You may.

20          MS. CASE:  Mr. Beard, I've handed you what's been

21  marked Government's Exhibit 21(b).  I'll ask if you recognize

22  that.

23  A    Yes, I do.

24  Q    How do you recognize that?

25  A    This is the transcript that you handed me the other day

1   while I was listening to the CD.

2   Q   And is that in the same condition as the last time you saw

3   it?

4   A   Yes, ma'am, it is.

5   Q   Does it show your correction to the transcript?

6   A   Yes, it does.

7       MS. CASE:  Your Honor, the government would move into

8   evidence what has been premarked Government's Exhibit 21(b).

9       THE COURT:  Any objection?

10      MR. RICH:  No objection, Your Honor.

11      THE COURT:  21(b) is admitted.

12   (Exhibit 21(b) marked)

13      MS. CASE:  May I retrieve the exhibit?

14      THE COURT:  Yes.

15      MS. CASE:  Well, let me let him have it as well, Your

16  Honor.

17      THE COURT:  All right.

18  BY MS. CASE:

19  Q   During this call, did you and your wife discuss the .22

20  caliber Taurus revolver?

21  A   Yes, we did.

22  Q   How did you refer to the gun?

23  A   As her birthday present.

24  Q   Why did you do that?

25  A   Because I knew we were being recorded.

```
1   Q    And about when did and your wife have this conversation?
2   A    This would have been the first week or two of when I was
3   arrested, and I was in Rankin County jail.
4   Q    This would have been in December 2016?
5   A    Yes, ma'am.
6   Q    Was that before or after you and your wife were indicted?
7   A    Way before, a year before.
8        MS. CASE:  Your Honor, may we approach for just a
9   moment?
10      (At the Bench:)
11       MS. CASE:  We have physical copies of the transcript
12  for the jury because it can't be shown at the same time that we
13  play the audio, and we also believe a limiting instruction
14  should be read before we play this, and we're about to play it
15  so --
16       THE COURT:  I have the limiting instruction ready.
17  And any objection to handing out the copy of the transcript?
18       MR. RICH:  No.
19       MS. CASE:  Shall I give it to Twana?
20       THE COURT:  Yes.
21      (Bench Conference Concluded)
22       THE COURT:  All right.  Ladies and gentlemen, you're
23  about to receive copies of the transcripts.  Exhibit 21(b) is a
24  typewritten transcript of the oral conversation which can be
25  heard on the tape recording I admitted as 21(a).  The
```

1  transcript also purports to identify the speakers engaged in

2  the conversation.  I admitted the transcript for the limited

3  and secondary purpose of aiding you in following the content of

4  the conversation as you listen to the tape recording and also

5  to aid you in identifying the speakers.

6       You are specifically instructed that whether the

7  transcript correctly or incorrectly reflects the content of the

8  conversation or the identity of the speakers is entirely for

9  you to determine based on your own evaluation of the testimony

10  you have heard concerning the preparation of the transcript and

11  from your own examination of the transcript in relation to your

12  hearing of the tape recording itself as the primary evidence of

13  its own contents.  And if you should determine that the

14  transcripts -- the transcript is in any respect incorrect or

15  unreliable, you should disregard it to that extent.

16       MS. CASE:  Your Honor, for the record I would ask that

17  we be able to publish Government's Exhibit 21(a) and(b) to the

18  jury.

19       THE COURT:  You may.

20  BY MS. CASE:

21  Q   Before we begin, Mr. Beard, whose voices will we hear on

22  this recording?

23  A   Heather's and mine.

24     (Clip Played)

25  Q   So, Mr. Beard, what were the voices that we heard?

1  A   That was Heather's voice and mine.

2  Q   And what are you and your wife talking about?

3  A   We are talking about the search, and I was curious if they

4  had found that pistol.

5  Q   And so what did you mean when you say "birthday present"?

6  A   It was purchased around the time of her birthday, and I was

7  referring to it as a birthday present because I didn't -- it

8  wasn't supposed to be in the house.  I didn't want to say it,

9  you know, because they might not have been in the house and so

10  I referred to it as a birthday present.

11  Q   I'm holding Government's Exhibit 4, which is the .22

12  caliber Tarus revolver.  Is that what you say -- what you're

13  referring to when you say "birthday present"?

14  A   Yes, it is.

15  Q   What does your wife say after you asked her whether the

16  agents found the birthday present?

17  A   The Taurus .22 pistol, the pistol.

18  Q   So your wife knows what you mean by "birthday present"?

19  A   Yes, she did.

20  Q   And what is her answer to your question about whether the

21  agents actually found the revolver?

22  A   She said, yes, that they found it and they found ammunition

23  and stuff and bullets.

24  Q   And does she acknowledge that she spoke with agents about

25  the gun?

1  A    She told me -- I don't remember if that was the

2  conversation or another conversation that when they asked her

3  was any guns in the house, any other guns, she told them where

4  the Taurus was.

5          MS. CASE:  No further questions, Your Honor.

6          THE COURT:  All right.  Thank you.  Can we collect the

7  transcripts?

8                        CROSS-EXAMINATION

9  BY MR. RICH:

10  Q    Mr. Beard, earlier you said that you married your wife out

11  of love.  Is that correct?

12  A    Yes, sir.

13  Q    What day did you marry her?

14  A    It was September -- right before my -- I think it was

15  September 9th.

16  Q    You think?

17  A    Yes, I don't remember.  It's been two years, and we haven't

18  been getting along in the last two years, 19 months.

19  Q    What's your wife's birthday?

20  A    August 2nd, 1978.

21  Q    And you said earlier that she was with you when you

22  purchased this gun?

23  A    Yes, she was.  We were in my Yukon.

24  Q    And the gun was handed to her?

25  A    It was handed through the window because Ian couldn't come

1  to my side.

2  Q    You said that you bought it for her protection?

3  A    Yes, I did.

4  Q    Okay.  And you said earlier today that you brought it in

5  June or July of 2016.

6  A    It was after we had signed my plea bargain and I knew I was

7  going to prison, or around that time.  My lawyer had told me

8  that I was definitely going.

9  Q    And you're certain you bought it in January or July?

10  A    Yes.

11  Q    You spoke to ATF agents on June 8th of 2017.  Do you

12  remember that conversation -- of 2016.

13  A    Yes, I do.

14  Q    Excuse me.  Let me -- I'm sorry, Mr. Beard.  Let met back

15  up.  I got that date wrong.  June 8, 2017.

16  A    Right.  They came to Greene County.

17  Q    It was after you had pled guilty in Rankin County.

18  A    Yes, I was in MDOC prison at that time.

19  Q    Okay.  And it's your testimony today that you purchased the

20  gun in June or July?

21  A    Right.  I purchased that summer.

22  Q    And during that interview, they told you that it was a

23  federal felony to make a false statement to a federal agent.

24  A    I'm sure they did.

25  Q    And during that interview, you told them that you bought

1   the gun in September?

2   A   I wasn't exactly sure when I bought it.  It was a lot going

3   on then.  I was getting ready to go to prison.

4   Q   But that was only six months after the event?

5   A   Do what?

6   Q   That was closer to the event than we are today.

7   A   I mean, it was a month difference.  I mean June, September.

8   I mean, it was August.

9   Q   June, July, August, September.  And you said in June of

10  2017, a year ago, that you bought it in September.

11  A   I bought it that summer.  I didn't remember the exact date.

12  Q   And they interviewed you for over an hour that day.

13  A   Sir?

14  Q   They interviewed you for over an hour that day.

15  A   I believe so.  They videoed it.

16  Q   And today you said that you bought it for her protection.

17  A   That's right.

18  Q   That was your testimony.  During that interview, June of

19  last year, you told them that you bought it for her for a

20  birthday present.

21  A   Right.

22  Q   All right.  But today you didn't say you bought it for a

23  birthday present.

24  A   It was bought around her birthday.

25  Q   Today you said you used the term "birthday present" in the

1  phone call as code.

2  A   Yes, I did.

3  Q   But you didn't buy it for a birthday present.

4  A   It was bought for protection is what it was bought for.   It

5  was bought for a gift for her.

6  Q   You told agents a year ago you bought it for a birthday

7  present.

8  A   Yes.

9  Q   A year ago during that interview, you didn't tell agents

10  that she was with you when you purchased it.

11  A   I don't believe they asked.   I was trying to protect my

12  wife too at that time.

13  Q   You never said she was with you.

14  A   No, I may not have.

15  Q   You said you bought it for her protection for when you went

16  to prison on the Rankin County charge.

17  A   Yes.

18  Q   And that was a charge of residential burglary?

19  A   Yes.

20  Q   But you didn't go to court?

21  A   I plea bargained.

22  Q   You were explaining the details of -- that led to your

23  arrest in that Rankin County charge earlier.

24  A   Yes.

25  Q   And did you plead guilty in that case because you are

1  guilty?

2  A    Somewhat.   I did not go into the house, but the person that

3  I asked to go with me did go in the house.   And so my lawyer

4  explained to me no matter what I was still guilty, and I was.

5  Q    And you went into the house to retrieve property?

6  A    Yes, I did.

7            MR. RICH:   Your Honor, may I approach for just a brief

8  moment?

9            THE COURT:   Sure.

10     (At the Bench:)

11            MR. RICH:   I'm only asking him questions about

12  circumstances that led to his arrest that -- on that charge

13  because the door is opened for him to explain the circumstance

14  leading to that charge, and he did not plead guilty to

15  possession of firearms in that case.   But it's my understanding

16  that he possessed firearms upon his arrest, and I'd like to ask

17  him a question about that.

18            THE COURT:   Any objection?

19            MS. CASE:   I'm not sure I understand.

20            MS. MIDDLETON:   You're saying that he possessed

21  firearms when he --

22            MR. RICH:   He was indicted --

23            MS. MIDDLETON:   -- was arrested?

24            THE COURT:   We're making a transcript.   This is your

25  witness.

1              MS. CASE:  I'm not sure I understood.  You're saying

2        the door was opened to firearms at that time?

3              MR. RICH:  Because explanation of the circumstances

4        surrounding those charges were asked about, and he was charged

5        with possession of firearms.

6              MS. CASE:  The questions had to do with his -- what

7        led him to being arrested, which was not appearing for a

8        sentencing on a charge he pled guilty to.

9              THE COURT:  Are you objecting to something?

10             MS. CASE:  Yes, Your Honor.

11             THE COURT:  On what basis?

12             MS. CASE:  On the basis that the door that Mr. Rich is

13       speaking of has not been opened.  The questions of Mr. Beard

14       backed from why were agents arresting you in December of 2016,

15       because I did not show up for my sentencing because I had pled

16       guilty to a charge of home invasion.  We did not explore any

17       other charges that were hanging out there.

18             THE COURT:  Right.  His point would be that you didn't

19       go into everything that actually involved the circumstance.

20       But whether the door is open or not, I need to start with why

21       you think it's admissible.

22             MR. RICH:  I think it's admissible to show that there

23       were other charges that he didn't plead to.  He's saying that

24       he pled guilty for a plea bargain.  I think it goes to his

25       motive in that case to plead as it goes to his motive in this

1    case to plead.

2            THE COURT:  All right.  I'm going to allow it.

3       (Bench Conference Concluded)

4    BY MR. RICH:

5    Q   Mr. Beard, you said on that Rankin County charge you

6    decided to reach a plea deal.

7    A   Yes.

8    Q   You were indicted on that case for possession of firearms,

9    weren't you?

10   A   No, no.  I was never indicted on possession of firearms.

11   Q   Were firearms found?

12   A   Firearms were found in my truck the day I was arrested, but

13   I don't believe -- I may have been indicted, but they were

14   dropped.

15   Q   But they were dropped.

16   A   Right.

17   Q   As part of a plea deal.

18   A   As part of the plea.

19   Q   So part of your motive for pleading in that case was to

20   avoid one charge and get a reduced sentence on the house

21   burglary.

22   A   It was getting a reduced sentence, yes.

23   Q   You mentioned earlier that when were you discussing your

24   marriage to your wife that you bought the gun for her

25   protection.  And you mentioned that it was solely for her

1   protection.  You lived in a bad neighborhood.

2   A    Right.  Both our protection until I went to prison.  I

3   didn't want to leave her alone there with just her and the dog

4   in that neighborhood.

5   Q    And you married her so she could visit you in prison?

6   A    We were in love, yes, and she could visit me in prison and

7   be there for me.  I left her with everything I had so she could

8   take care of me in prison.

9   Q    Before you married her, you owned that building by

10  yourself?

11  A    Yes.  I was in purchasing, yes, buying it.  It was put in

12  my name before we were married when I paid the tax off on it.

13  Q    And there was a tax sale on that property?

14  A    Right.  The gentleman I was purchasing it from did not pay

15  the taxes, and it came up for sale for taxes.

16  Q    So you're telling the jury your marriage had nothing to do

17  with protecting your property?

18  A    Do what?

19  Q    Your marriage had nothing to do with protecting your

20  property?

21  A    Well, sure.  I mean, I left everything to her.  Hopefully

22  when I got out in a year and a half, two years, I would be able

23  to come home to my wife, my buildings, my cars and stuff.  Yes,

24  I was definitely hoping for that.

25  Q    You mentioned earlier that you didn't go to court in

1  October of 2016 in Rankin County because Ms. Beard wouldn't

2  drive you.

3  A    Yes.  We had gotten -- we were -- planned to get up that

4  morning and go to my sentencing.  I got up and I got in the

5  shower.  And we were already late, and I came back out and she

6  was refusing to go with me to drive me or anything because the

7  windshield was busted out of the Yukon.  We had been in a fight

8  prior to that, and I was not going to drive myself there and

9  leave my vehicle in the parking lot.

10  Q    So you were more concerned about the status of your

11  property than going and turning yourself in?

12  A    At that time I was using drugs.  I was -- I wasn't thinking

13  right.  I should have went and turned myself in.  I wouldn't be

14  here.

15  Q    Let's talk about that drug use.  You said that the

16  methamphetamine in the house was yours.

17  A    Yes, it was.

18  Q    The rig that we saw a picture of, and rig -- by "rig," I

19  mean the syringe.

20  A    Yes.

21  Q    That was loaded?

22  A    Yes.

23  Q    Was yours?

24  A    Yes.

25  Q    And you were using methamphetamine multiple times a week?

1   A   Yes.

2   Q   And you were injecting it?

3   A   Yes.

4   Q   And you just said during that time you were messed up.

5   A   Yes.  That syringe had been laying there for three days.

6   Q   And you were using multiple times a week.

7   A   Yes.

8           MR. RICH:  Court's indulgence.

9           THE COURT:  Of course.

10  (Short Pause)

11  BY MR. RICH:

12  Q   Mr. Beard, I'm showing you what's been marked as G-33(j).

13  You identified this earlier as a drawer on your side of the

14  bedroom.

15  A   Yes, sir.

16  Q   And there are multiple methamphetamine baggies in this

17  drawer.

18  A   Yes, there are.

19  Q   And there is, for lack of a better term, a stack of cash in

20  the drawer.

21  A   About $200.

22  Q   And there's also a .22 bullet in the drawer.

23  A   Yes.

24  Q   And that .22 bullet is in your drawer.

25  A   Yes, it is.

1   Q   Where did you get these shotgun shells?

2   A   From my father, and my father was -- lived in Vicksburg

3   when he passed away.  He was a hunter and Warren County deputy

4   at one time.  And different ones he had collected and stuff.

5   When he passed away, that was some of the stuff I got from

6   there.

7   Q   All the ammunition came from your father?

8   A   I'd say 90 percent of it, yes.

9   Q   When you were interviewed last year, you told ATF agents

10   that you bought a bunch of junk from some guy.

11   A   Yeah.  That's where some of it come from, the clips.  The

12   rounds that are -- I don't even know what they are, they are

13   some kind of AK rounds or something that come from him.

14   Q   You've given two statements to ATF agents.  Is that

15   correct?

16   A   No, one that he come to see me at Greene County.

17   Q   Did people come interview you about a week and a half ago?

18   A   No, I came here and we talked here, yes.

19   Q   Two interviews were conducted with you?

20   A   Yes, yes.  I was -- it wasn't ATF.  It was the government

21   there.

22   Q   And in both of those interviews, you never mentioned

23   anything about this ammunition coming from your father.

24   A   Yes, I did.  Maybe not the first one, you know, but I did

25   on the ones here.

1   Q   You said that -- Mr. Beard, you said earlier that your

2   wife -- you saw her fire the gun, this Taurus, twice into the

3   air one evening.

4   A   I didn't see it.  She was behind me.  She fired it.  I spun

5   around.  It was in her hand.  There was a little shed from the

6   back neighborhood went through our fence.  We have a fence, big

7   security fence, be around it.  It was in our property.  She

8   fired it in the air, and I turned around and she was hollering,

9   *Next time I'm going to put one in your ass.*

10   Q   It was loud?

11   A   Yeah.

12   Q   Fired it twice.

13   A   Yeah.  She was behind me.

14   Q   So the gun was loaded.

15   A   Yes, it was loaded.

16   Q   And it frightened you?

17   A   Yes.  It scared the mess out of me.  I wasn't expecting it.

18   Q   And you didn't take the gun away from her that night?

19   A   No.

20   Q   But you took the gun away from her at some point, you said

21   earlier.

22   A   Right.

23   Q   You said you gave it to a man named Todd Bates.

24   A   Todd Bates.

25   Q   And you said you didn't know that the gun was still there.

1   A   Todd was supposed to be holding it, and either Todd or his

2   twin brother, Tim, must have gave it back to her.

3   Q   Mr. Beard, I'd like to -- do you still have a copy of your

4   transcript?

5   A   Yes.

6   Q   I'd like to direct you to that transcript. You see on the

7   second of that transcript, you asked her, "Heather," on this

8   telephone, "Did they find your birthday present?"

9   A   Right.

10   Q   You asked her.

11   A   Right.

12   Q   You asked her about something that you believed did not --

13   was not still in the house.

14   A   It was not supposed to be in the house.

15   Q   Why would you ask her about something that was not supposed

16   to be in the house?

17   A   I had found out she had been talking to Tim Bates --

18   romantically involved with Tim Bates.

19   Q   This Winchester rifle, you said you weren't sure who put it

20   in the gun safe?

21   A   There was a lot of stuff moved in and out. Sometimes there

22   were things -- some stuff taken out of there and sold because

23   we needed the money. And I'm not actually sure which one of us

24   put it in there. Like I said, it was, at the time, all rusty

25   and brown, and it was a piece of junk.

1  Q   But a week and a half ago you told members of the U.S.

2  Attorney's Office and Agent Robichaux that she put it in the

3  gun safe.

4  A   Right.

5  Q   You made that definitive statement a week and a half ago.

6  A   Got to thinking about it, and I told them the next week it

7  might have been either me or her.

8  Q   And then a year ago when they interviewed you, you said --

9  let me ask you about that interview a year ago.  You were read

10 your *Miranda* rights before that interview, weren't you?

11 A   Yes, I believe so.

12 Q   That interview was video and audio recorded, wasn't it?

13 A   Yes, it was.

14 Q   And again they told you that it was a federal felony to

15 give a false statement to a law enforcement officer.

16 A   That's right.

17       THE COURT:  Mr. Beard, do me a favor and stay close to

18 that mic.  Okay?

19       MR. BEARD:  Okay.

20 BY MR. RICH:

21 Q   During that interview, you said, "I just threw it in the

22 gun cabinet with the air rifles we have."  That was your

23 statement in June of last year.

24 A   That's probably true.

25 Q   At first when you were asked by -- let me ask one more

1  question before we go here.  You mentioned earlier today that

2  Ms. Beard shot that Taurus -- pulled the trigger on that Taurus

3  three times.

4  A    In my face.

5  Q    In your face.

6  A    Yes, in the shop area, the garage area.

7  Q    A year ago you didn't tell law enforcement that, did you?

8  A    No, I did not.

9  Q    A year ago when you -- when you did that interview with law

10 enforcement, you told them that .22 Winchester rifle was not a

11 working firearm.

12 A    That's right.  I did tell them that.

13 Q    You believed that?

14 A    I believed that because it doesn't have a serial number.

15 And the shape it was in and where I found in a vehicle with

16 leaves all over it, I wasn't going to try and fire it.

17 Q    But you've since learned that it is a working firearm.

18 A    After I was told that the ATF fired it, I was showed a

19 report to where they fired it.  So, I mean, I have to go by

20 their report is all I know.

21 Q    Earlier today you mentioned that after you found the

22 firearm you called the owner of the vehicle that you had

23 purchased.

24 A    Buddy of mine I had got it from, yes.

25 Q    A year ago during that interview with ATF, you stated about

1   that firearm, that Winchester rifle, "It was in a vehicle.   It

2   was in the back.  It didn't have a serial number or nothing on

3   it so I Googled it."

4   A    So I what?

5   Q    "I Googled it," in reference to how you knew it was not a

6   working firearm.

7   A    Right, right.

8   Q    You never told them that you called the man who owned it.

9   A    I did.  I just didn't tell them.  I called Dax.  He told me

10  that, and I Googled.  And they used to bring them into the

11  schools when I was six or seven years old.  The game wardens

12  used to do a hunting and safety course in the schools.  Of

13  course, they wouldn't bring a firearm in that would fire.

14  Q    But you didn't tell them that day what you're telling us

15  today.

16  A    I told them I believed that it was a hunting safety course

17  weapon, yes, I did.

18  Q    But you did not tell them that you called the owner of the

19  gun?

20  A    No.  I probably didn't mention Dax's name.

21  Q    So let's go through some things that we've gone over today.

22  So a year ago you didn't tell ATF agents about her shooting the

23  gun three times -- or three times at you unloaded.

24  A    No, I did not.

25  Q    You told the agents that the Winchester rifle was not a

1  working firearm.

2  A   That's right.

3  Q   And it is a working firearm.

4  A   I did not know that at that time.

5  Q   A year ago you told ATF agents that you put the gun in the

6  gun cabinet.

7  A   Okay.  I may have.  I'm sure I did.

8  Q   A week and a half ago you told members of the U.S.

9  Attorney's Office that Heather put the gun in the gun cabinet.

10  A   Right.  Could have been Heather or I.  And at that time too

11  I was trying to protect my wife from getting charges.

12  Q   And now you're not trying to protect her.

13  A   She's been charged.

14  Q   Now you're not trying to protect her.

15  A   No, I'm telling the truth.

16  Q   Since those statements a year ago, between a year ago and

17  today, you believe that your wife is having an affair with

18  someone?

19  A   Having what?

20  Q   An affair.

21  A   She definitely was.  He's living in my house sleeping in my

22  bed.  There's a report from the probation officer that he was

23  naked in my bed.

24  Q   You believe that your wife has sold some of your property.

25  A   My wife sold -- yes, she sold a lot of my stuff.

1  Q    You're unhappy with your wife because she hasn't put enough

2  money on your jail account.

3  A    I have plenty of money on my jail account.  My niece put

4  $3,000 on there for me.

5  Q    But you're unhappy with her because she has not put money

6  on your jail account.

7  A    I'm unhappy with my wife because she has not been loyal to

8  me and stood by me.

9  Q    Since those statements a year ago today, you pled guilty in

10  this case.

11  A    Do what?

12  Q    Since you gave statements to ATF agents a year ago, you

13  pled guilty in this case.

14  A    Yes, I have.

15  Q    And you have not been sentenced in this case.  Correct?

16  A    Correct.

17  Q    But you have received a copy of your presentence report?

18  A    Yes, I have.

19  Q    So now you have an idea of how much time you're facing in

20  the case?

21  A    Yes, I do.

22  Q    And --

23  A    Nine years.

24  Q    And you hope to reduce that by cooperating with the

25  government?

1  A   That's up to the judge.  Yes, I'm praying for it, but it's

2  up to the judge.

3  Q   So in the Rankin County charge case, you were found with

4  firearms.  Is that correct?  Firearms?

5  A   Yes.

6  Q   And you reached a plea deal in that case?

7  A   Yes.

8  Q   In this case, there were guns found in the house.  Correct?

9  A   Yes.

10  Q   And you're cooperating after finding out how much time you

11  were facing?

12  A   I'm cooperating because I was shown definitive proof that

13  my wife had a naked man in my bed.

14  Q   You're cooperating because you're angry with your wife?

15  A   I'm upset with my wife, yes.  But I'm telling the truth.

16  Q   Which the statements that you've made today differ from the

17  statements that you've given to ATF agents in the past.

18  A   Yes.  I was trying to protect my wife when they came to

19  Greene County.  She was not charged at that time.

20  Q   Let me ask you one other question.  I can't remember did

21  you say earlier that you pled guilty in the Rankin County case

22  to home burglary because you were guilty?

23  A   Yes.  Yes, I was guilty.

24          MR. RICH:  Court's indulgence.

25      (Short Pause)

1        MR. RICH:  Your Honor, with tender the witness.

2        THE COURT:  All right.  Redirect?

3        MS. CASE:  Your Honor, may we approach briefly?

4        THE COURT:  Yes.

5    (At the Bench:)

6        MS. CASE:  Your Honor, on redirect I intend to seek to

7   introduce Government's Exhibit 17(a), at least clips of it.

8   This will be under the prior consistent statement rules of

9   evidence.  Mr. Rich has not seen the clipped portions of the

10  interview that he's been discussing with Mr. Beard.  Mr. Beard

11  hasn't seen them either, but unless we -- I was trying to think

12  if he should get an opportunity to see how we clipped it to

13  make sure he does not have an objection to where we start and

14  stop the conversation, principally because there are things

15  from the motion in limine that should not be revealed to the

16  jury.

17       THE COURT:  All right.  It's 12:00 and you probably

18  want to see it before -- you have a right to see it before they

19  use it.  We'll go ahead and take the lunch break at this point.

20  I'm going to instruct you client not to leave the building.

21       MR. RICH:  I think that's a good idea.  Please do.

22       THE COURT:  So if you want to arrange for somebody to

23  bring her lunch or something.  I'll say that after the jury's

24  gone.

25    (Bench Conference Concluded)

1          THE COURT:  All right.  Ladies and gentlemen, it's

2     almost noon.  There is some housekeeping work that I need to do

3     with the attorneys.  And instead of having you sit there

4     through it, I'm going to go ahead and let you take your lunch

5     break.  I'll ask you to come back at 1:00.

6          Remember don't talk to anybody in or around the

7     courthouse.  Don't do any research.  Don't communicate with

8     anybody about the case.  Keep an open mind because you have not

9     heard all the evidence.  Leave your notepads in your chair, and

10    I hope you have a good lunch, and I'll see you at 1:00.

11         (Jury Out)

12         THE COURT:  All right.  Mr. Beard, during the lunch

13    don't speak with anybody about the case.  Okay.  Ms. Beard, I'm

14    instructing you not to leave the building.  There's some

15    machines down in the basement that have some food, and,

16    Mr. Rich, you can arrange to get her something else if that's

17    not sufficient.

18         My understanding is that -- have you ever received a

19    copy of the transcript that's in issue here?

20         MR. RICH:  I have not, Your Honor.  I understand

21    there's clips of certain videos.  I have seen the videos in

22    their whole but not the clipped version.

23         THE COURT:  Okay.  Let me ask you to go ahead and look

24    at that and if there are issues that need to be addressed

25    before the jury comes back in, just send a note back and we can

1  come back in maybe a couple of minutes early and knock that

2  out.  Anything else before we break for lunch?

3           MS. CASE:  No, Your Honor.

4           THE COURT:  Court's in recess.  Thank you.

5      (Recess)

6           THE COURT:  All right.  Ms. Case, I understand there's

7  something that you need to authenticate, but there's no way to

8  do it technologically with the jury in the room.  Is that

9  right?

10           MS. CASE:  That's right, Your Honor.

11           THE COURT:  Okay.  Mr. Rich -- I suppose what you want

12  to do it right now?

13           MS. CASE:  We would like to, yes, Your Honor.  We have

14  four rather short video clips that we'd like to have Mr. Beard

15  authenticate so that then we could proceed with the jury as to

16  what's on them.

17           THE COURT:  All right.  Any objections?

18           MR. RICH:  No, Your Honor.

19           THE COURT:  All right.  You may proceed.

20           EXAMINATION OUTSIDE THE PRESENCE OF THE JURY

21  BY MS. CASE:

22  Q   These clips are marked as Government's Exhibit 17(a)

23  through 17(d), and Mr. Beard we're going to play them

24  one-by-one starting with 17(a), and I'll ask that you review

25  them and tell us if you recognize them.

1      (Clip Played)

2   Q   The next one will be 17(b).

3      (Clip Played)

4   Q   This next clip is Government's Exhibit 17(c).

5      (Clip Played)

6   Q   And the last clip is Government's Exhibit 17(d).

7      (Clip Played)

8   Q   Mr. Beard, do you recognize what you just saw and heard?

9   A   Yeah.  That's the videos from Greene County last year.

10  Q   Who's speaking in those videos?

11  A   I was, an ATF officer.

12  Q   Are these accurate recordings of the portions of your

13  interview with ATF?

14  A   Yes.  This is the interview with ATF.

15      MS. CASE:  Your Honor, the government would move to

16  admit into evidence what has been premarked as Government's

17  Exhibits 17(a) through 17(d).

18      THE COURT:  Any objection?

19      MR. RICH:  No objection.

20      MS. CASE:  We would ask that we be able to publish

21  those to the jury.

22      THE COURT:  Of course.  17(a) through(d) are admitted.

23      (Exhibit D-17(a) through 17(d) marked)

24      THE COURT:  Are we ready to bring the jury back in?

25      MS. CASE:  We have one audio clip that might be

1  appropriate to go ahead and do it at this time.  It's a short

2  clip as well.  And it will be marked for identification as

3  government's 22(c).

4      (Clip Played)

5  BY MS. CASE:

6  Q   Mr. Beard, do you recognize what you heard?

7  A   Yes.  It was a phone conversation between Heather and I

8  when I was at Rankin County jail.

9  Q   Is that an accurate recording of that phone conversation?

10 A   Yes, it was.  Yes, it is.

11         MS. CASE:  That's all, Your Honor.  At this time we

12 would just ask that that be marked for identification purposes.

13         THE COURT:  All right.  It will be marked for

14 identification.

15         MS. CASE:  This is 22(c).

16     (Exhibit G-22(c) for ID marked)

17         MS. CASE:  I believe that's all we have before the

18 jury comes in, Your Honor.

19         THE COURT:  Okay.  Mr. Rich, anything before we bring

20 the jury back?

21         MR. RICH:  No, Your Honor, other than G-22(c), that's

22 the recording of that jail transcript that I filed the motion

23 on.  And since they haven't sought to introduce it, I don't

24 think it's appropriate for me to make an objection.  But

25 just -- I'm sure the court knows I intend to renew my objection

1   to a portion of that jail call.

2          THE COURT:  I understand.  And based on our

3   conversation yesterday, Ms. Case, I think you indicated that

4   you would bring to it my attention outside the presence of the

5   jury before you tried to introduce it.

6          MS. CASE:  That's right, Your Honor.  We just took the

7   opportunity to authenticate it while we're here.

8          THE COURT:  I understand.  All right.  Anything else?

9          MS. CASE:  No, Your Honor.

10         THE COURT:  All right.  Shone, will you get the jury.

11     (Jury In)

12         THE COURT:  All right.  Thank you.  You may proceed.

13         MS. CASE:  Thank you.

14                  REDIRECT EXAMINATION

15  BY MS. CASE:

16  Q   Mr. Beard, Mr. Rich asked you had a series of questions

17  about what you told ATF agents in this case.  Do you recall

18  when -- do you recall being interviewed by ATF agents?

19  A   I do.

20  Q   And did that interview take place about a year ago?

21  A   Yes.

22  Q   I'm going to play Government's Exhibit 17(b) and ask you

23  some questions about it after it plays.

24  A   Okay.

25  Q   Excuse me, 17(a).

THE COURT:  Ms. Case, hang on a second.  I'm sorry.

Ladies and gentlemen, I hate to do this to you, but I'm going

to ask you go back to the jury room for just a minute.  Okay.

   (Jury Out)

THE COURT:  All right.  Before lunch, I had instructed

Ms. Beard not to leave the building.  My understanding is that

she did leave the building.  I don't think she left the

premises, but she left the building.  I asked probation to run

a drug test when she did come back, and my understanding -- and

I'll ask the officer here in a second.  My understanding is

that she tested positive.

Brooke, why don't you come up here for a second.  All

right.  Officer Sullivan, will you just tell me the results of

the drug test.

PROBATION OFFICER:  The defendant tested positive for

amphetamines and methamphetamine.  She admitted that she took

Adipex that did not belong to her a couple of days ago which

would test positive for the amphetamine.  Methamphetamine will

only test positive if it is methamphetamine.  She denied use or

said it had been several months since she used ice, but that

there is no meth anymore.  Nobody makes meth, that it's ice.

Of course, ice is methamphetamine, as Your Honor I'm sure is

aware.

THE COURT:  Okay.  All right.  Thank you.  Stick

around, though.  Counsel, my concern is we're getting near the

1    end of the trial here.  She's going to have to make a decision

2    whether to testify or not, and she's just tested positive for

3    methamphetamine.  I've never had this situation before, but

4    here it is, and I guess I would welcome your input on the

5    appropriate next step.  Obviously at some point outside the

6    presence of the jury you need to talk about revoking her bond.

7    But in terms of going forward, I'm not sure what -- I want to

8    hear from both sides.

9            MR. RICH:  Your Honor, I understand we need to have

10   this discussion.  I don't know if this is something that we

11   should do outside of the presence of the current witness.

12           THE COURT:  That's fine.  Would you take him back.

13      (Witness Removed from the Courtroom)

14           THE COURT:  So I guess, let me hear from the

15   government first.

16           MS. CASE:  Your Honor, I'm a little bit stumped is my

17   first reaction.  We might have to back up even before the

18   possibility of testifying to the ability to assist her counsel

19   effectively, and there may need to be a hearing on that.

20           THE COURT:  Mr. Rich.

21           MR. RICH:  Your Honor, I can say that throughout today

22   when Mr. Beard has been present with me yesterday when she was

23   present with me that she participated in her defense.  She

24   asked questions to me that showed me that she was paying

25   attention to testimony during the trial, evidence that was

1    introduced.  She participated in jury selection.  They made

2    notes about potential jurors, and we discussed those notes, and

3    she was with me every step along the way up until now up until

4    this discussion.  She's been participating in her defense.

5         Prior to this trial, we've had multiple telephone

6    conversations.  She's come to my office, and she and I have

7    discussed where the case stood, the evidence in the case and

8    I've never had any -- I've never had any doubt that Mr. Beard

9    knew -- knew the full extent of the charges that she was

10   facing.

11        I've never had any doubt that she did not understand

12   the full extent of the discovery materials that were provided

13   to us, and that she was -- that she had had an inability to

14   make a rational decision on how to proceed, whether to go to

15   trial or reach a plea deal or anything that we've been doing

16   here this week.  There have been no red flags to me, Your

17   Honor.

18        THE COURT:  I suppose -- I suppose one option is to if

19   she chooses to speak, to hear from Ms. Beard and just confirm

20   what Mr. Rich just told me and to see when -- the last time she

21   consumed meth was and whether she's under its influence at this

22   time.  I'm not sure what else to do.

23        MS. CASE:  Your Honor, should there be at least a

24   brief colloquy now to confirm now that she has tested positive

25   to ensure her current state is appropriate?

1          THE COURT:  That's what I'm asking.  That's what I'm

2 suggesting.

3          MS. CASE:  Okay.  Oh, to do it right now?

4          THE COURT:  Right.  You say "colloquy," you mean

5 between me and her.  Right?

6          MS. CASE:  Yes, Your Honor.

7          THE COURT:  That's what I'm proposing.

8          MS. CASE:  We would agree with that, Your Honor.

9          THE COURT:  Mr. Rich, would you like to speak with

10 your client for a minute before we go any further?

11          MR. RICH:  If we could, Your Honor.

12          THE COURT:  Okay.  Why don't you go -- are there any

13 witnesses in the witness room?

14          MR. RICH:  Not that I know of.

15          THE COURT:  All right.  But she is not going past that

16 courtroom door.

17          MR. RICH:  Correct, Your Honor.

18          THE COURT:  All right.

19    (Recess)

20          THE COURT:  All right.  We've had a couple of minutes

21 to allow Mr. Rich to meet with his client, but also I guess I

22 see some reinforcements in the room.  This -- as I said, I'm

23 not sure procedural what is the correct step here.  Ms. Case,

24 have you had a chance -- or Ms. Middleton an opportunity to

25 have somebody look at that already?

1          MS. CASE:  We have attempted to confer in the brief

2     recess.  Just from experiences at other types of court

3     proceedings, if the defendant were to test positive for

4     something like this, the proceeding would probably not proceed.

5     I hate to say that, but that's the direction we're leaning

6     right now, Your Honor.

7          THE COURT:  You think the safe course would be to

8     declare a mistrial and start again Monday morning?

9          MS. CASE:  One moment, Your Honor.

10     (Short Pause)

11          MS. CASE:  To answer that question, Your Honor, what

12     we're attempting to discuss is whether we know when Ms. Beard

13     last was affected by drugs, and we're asking probation if they

14     know that answer.

15          THE COURT:  I asked her the same thing.

16     (Short Pause)

17          MS. CASE:  Reluctantly we believe that's right, Your

18     Honor.  Your suggestion?

19          THE COURT:  All right.  Officer, would you grab a

20     microphone.  Ms. Sullivan, I had asked you when you gave me the

21     report your understanding of how long methamphetamine will

22     remain in the system and show up on a test.  And just for the

23     record here, what was your advice to me?

24          PROBATION OFFICER:  The defendant would have had to

25     use methamphetamine within the last 72 hours, give or take

1    eight hours or so.  But it doesn't stay in your system much

2    longer than that at all.

3            THE COURT:  Okay.  Thank you.  All right.  Mr. Rich,

4    the government has indicated that with that information that

5    the most prudent course here would be to declare a mistrial and

6    start over.  Do you have a position?

7            MR. RICH:  Your Honor, I think my position and my

8    client's position are in conflict.  I would agree that that's

9    prudent.  I've instructed Ms. Beard that what will probably

10   happen as a result of a mistrial is she will probably be taken

11   into custody and will be held in custody until we have the next

12   trial.

13           THE COURT:  Well, I intend to -- I'm sorry.  I

14   interrupted you.  Go ahead and finish.

15           MR. RICH:  During that discussion, she told me she

16   does not want a mistrial declared and that she would wish --

17   she wishes to proceed with the trial that we're currently

18   participating in.

19           THE COURT:  All right.

20           MR. RICH:  I can say normally I would agree.  My

21   client has instructed me.  Her wishes differ than from what I

22   would normally advise.

23           THE COURT:  Will she put on any evidence to contradict

24   the drug test?  Obviously, Ms. Beard, you can testify if you

25   want.  But you have the right to remain silent, and it's a

1    decision that only you can make.  Mr. Rich can't make it for

2    you.  But, Mr. Rich, why don't you chat with your client for a

3    second.  But are you going to put on evidence that the drug

4    test was somehow incorrect?

5              MR. RICH:  Your Honor, the only evidence that we could

6    offer is her statement saying that she did not use.

7              THE COURT:  But she's not -- is she going to exercise

8    her right not to testify?

9              MR. RICH:  Just a moment.

10             THE COURT:  Of course.

11        (Short Pause)

12             MR. RICH:  Your Honor, there's still somewhat of a

13   conflict of positions.  Ms. Beard has informed me that she

14   denies drug use and is -- she believes herself to be competent.

15   I asked her whether she wanted to make a statement, a sworn

16   statement, about either of those.  I told her that I would

17   advise against that and she was unable to come to a decision on

18   either of those and it seems to me out of just pressure of the

19   moment.  During these discussions, she has seemed to be

20   competent.  She's understood what I have told her and what the

21   effects will be here today, the effects of a mistrial versus

22   going forward with a trial.  But at this point, she's not

23   willing to make a statement.

24             THE COURT:  Okay.  Yes, ma'am.

25             MS. CASE:  Your Honor, before the court makes its

1  decision, will Ms. Beard be given a colloquy so that we can

2  maybe assess what her mental state is?

3        THE COURT:  So my concern -- and I'll let both sides

4  address it -- is that according to the probation officer,

5  methamphetamine stays in your system for about 72 hours such

6  that it could be detected, give or take.  This is the second

7  day of trial.  And I don't know what state she was in yesterday

8  when we were selecting the jury.  Counsel indicates that they

9  were communicating and that she was participating.  But if she

10  was under the influence of methamphetamine, I don't know that

11  her participation was the same as it would have been had she

12  not taken methamphetamine.  And with that, I'll let you give me

13  your thoughts.

14        MS. CASE:  Well --

15        THE COURT:  In other words, she's probably not in the

16  same condition she was right now as when she started.

17        MS. CASE:  One concern is that she's is in the same

18  condition and that she's continued to take methamphetamines

19  throughout the trial such that she's maintained whatever the

20  current mental state is, and Mr. Rich would be a good judge of

21  that.  But to assess -- to validate Mr. Rich's belief about

22  Ms. Beard's current mental state, a colloquy would be of

23  assistance at least to the government.

24        THE COURT:  Well, he's just indicated she's not

25  willing to give a statement about her drug use, and I don't

1  know how much -- that's certainly something I would go into.  I

2  just -- I just think there's a taint here that I can't fix so I

3  am going to declare a mistrial.  I was supposed to start a

4  week-long trial next Monday, so my calendar is clean.  How do

5  your calendars look?

6         MS. CASE:  Your Honor, speaking for the government,

7  I've had a death in my family overnight.

8         THE COURT:  I just -- I'm sorry.  Go ahead.

9         MS. CASE:  I expect to be out of town Monday and

10  perhaps Tuesday.

11         THE COURT:  I'm sorry.  So next Wednesday?

12         MS. CASE:  We had looked at our calendars, and the

13  27th is the best day that works for -- the best day in the

14  immediate future that works for the government but --

15         THE COURT:  Mr. Rich, how do you look on the 20th?

16         MR. RICH:  The 20th, Your Honor?  We have -- I have

17  court in multiple locations that day, Your Honor.  I have a

18  preliminary hearing that morning, and I've got a trial that

19  afternoon.

20         THE COURT:  What about the 21st?

21         MR. RICH:  21st I have court in three different courts

22  that day.

23         THE COURT:  Cherie, let's go off the record for this.

24     (Off Record)

25         THE COURT:  The case will be reset for the 28th.  Let

1   me -- I want to excuse the jury because they are sitting back

2   there.  If there's no objection -- we obviously have some more

3   business to take care of, but if there's no objection I may go

4   back and thank the jury for their service and excuse them.  Any

5   objection to that?

6          MS. CASE:  No, Your Honor.

7          MR. RICH:  No, Your Honor.

8          THE COURT:  All right.  In the interim, we'll take a

9   recess here.  It's 2:00.  The -- obvious next issue has to do

10  with the defendant's bond, and there are a couple of issues on

11  the table there.  One has to do with the fact that she was late

12  yesterday, she was late yesterday afternoon, she was late this

13  morning, on top of what appears to be a violation of her terms

14  of supervised release -- terms of her bond.

15         So procedurally I think the statute says she's

16  supposed to go back before the judge that entered the initial

17  bond, but there may be a -- there may be a way around there,

18  but it's 18 USC Section 3148, I think.  3148.  Let's take a

19  20-minute recess and I'll let everybody take a look at those

20  issues as I excuse the jury.  We're in recess.

21     (Recess)

22         THE COURT:  I want to put one more thing on the record

23  here.  Obviously the drug test that I have indicating, drug

24  use, it is a primary basis for declaring a mistrial.  But I

25  also for the record feel compelled to say that the defendant's

1   behavior in the courtroom was in my opinion abnormal.  I don't

2   normally see defendants reacting throughout the trial the way

3   that this defendant did.  She might just be highly emotional,

4   but it was part of the reason why I was concerned enough to

5   order a drug test, that and her being late and leaving the

6   building when I told her not to.  So it wasn't just the test

7   itself.  I just saw too much going on and felt like I needed to

8   see whether or not she was on drugs because I was concerned

9   that if she was, that it would be basically an invalid trial so

10  that's why I made that decision.  All right.  We're in recess.

11      (Recess)

12          THE COURT:  All right.  I want to do a little

13  housekeeping again with respect to the drugs that the defendant

14  appears to have taken.  Apparently she admitted to taking

15  another medication, something other than the methamphetamine.

16  Officer Sullivan, you have some information on the -- I guess

17  the side effects of the medication that she admitted taking to

18  you?

19          PROBATION OFFICER:  Yes, sir.  Among others are --

20  possible side effects are aggressiveness, irritability,

21  hyperactivity, restlessness, and a long list of others.

22          THE COURT:  Okay.  That's certainly consistent with my

23  observations.  So the next question here, is there a motion

24  from the government with respect to bond.

25          MS. MIDDLETON:  Yes, Your Honor.  The government is

1    requesting that the defendant's bond be revoked.  However, it

2    is our understanding that under 3148(c) the court could -- if

3    the court found the defendant in contempt, the court could

4    proceed sue sponte.  However, if we are proceeding on the

5    revocation, it would have to be before a magistrate judge and

6    in this instance Judge Ball, I believe.

7          THE COURT:  Yeah.  I wondered about that myself.  The

8    statute itself says to the extent practicable that the

9    defendant would be taken in front of the original judge.  And

10   in this case, Judge Ball has no knowledge of all the different

11   things that I've observed in the last 48 hours.  I don't even

12   know if he's available.  First of all, let me hear from the

13   government.

14         MS. MIDDLETON:  The government has no objection to the

15   court proceeding under -- and we do understand that the

16   observations that were made were made by this court, and that

17   information would have to be otherwise conveyed to the

18   magistrate judge and his unavailability would make it

19   practicable for it to be here in the district court.

20         THE COURT:  All right.  Mr. Rich?

21         MR. RICH:  Your Honor, I'd like to check to make sure

22   if Judge Ball's available, if that's what the statute calls

23   for.

24         THE COURT:  I don't know if he is or not, but I think

25   that Judge Ball -- I would have to testify, I think, to tell

1   him all the things I've seen, which doesn't seem practicable to

2   me.  I suppose I have two options.  One, I could proceed as a

3   bond revocation issue or I could treat this as a matter of

4   criminal contempt or summary contempt, more likely, and proceed

5   that route.  Seems to me the cleaner route is to take it as a

6   bond issue.  You want a minute -- as much time as you need.

7   We're not in a rush.  The jury's been excused.

8           MR. RICH:  I think our arguments would be the same

9   regardless of how I proceed, Your Honor.

10          THE COURT:  All right.  Just for the record, is

11  there -- I would propose to handle this as a bond revocation

12  issue that I would handle.  Is there an objection to that?

13          MR. RICH:  No, Your Honor, no objection to that.

14          THE COURT:  All right.  Ms. Middleton, are you

15  handling this?

16          MS. MIDDLETON:  Yes, Your Honor.

17          THE COURT:  All right.  You may proceed.

18          MS. MIDDLETON:  Court's indulgence for just one

19  moment.

20      (Short Pause)

21          MR. RICH:  Your Honor, if I may briefly, Ms. Beard has

22  informed me that she has no objection to her bond being revoked

23  because of the positive screen, but she does have a pet and

24  animal inside her residence and needs to make some arrangements

25  for it if her bond is revoked.

1          THE COURT:  Okay.

2          MR. RICH:  The other issue, Your Honor, for me would

3     be since we're not set for a trial to begin until the

4     28th would be clothing for Ms. Beard for that trial, where that

5     clothing would come from, if it came from her house, the

6     process of getting it from her house and in custody, to bring

7     to the U.S. Marshals, how that would work.

8          So if her bond is revoked, I don't know if it's

9     appropriate for somebody from the marshals to escort her to her

10    residence to get clothing or -- I don't know what the steps

11    need to be, Your Honor.  But she does not oppose her bond being

12    revoked and going into custody because of that screen as long

13    as she has an opportunity to take care of an animal at her home

14    and --

15         THE COURT:  Right.  The -- it appears there have been

16    two individuals accompanying the defendant today and yesterday.

17    One is I think the boyfriend, I assume, from what I saw in the

18    courtroom.  I was working at my window desk this morning when

19    the defendant drove up, and she appeared to be with the

20    boyfriend.  She was certainly with him during lunch.  There

21    was -- which was videotaped by the court security officers at

22    the command center downstairs.

23         There's also another gentleman that I don't know who's

24    I think, been with her today.  And certainly she could make

25    arrangements, you know, to have one of them take care of the

dog.  And, yes, you're right, she will need, by the time we go
to trial, to have some clothes available.

        For what it worth, she showed up this morning in
that -- in what looked to me to be the Yukon in all those
photographs with the windows smashed out.  I think she was in
Mr. Beard's vehicle when she showed up.  Maybe not, but you
were definitely in a big SUV that looked like the one in the
picture with all the windows smashed out.

        The motion having been made -- I guess the motion
having been conceded and based on that plus the fact that it's
clearly in order for a wide variety of reasons, not the least
of which is the positive drug test, I'm granting the
government's motion and revoking the bond.  I will give her
some time here to get on the phone to make arrangements for the
pet and to have somebody pick up some clothing.  I don't know
what you want to do with it, Mr. Rich.  You can keep it at your
office or wherever, but that will need to be arranged before
she leaves.

        MR. RICH:  Yes, Your Honor.

        THE COURT:  Anything else from the government?

        MS. MIDDLETON:  Your Honor, the government would ask
that there be an order entered that this defendant be separated
from Mr. Beard at all times while at Madison County as well as
she be directed not to interact with any potential witness in
this matter until the trial and thereafter.

1      THE COURT: Right. Certainly there's already an order

2  entered that I'll just reiterate. And, Ms. Beard, I'm sure you

3  understand that you're not allowed to have any contact in

4  person, over the phone, through text message, through letters.

5  You're shaking your head. Do you not understand what I'm

6  saying?

7      MS. BEARD: I do understand. I don't want to have any

8  contact with him, Your Honor.

9      THE COURT: Not just him, but any other potential

10  witnesses in this case. You're not allowed to have any contact

11  in any format whatsoever. I will also instruct the marshals to

12  make sure that the defendant is not in the presence of -- are

13  there any other -- I know Mr. Beard's up there. Are there any

14  other detainees that are related to this case?

15      MS. MIDDLETON: To our knowledge, there are no other

16  detainees at this time.

17      THE COURT: Okay. So I enter an order to make sure

18  that she is kept apart from Mr. Beard. I will at some point

19  want to talk to the attorneys. There was obviously testimony

20  given in this case, and we'll need to give a little attention

21  to how we treat that testimony if it's used in the second case.

22  I don't want to indicate to the next jury that there was a

23  mistrial. That might be prejudicial to the defendant. All

24  right. Anything else before we are adjourned?

25      MS. MIDDLETON: Nothing further.

1          MR. RICH:  Your Honor, do we need an order so we can

2 pick these clothes up from the Madison County Detention Center

3 that she's wearing today?

4          THE COURT:  Do you need an order?  I don't know if you

5 need one or not, but if you do, I'm happy to sign it.

6          MR. RICH:  If I could prepare an order and send it to

7 your clerk or administrator --

8          THE COURT:  That's fine.

9          MR. RICH:  Thank you, Your Honor.

10          THE COURT:  I assume there's no objection.

11          MS. MIDDLETON:  None, Your Honor.

12          THE COURT:  Okay.  Anything else, Mr. Rich?  I may

13 have something from the marshal.

14          DEPUTY MARSHAL:  Yes, sir, Your Honor.  If those

15 clothes are released to her attorney in the event she does get

16 a bond or something else along later, some more clothing would

17 have to be provided to the jail for her to be released in.

18 Normally Madison County will take the clothes that they come in

19 and put them in their property for that event.

20          THE COURT:  I don't anticipate her being released

21 before trial.

22          DEPUTY MARSHAL:  Okay.  Thank you.

23          THE COURT:  So and -- but it's a good point.  If we

24 get to the point posttrial and she's acquitted, then Mr. Rich

25 you'll need to make sure that those clothes are pretty quickly

1    delivered.

2            MR. RICH:  I will.

3            THE COURT:  All right.  Anything else?  We're

4    adjourned.

5        (Recess)

CERTIFICATE OF REPORTER

1

2

3    I, CHERIE GALLASPY BOND, Official Court Reporter, United

4 States District Court, Southern District of Mississippi, do

5 hereby certify that the above and foregoing pages contain a

6 full, true and correct transcript of the proceedings had in the

7 aforenamed case at the time and place indicated, which

8 proceedings were recorded by me to the best of my skill and

9 ability.

10    I certify that the transcript fees and format comply

11 with those prescribed by the Court and Judicial Conference of

12 the United States.

13

14    This the 18th day of June, 2018.

15

16    s/ *Cherie G. Bond*
       Cherie G. Bond
17       Court Reporter

18

19

20

21

22

23

24

25

EXHIBIT NO. Ple evid.
CAUSE NO. 3.17cd14072DI-FLB
WITNESS
CLERK: SHONE POWELL

SEP 25 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI

Gina Morris , REPORTER